1               UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

4

5    MARCELO OSCAR BEDETTI,              )
                                         )
6                    Plaintiff,          )
                                         )              Case No.
7         vs.                            )    CV14-09102 DMG (JCx)
                                         )
8    CITY OF LONG BEACH, et al.,         )        (Pages 1 - 97)
                                         )
9                    Defendants.         )
     _____)

10

11

12            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                  TRIAL DAY 1 - MORNING SESSION
13                   TUESDAY, MAY 2, 2017
                         8:51 A.M.
14                 LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22    _____

23          CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                 FEDERAL OFFICIAL COURT REPORTER
24               350 WEST 1ST STREET, SUITE 4311
             LOS ANGELES, CALIFORNIA 90012-4565
25                     (213) 894-3539

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        LAW OFFICES OF MARK PACHOWICZ, APLC
         BY:  MARK PACHOWICZ
5        BY:  JONNY RUSSELL
             Attorneys at Law
6        771 Daily Drive, Suite 230
         Camarillo, California 93010
7        (805) 987-4975

8

     **FOR THE DEFENDANTS:**
9
         LONG BEACH CITY ATTORNEY'S OFFICE
10       BY:  HOWARD D. RUSSELL
             Deputy City Attorney
11       333 West Ocean Boulevard, 11th Floor
         Long Beach, California 90802
12       (562) 570-2200

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, MAY 2, 2017

 2                          8:51 A.M.

 3                           --oOo--

 4          THE COURTROOM DEPUTY:  Calling Item No. 1:

 5   CV 14-9102-DMG; Marcelo Oscar Bedetti versus City of Long

 6   Beach, et al.

 7       Counsel, your appearances, please.

 8          MR. PACHOWICZ:  Good morning, Your Honor.  Mark

 9   Pachowicz on behalf of Mr. Bedetti, who is present.

10          MR. J. RUSSELL:  Good morning, Your Honor.  Jonny

11   Russell on behalf of the plaintiff.

12          MR. H. RUSSELL:  Good morning, Your Honor.  Howard

13   Russell for the defendants.

14          THE COURT:  Good morning.

15       Counsel, I assume you have reviewed a copy of the

16   preliminary instructions.  They are fairly standard, except for

17   the claims and defenses.  I wanted to see if you had any

18   comments on that.

19          MR. PACHOWICZ:  Counsel and I had discussed a couple

20   of things this morning regarding the claims and defenses.  The

21   final pretrial conference order referenced -- in reference to

22   The Bane Act, I think in one place it had six of the defendants

23   and the other it had four.  And as we discussed that, we, I

24   believe, reached an agreement that we would be dismissing

25   The Bane Act claim.
```

```
 1              THE COURT:  Okay.

 2              MR. PACHOWICZ:  The City of Long Beach would

 3  stipulate that if the plaintiffs are successful on the battery

 4  or false imprisonment claim on the state actions, that we would

 5  be entitled to seek attorney's fees as if we had The Bane Act

 6  in place.  And because of that, we would dismiss Officer Bacon

 7  and Foster from the battery claim so that it's consistent with

 8  the Court's ruling regarding the excessive force claim.

 9              THE COURT:  All right.

10              MR. PACHOWICZ:  And then the plaintiffs would not be

11  seeking -- and I think I had mentioned this before -- punitive

12  damages regarding the state claim, which would eliminate the

13  need for the clear and convincing preliminary instruction

14  because I think that's the only place that would be applicable.

15              THE COURT:  So you are not seeking punitive damages

16  under the state law claims?

17              MR. PACHOWICZ:  Yes.

18              THE COURT:  Any of them?

19              MR. PACHOWICZ:  Yes.

20              THE COURT:  Okay.  Anything else?

21              MR. PACHOWICZ:  I think that was the housekeeping

22  that we had discussed.

23              THE COURT:  All right.  Is that consistent with your

24  understanding, Mr. Russell?

25              MR. H. RUSSELL:  It is, Your Honor.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  All right.  That means the claims and

2    defenses instruction will delete the reference to The Bane Act,

3    and the Instruction Number 4 for clear and convincing evidence

4    will be deleted.

5          Any other issues with regard to the preliminary

6    instructions?

7          MR. PACHOWICZ:  I do have a question, and that would

8    be with regard to the claims and defense on the negligence.  My

9    understanding of the final pretrial order and the bifurcation

10   was that was going to be in phase 2, and I didn't know if --

11         THE COURT:  Well, is negligence only pertaining to

12   the supervision or --

13         MR. PACHOWICZ:  No.

14         THE COURT:  So there are other aspects of negligence

15   that are going to be pertinent in the phase 1, and then some

16   aspects related to supervision in the Monell-type claims that

17   are going to be pertinent in the second phase, correct?

18         MR. PACHOWICZ:  Yes, as long as that's -- okay.

19         THE COURT:  And it is usually my practice not to

20   inform the jurors of phase 2 because I don't want them to get

21   into their head that they don't want to have a phase 2 and then

22   do something that might cause that not to happen.  So I usually

23   let them know about that, depending on what the verdict is, in

24   the phase 1.

25         MR. H. RUSSELL:  My only question about that,

1    Your Honor, is when we get to discussing the verdict form,

2    counsel would be allowed to say -- explain the entitlement

3    question for phase 2, correct?

4         THE COURT:  I'm not certain I'm following you.

5         MR. H. RUSSELL:  So on the verdict form in phase 1,

6    what we typically see is if Officer X is liable for this claim,

7    then you have to answer the question as to whether the

8    plaintiff is entitled to punitive damages, so that would

9    obviously be a discussion of a possible phase 2.  So I just

10   want to make sure I don't misunderstand the Court.

11        THE COURT:  No, obviously you're going to be

12   presenting evidence that will be pertinent to the question of

13   liability for punitive damages, and there's no problem with

14   making arguments or referencing the fact that you'd be asking

15   about liability on punitive damages.  You just simply won't be

16   talking about what the amount would be.

17        MR. H. RUSSELL:  Sure.  I just didn't want to -- I

18   just didn't know if the Court was asking counsel not to mention

19   the possibility of a phase 2.

20        THE COURT:  Yeah, you shouldn't refer to a

21   possibility of a phase 2.  The liability issue will be decided

22   in phase 1.  After we determine that, I will inform the jurors

23   at that point in time that we will have a phase 2 to determine

24   the amount of the punitive damages.

25        MR. H. RUSSELL:  Okay.  One other housekeeping note,

1    Your Honor, and it's fairly minor.  I did not submit with my

2    appropriate voir dire questions a question to the jury as to

3    whether or not they would hold it against any party who's not

4    present throughout the trial.  I have at least one defendant

5    who cannot be here the entire time, and there are others that

6    may be coming and going depending on their duties, and I know

7    the Court had said we can only really ask follow-up questions

8    to the Court's questions.  So I just wanted to throw that out

9    there and make sure it's okay for me to ask that question.

10             THE COURT:  If you will tell me who is going to be

11   not present or who will be coming in and out, I can inform the

12   jurors once they're empaneled that that will be the case and

13   that they should not hold that against any of them.

14             MR. H. RUSSELL:  Okay, Your Honor.  It's

15   Officer Corcoran is likely going to be here probably only

16   tomorrow, and then if there's a phase 2, he may return for

17   that.  Officer Bacon and Officer Beach may be in and out, but I

18   expect them to be here for the majority of the proceedings.

19   And I expect Officer Lehman, Officer Saldana and Officer Foster

20   to be here the whole time.

21             THE COURT:  Should I also mention that Chief Jim

22   McDonnell will not be here during this first phase?  Or should

23   we not mention him at all since he is not going to be in the

24   first phase?

25             MR. H. RUSSELL:  I think it's probably best not to

1    mention him until we have to mention him, Your Honor.

2          THE COURT:  All right.  The other question I have is

3    that during the voir dire process, I always ask questions about

4    whether anyone knows anyone or has had any association with any

5    of the police departments that are at issue.  Is Mr. Bedetti

6    still an officer of a police department at this time?

7          MR. PACHOWICZ:  Yes.

8          THE COURT:  Which police department?

9          MR. PACHOWICZ:  South Gate.

10          THE COURT:  South Gate.  All right.  Then I will be

11    inquiring into that as well.

12          MR. H. RUSSELL:  And, Your Honor, out of an

13    abundance of caution, the Court may just want to ask about the

14    L.A. County Sheriff's Department too, because if we do get to a

15    phase 2 and Sheriff McDonnell comes in, that's where he's been

16    for the last several years.

17          THE COURT:  All right.  Is there going to be a

18    representative of the City of Long Beach during the first

19    phase?

20          MR. H. RUSSELL:  No, Your Honor, not other than

21    myself and the actual defendants.

22          THE COURT:  Okay.  I'm going to be introducing

23    everyone at the voir dire process, so usually I will introduce

24    a representative of the city, if you had one.

25          MR. H. RUSSELL:  Thank you.

1          THE COURT:  All right.  Are there any other issues?

2          MR. H. RUSSELL:  None from the defense, Your Honor.

3          THE COURT:  Were counsel able to work out a limiting

4   instruction with regard to the verdict in the criminal case?

5          MR. PACHOWICZ:  I think we sent one over, but I know

6   that Mr. Russell's been in trial, so perhaps we can talk about

7   that.

8          THE COURT:  All right.  Is that likely to be needed

9   in the afternoon such that you can review it during the lunch

10  period?

11         MR. H. RUSSELL:  I don't think so, Your Honor.  The

12  testimony, I can talk to Mr. Pachowicz about it, but we should

13  have something agreed upon by tomorrow morning at the very

14  latest.

15         THE COURT:  All right.  If we get to the plaintiff's

16  case in the afternoon, which I'm hopeful we will because I

17  usually am fairly successful at picking a jury by lunchtime,

18  you might have, at least, your first witness on in the

19  afternoon.  I'm not sure who that will be, but if it's

20  Mr. Bedetti, he might be talking about what happened in the

21  criminal trial.

22         MR. PACHOWICZ:  It will not be.

23         THE COURT:  Okay.  All right.  Then let us recess so

24  that I can revise the preliminary instructions and the

25  PowerPoint that will be a reflection of that, and we will then

1    resume in about 10 or 15 minutes.

2              THE COURTROOM DEPUTY:  This Court's in recess.

3         (Recess taken from 9:02 a.m. to 9:25 a.m.)

4              THE COURTROOM DEPUTY:  All rise for the jury panel.

5         (In the presence of the prospective jury.)

6              THE COURTROOM DEPUTY:  You may be seated.

7         Again, good morning.  My name is Kane.  I'm the clerk to

8    the Honorable Dolly Gee.  What's going to happen is the Court

9    is going to ask you a few questions.  If you have an answer,

10   just raise your hand, and I will give you this fancy mic.  Once

11   I give you the mic, just state the jury number I gave you this

12   morning and stand up and answer the Court's questions.

13        We have here today Carol Zurborg, our court reporter.  She

14   has the daunting task of taking everything down on the record.

15   So when you speak, speak loud and clear for her so she can take

16   down everything on the record.  That's why I gave you your

17   number, so your name won't be on the record.

18        So we will get started.  Last chance, turn off your cell

19   phones, BlackBerrys, pagers.  Okay.  Thank you.

20        (Pause in proceedings.)

21              THE COURTROOM DEPUTY:  All rise.

22        Recalling Item No. 1:  Case number CV 14-9102-DMG; Marcelo

23   Oscar Bedetti versus City of Long Beach, et al.

24        Counsel, your appearance again, please.

25              MR. PACHOWICZ:  Good morning, Your Honor.  Mark

1   Pachowicz on behalf of Oscar Bedetti.

2          MR. J. RUSSELL:  Good morning, Your Honor.  Jonny

3   Russell on behalf of the plaintiff.

4          MR. H. RUSSELL:  Good morning, Your Honor.  Howard

5   Russell for defendants.

6          THE COURT:  Good morning.

7      Good morning, ladies and gentlemen, and welcome to

8   Courtroom 8C of the United States District Court for the

9   Central District of California.  You have already met my

10  courtroom deputy clerk, Kane Tien.  And seated to my right

11  here, is my court reporter, Carol Zurborg.

12      This morning we are selecting a jury for a civil case

13  called Marcelo Oscar Bedetti versus the City of Long Beach, et

14  al., and it is expected to last approximately five court days,

15  not including the time for jury deliberations.  This is an

16  estimate, not a promise.  But what I can promise you is that we

17  will try our very best to conclude the trial within that time

18  estimate.

19      From the time our 13 American colonies declared

20  independence from Great Britain, the right to trial by jury has

21  been enshrined in our Constitution, and it is a cherished right

22  that many have fought and died for.  The right to a jury trial

23  in civil cases is in the Seventh Amendment to the Constitution.

24      While we recognize that serving on a jury is an imposition

25  on your time and may be inconvenient, jury service is extremely

```
 1   important to our system of justice in this country, and it is

 2   one of your most important duties as a citizen of the United

 3   States.

 4       When summoned for jury service, I know that many people

 5   often feel stress, anxiety and sometimes even a bit of

 6   resentment, but I have spoken to many jurors over the years,

 7   and I have served as a juror myself, and some of you may not

 8   recognize who that is, that is Chief Justice John Roberts of

 9   the United States Supreme Court, and he too had to go to jury

10   duty.  Unfortunately for him, he was not selected.

11       I have found that most people, once they have actually

12   served on a jury, feel that jury service is not only their

13   civic duty, but also a gratifying learning experience.  Now, I

14   know that you might feel skeptical about that at this moment in

15   time, but I assure you that virtually every person that I have

16   ever spoken to after a jury trial has informed me that although

17   they were skeptical at first when I said it, they actually did

18   think that it was a gratifying learning experience.

19       And so as you can see, this beautiful new courthouse is

20   not the judge's courthouse.  It's not the lawyers' courthouse.

21   It is the people's courthouse, and this building belongs to the

22   public.  And so, therefore, it is important that each of us

23   realize that it is the people's business that is being

24   conducted here.

25       In other words, jury service is not optional.  With that
```

```
 1    in mind, I will try to be fair, but I also must be very firm

 2    about what is considered a hardship for purposes of excusing

 3    you from jury service in this case.

 4         So first of all, is there anyone here who will be unable

 5    to serve on a five-day trial because of financial, family,

 6    medical or other hardship that absolutely cannot be

 7    accommodated?

 8         Please state your juror number.

 9              PROSPECTIVE JUROR:  4.

10         I'm self-employed, so if I don't show up, the job's just

11    not going to get done, period, and I'm not going to get paid.

12              THE COURT:  What is your employment?

13              PROSPECTIVE JUROR:  Event lighting, freelance.  And

14    I usually work every weekend with the same banquet

15    halls/nightclub.

16              THE COURT:  All right.  Thank you.

17         Anyone else?

18         All right.  We will be selecting eight jurors today, and

19    under current law, there are no alternate jurors in civil

20    cases.  So all jurors who are present on the jury at the time

21    the case concludes will deliberate as long as there are at

22    least six jurors remaining.  The parties, that is the plaintiff

23    and the defendants, in this case have a right to have their

24    case tried by qualified, fair and impartial jurors.

25         So before I begin to question you, I'm going to explain
```

briefly the function and duties of a juror.  It is the sworn
duty of a juror to hear and then consider conscientiously the
evidence introduced at the trial and to make a determination of
the facts of the case based entirely and exclusively on such
evidence without fear, prejudice, favoritism or bias.  It is
the sworn duty of a juror to accept from the Court the rules of
law applicable to the case and to apply those rules of law to
the facts of the case as found by the jurors.  This must be
done regardless of any personal or preconceived notion of what
the law is or ought to be.

A juror's qualifications and impartiality cannot be
assumed without inquiry, and so I'm going to be asking you a
series of questions, which is known as the voir dire
examination.  It is a time-honored process by which the
qualifications and impartiality of jurors may be determined.

Let me caution you that what is said during the voir dire
process is not evidence and is not to be taken as proof of any
fact.  The purpose of voir dire is simply to develop the truth
about a juror's competency, his or her frame of mind and
ability to do his or her sworn duty in accordance with the
juror's oath.

Your answers to the questions I will ask will enable me to
determine whether a juror should be excused for cause either on
my own motion or upon the motion of a party.  Cause means that
there is a reason a juror will not be able to render an

1    impartial verdict, such as a business or personal relationship

2    with a party, a witness or attorney in the case or a prejudiced

3    state of mind.

4        The voir dire question-and-answer process also will allow

5    counsel to make intelligent use of their peremptory challenges.

6    These are challenges to a juror for which no reason needs to be

7    stated by the attorney.  In other words, the lawyer, based upon

8    his trial experience, knowledge of the case and the answers

9    given during the voir dire process has determined that someone

10   else should sit on the jury.

11       It is important, therefore, that your answers to the

12   questions that I ask be as complete and truthful as possible.

13   By asking questions, we are not intending to pry into your

14   personal affairs, but we are simply trying to find out whether

15   or not there's information that the lawyers can use to

16   intelligently exercise their challenges.  The goal is to obtain

17   a fair and impartial jury.  The parties are entitled to that.

18   They cannot ask you for more, and you cannot give them less.

19       Consider each question I ask very carefully, and please,

20   please, please do not wait until after you have been sworn in

21   as a juror and led to my jury room to suddenly disclose

22   something that should have been disclosed during the voir dire

23   process.  I can't tell you how many times that has happened,

24   and that is always a cause of great dismay because that is a

25   point in time when we can no longer find another juror to take

1   your place.  So this is the time, if you have anything to

2   disclose, to disclose it when we're asking the questions.  All

3   right?

4        Consider each question very carefully.  And the questions

5   that I ask will be addressed to all of you in the courtroom,

6   wherever you may be seated.  And we will go first from the jury

7   box to the gallery getting your answers.

8        First, I am going to be asking a series of general

9   questions, and then I'm going to have each of you, wherever you

10  may be seated, read either a piece of paper that my clerk will

11  give you or look at the screen, which will have a number of

12  specific questions that are reflected on the screen.

13       If you have a response to one of my questions, please

14  raise your hand, and I'll call on you in the jury box first.

15  Make sure that you don't say your name; you can just use your

16  juror number.  And if there is something sensitive that you

17  wish to disclose that you don't want to say in front of

18  everyone, please let me know that, and you can come to sidebar,

19  and we will talk with you outside the hearing of other members

20  of the jury venire.

21       Each time I call on you, please state your juror number so

22  that the court reporter can take down what you are saying, and

23  then give your response.

24       First of all, is there anyone here who can not read,

25  write, speak and understand the English language?

1      All right.  That's good.  We are off to a good start.

2      Do any of you have any problems with hearing or seeing

3 such that it might interfere with your ability to sit as a

4 juror?

5      All right.  The plaintiff in this case is Marcelo Oscar

6 Bedetti.  The defendants are the City of Long Beach, David

7 Corcoran, Douglas Bacon, Roque Foster, Alexander Saldana,

8 Randall James -- I'm sorry, Randall James Beach, Jason Lehman

9 and Jim McDonnell.

10      Plaintiff Marcelo Oscar Bedetti asserts that defendants

11 City of Long Beach, Officers Douglas, Bacon, Roque Foster,

12 David Corcoran, Alexander Saldana, Randy Beach and Jason Lehman

13 violated the United States Constitution by arresting him

14 without probable cause and deprived him of his right to

15 exercise free speech by arresting him in retaliation for his

16 criticism of the defendant officers' conduct.

17      Plaintiff also asserts that Defendant's Corcoran, Saldana,

18 Beach and Lehman used or caused to be used excessive force

19 while arresting him.  In addition, plaintiff asserts state law

20 claims for negligence, battery and false imprisonment.

21 Plaintiff has the burden of proving these claims.

22      Defendants deny those claims and allege the affirmative

23 defense that plaintiff was negligent in causing his own injury.

24 Defendants have the burden of proving their affirmative

25 defense.  Plaintiff denies defendant's affirmative defense.

1          Plaintiff Marcelo Oscar Bedetti is also an officer of the

2     South Gate Police Department.

3          Do any of you think you know anything about the case, or

4     have you read or heard anything about it, other than what I

5     have just told you so far here in court?

6          All right.  Is there anything about the nature of this

7     case that would cause you to have any difficulty in being fair

8     and impartial to both sides of this case?

9               PROSPECTIVE JUROR:  Juror No. 8.  I'm a federal

10    employee.  I work for Custom and Border Protection, so I'm in

11    law enforcement.

12              THE COURT:  Okay.

13              PROSPECTIVE JUROR:  So I am plus law.  So I'm afraid

14    with this trial, I cannot, you know, decide.

15              THE COURT:  So if you enforce the law, why would you

16    have a difficulty enforcing the law in this trial?

17              PROSPECTIVE JUROR:  Because I'm -- they train me to

18    always go by the law and see what are on the paper, on

19    regulation.  So I'm afraid I always by the department of -- you

20    know, what my department is.

21              THE COURT:  Well, that's exactly what we want you to

22    do is follow the law.  So we are not asking you to apply your

23    knowledge as an employee of the Department of Agriculture.  We

24    are asking you to listen to the evidence that's presented in

25    this trial and to apply the law as I give it to you to the

| | |
|---|---|
| 1 | facts as the jurors find it. |
| 2 | PROSPECTIVE JUROR:  Okay. |
| 3 | THE COURT:  All right.  Can you do that? |
| 4 | PROSPECTIVE JUROR:  I'll try. |
| 5 | THE COURT:  I don't want you to just try.  I need |
| 6 | you to assure me, as you just did, that you have to apply the |
| 7 | law. |
| 8 | PROSPECTIVE JUROR:  Okay.  Yes. |
| 9 | THE COURT:  You can apply the law? |
| 10 | PROSPECTIVE JUROR:  Yes. |
| 11 | THE COURT:  Okay.  Thank you. |
| 12 | PROSPECTIVE JUROR:  4. |
| 13 | THE COURT:  Juror No. 4. |
| 14 | PROSPECTIVE JUROR:  Yeah, Juror No. 4.  I'm |
| 15 | originally from Long Beach.  A while ago I have a history |
| 16 | already with that, and due to the current climate, I don't have |
| 17 | to remind everybody of what's going on.  I don't think I could |
| 18 | be not biased in this one. |
| 19 | THE COURT:  You say that you've had some |
| 20 | interactions with the Long Beach Police Department yourself? |
| 21 | PROSPECTIVE JUROR:  Yeah. |
| 22 | THE COURT:  I take it your experience was one |
| 23 | that -- |
| 24 | PROSPECTIVE JUROR:  Less than stellar, yeah. |
| 25 | THE COURT:  And, you know, I want to tell you that |

1    every juror or potential juror who comes into this courtroom

2    comes with their experiences and their opinions and all of the

3    things that have happened in their lives.

4        You can be seated.

5        That doesn't mean you are automatically excluded from

6    being a juror.  I come to this position as a judge with all of

7    my experiences and opinions.  What we ask you to do during a

8    trial is whether you can set aside those experiences that

9    happened to you personally and judge the case only on the

10   evidence that's presented in this case and on the law as given

11   to you by the Court.

12       The question is do you think you can do that?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  All right.  That's a pretty clear

15   answer, and I'm not going to even try to dissuade you from

16   that.

17       Anyone else?

18           PROSPECTIVE JUROR:  Number 23.  As someone that's

19   gone through years worth of protests, and especially more

20   recently, I have, myself, fell victim to certain mistreatments,

21   not being taken into custody, but broader mistreatments,

22   mistreatment of my friends, but also being forceful with

23   crowds, tear gassing, things like that.  So kind of with this

24   subject comes a lot of resentment and anger on my behalf.  So I

25   don't know.  For me it's a bit like picking a scab.  I can try

1    to ignore it's there, but I don't know how impartial I can be.

2            THE COURT:  Was your experience or your friends'

3    experience with a particular police department or --

4            PROSPECTIVE JUROR:  It was -- in this case it was

5    Denver.

6            THE COURT:  It was what?

7            PROSPECTIVE JUROR:  Denver.

8            THE COURT:  Oh, Denver.

9        And have you had any personal experiences with the police

10   departments I mentioned in this case?

11           PROSPECTIVE JUROR:  Not these, but I have had

12   experiences as far as one of my neighbors was shot on premises

13   by the police, so it's not -- my trust is kind of deep rooted

14   in negativity.

15           THE COURT:  All right.  The question I'm going to

16   ask you is the same as what I just asked the previous person,

17   which is notwithstanding those experiences and those feelings,

18   do you think that you could set that aside and listen to the

19   evidence that is presented in this case and judge the case

20   solely on the evidence presented, rather than relying on your

21   own personal experiences?

22           PROSPECTIVE JUROR:  No.  I have difficulty with

23   that.

24           THE COURT:  All right.  Thank you.

25       Anyone else?

1       All right.  The plaintiff, as I said, in this case is

2   Marcelo Oscar Bedetti, who is an officer of the South Gate

3   Police Department.

4       Mr. Bedetti, would you please stand.

5       Thank you.

6       And the defendants in this case are the City of Long

7   Beach, Long Beach police officers Douglas Bacon, Roque Foster,

8   David Corcoran, Alexander Saldana, Randy Beach and Jason

9   Lehman.

10       Would you please stand.

11       Thank you.

12           MR. H. RUSSELL:  Your Honor, Officer Corcoran is the

13   one who's not here.

14           THE COURT:  Oh, and Officer Corcoran apparently is

15   unable to be here at this moment.  He will be here at the trial

16   at another point in time.

17       Do any of you recognize either the plaintiff or any of the

18   individual defendants in this case or know their family or

19   friends?

20       All right.  Do you or anyone close to you have any

21   business connections with the City of Long Beach or its police

22   department?

23           PROSPECTIVE JUROR:  Good morning.  I'm an attorney.

24   Oh, Number 5, Juror 5.  I'm an attorney with the law firm of

25   Atkinson, Andelson, Loya, Ruud & Romo.  We represent public

1 agencies.  My practice is primarily schools.  I do believe that

2 we may represent the City of Long Beach in general employment

3 matters.  I'm not particularly assigned to any cases involving

4 the City of Long Beach.  I have a vague recollection that I may

5 have given a presentation to managers and supervisors of the

6 City of Long Beach on employment practices.  That's the extent

7 of the relationship that I can think of in terms of my

8 profession.

9          THE COURT:  All right.  Are you a partner of the

10 firm or --

11          PROSPECTIVE JUROR:  Yes, I am.

12          THE COURT:  A partner.  And your firm specializes in

13 doing labor and employment work?

14          PROSPECTIVE JUROR:  Correct.

15          THE COURT:  Is there any work that you have done

16 that is similar to the subject of this lawsuit?

17          PROSPECTIVE JUROR:  No, Your Honor.  I don't know

18 any of the facts in this case.  If it's an abuse of laws or

19 constitutional issues, I would not have advised on that.  My

20 practice does involve employee discipline matters.  I do labor

21 negotiations myself.  I do not do labor negotiations with peace

22 officer-related issues.  There are other members of my firm who

23 do.

24          THE COURT:  I see.  But you think that the City of

25 Long Beach is a client of your firm for purposes of labor and

1   employment matters?

2           PROSPECTIVE JUROR:  I'm not certain, Your Honor.  I

3   believe we might be, and out of an abundance of caution, I

4   think the parties are entitled to know that.  We may also

5   represent -- have some dealings with the City of South Gate,

6   but myself, I don't.  I couldn't tell you with certainty.

7           THE COURT:  All right.  Thank you.

8       Anyone else?

9           PROSPECTIVE JUROR:  I don't know if this is

10  relevant --

11          THE COURT:  Your juror number, please.

12          PROSPECTIVE JUROR:  Oh, number 10.  But about nine

13  months ago, I donated an airplane to the Long Beach Police dive

14  team.

15          THE COURT:  You donated an airplane?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  To the?

18          PROSPECTIVE JUROR:  Long Beach Police dive team.

19          THE COURT:  Dive team?

20          PROSPECTIVE JUROR:  Yeah.

21          THE COURT:  What motivated you to do that?

22          PROSPECTIVE JUROR:  They wanted one.

23          THE COURT:  That was very generous of you.

24          PROSPECTIVE JUROR:  It was more or less a scrap

25  airplane.  And they drop it in the water with a dummy in it,

1    refind it with their sonar and then swim down and pull the

2    dummy out and recover it with airbags.

3              THE COURT:  I see.

4         Did you have a particular relationship with the department

5    or a particular person at that department for you to become

6    aware of the need for that airplane?

7              PROSPECTIVE JUROR:  No.  They came and contacted me

8    because they knew I had some airplanes.

9              THE COURT:  Is that your line of business?

10             PROSPECTIVE JUROR:  No.  I was clearing a friend of

11   mine's deceased hangar of airplanes.

12             THE COURT:  So the airplane belonged to your

13   deceased friend?

14             PROSPECTIVE JUROR:  Yes, and I donated it.

15             THE COURT:  And this occurred about ten months ago?

16             PROSPECTIVE JUROR:  About ten months ago, yeah.

17             THE COURT:  Is there any other relationship that you

18   have with the City of Long Beach?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  So this is the only contact that you've

21   had with the City in terms of any business relationship or any

22   other kind of interaction?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  And so you donated it.  You did not

25   receive any compensation?

```
 1                    PROSPECTIVE JUROR:  No.
 2                    THE COURT:  All right.  Would you have any trouble
 3       in being a fair and impartial juror in a case like this?
 4                    PROSPECTIVE JUROR:  I don't think so, no, but I
 5       thought I would mention this anyway.
 6                    THE COURT:  All right.  Thank you.
 7          Anyone else?
 8          Let me ask the same question with regard to the South Gate
 9       Police Department.  Do you or anyone close to you have any
10       business relationships or any other specific interactions with
11       the City of South Gate or its police department?
12          Do you or anyone close to you have any interactions with
13       the County of Los Angeles Sheriff's Department?
14                    PROSPECTIVE JUROR:  Juror No. 3.  About 16 years ago
15       my father was arrested from the Los Angeles Police Department.
16                    THE COURT:  By the Los Angeles County Sheriff's
17       Department or by the Los Angeles Police Department?
18                    PROSPECTIVE JUROR:  I'm not really sure.  I was like
19       nine at the time.
20                    THE COURT:  So this happened 16 years ago to your
21       father?
22                    PROSPECTIVE JUROR:  Yeah.  He is still in prison at
23       the time.
24                    THE COURT:  So he was arrested at that time and
25       remains in prison as a result of that?
```

```
 1                PROSPECTIVE JUROR:  Yeah.

 2                THE COURT:  Do you -- did you have any interaction

 3     with the police force yourself directly?

 4                PROSPECTIVE JUROR:  No.

 5                THE COURT:  Do you have any resentments or lingering

 6     issues with the Los Angeles County Sheriff's Department or the

 7     Los Angeles Police Department as a result of that occurrence?

 8                PROSPECTIVE JUROR:  Just with recently things that

 9     have been going on with the protests and stuff.

10                THE COURT:  All right.  When you say that, most of

11     us know about the protests and have become aware of them.  I

12     don't think that everyone is going to have to be excused from

13     being a juror because we have actually seen that on television.

14          Do you think that you can set that aside and decide this

15     case solely on the evidence presented in this case and apply

16     the law as I give it to you.

17                PROSPECTIVE JUROR:  Yeah, I can try.

18                THE COURT:  All right.  Thank you.

19                PROSPECTIVE JUROR:  Juror No. 5, again, Your Honor.

20     Our firm represents public agencies, the County of Los Angeles.

21     I do have dealings with the county office of education.  We do

22     represent some other county agencies.  As I mentioned, I may

23     have partners or other attorneys in our offices that would have

24     represented the county sheriff's department at some point in

25     time.  I have no particular knowledge of any of those
```

```
 1   particular cases or matters that are pending.

 2           THE COURT:  All right.  Thank you.

 3       Anyone else?

 4       All right.  Plaintiff in this case is represented by Mark

 5   R. Pachowicz and Jonathan Russell of the Law Offices of Mark R.

 6   Pachowicz.

 7       Mr. Pachowicz and Mr. Russell, would you please stand.

 8       Jonathan Russell, not to be confused with the opposing

 9   counsel, who is Howard Russell.

10       Do any of you recognize these attorneys or their law firm

11   or had any interactions with these law firms or been

12   represented by the law firm?

13       Thank you.

14       All right.  The defendants are represented by Howard

15   Russell of the Long Beach City Attorney's Office.  Do any of

16   you recognize Mr. Russell or have any interactions with the

17   Long Beach City Attorney's Office?

18       Thank you.

19       All right.  I'm going to now read to you a list of

20   witnesses who may be called to testify during the course of

21   this case, and when this has been done, please raise your hand

22   if you recognize or know any of these possible witnesses.

23       Marcelo Oscar Bedetti; Douglas Bacon; Randall Beach; David

24   Corcoran; Roque Foster; Jason Lehman; Alexander Saldana;

25   Lieutenant Ryan Lebaron; Lieutenant Patrick O'Dowd;
```

```
 1    Lieutenant Darren Lance; Officer John Garry; Jeff Megee; Susan
 2    Hacopian; Christina Merran; Felipe Baeza; Karen Villanueva;
 3    Officer Derek Ernest; Officer Shawn Loughlin; Federico Mercado;
 4    Detective David Ternullo; South Gate Police Department captain
 5    Darren Arakawa; Curtis J. Cope; Los Angeles County Sheriff Jim
 6    McDonnell; Officer Humberto Reyes Suarez; Officer Francisco
 7    Vazquez; Officer Jose Rios; Officer Robert Cruz; Officer Juan
 8    Ortiz Ferrer; Officer Ernesto Perez; Anaheim Police Department
 9    officer Kalid Abuhadwan; Officer Alberto Leon; Sergeant Michael
10    Richens; Sergeant Abram Yap; Officer Martin Ron; Officer Juan
11    Reyes; Officer Shannon Phillips; Sergeant Carlos Nava;
12    Officer Javier Valencia; Sergeant Herbert Smith;
13    Officer Christopher Brammer; Deputy Chief Richard Conant;
14    Sergeant Megan Zabel; Sergeant Paul Gallo; Officer Bernardon
15    Barajas; Sergeant Paul Esko; Commander Joseph Levy; Nicholas
16    Kent; Eduardo Reyes; Robert Belcher; Sergeant Dave Scott; Curt
17    Rothschiller; Doug Carner; Joseph Cipollini; Patrick
18    Servnek, M.D.; Elsa Del Rio-Elizarraraz, M.D.; Tony Ivashkov;
19    Dewayne Rose; Elizabeth Cabello; Paul Estrada, Jr.; Ashleigh
20    Sola; Kara Stevenson; Reginald Perkins.
21         Does anyone recognize any of these names or know any of
22    these potential witnesses?
23         All right.  Have you or anyone close to you have any legal
24    training, legal education or legal employment?  And for this
25    you don't have to tell us if you have already told us this.
```

```
 1                    PROSPECTIVE JUROR:  Juror 11.  I work as a paralegal

 2    in a law firm.

 3                    THE COURT:  Okay.  What's the law firm that you work

 4    for?

 5                    PROSPECTIVE JUROR:  Akin Gump Strauss Hauer & Feld.

 6                    THE COURT:  Is there a particular area of practice

 7    that you --

 8                    PROSPECTIVE JUROR:  Corporate.

 9                    THE COURT:  Corporate?

10                    PROSPECTIVE JUROR:  Yes.

11                    THE COURT:  So is it just transactional?

12                    PROSPECTIVE JUROR:  Yes.

13                    THE COURT:  And Akin Gump is a corporate litigation

14    law firm, correct?

15                    PROSPECTIVE JUROR:  They do everything.

16       I did have experience years ago working for one of the

17    commissions investigating the Los Angeles Police Department,

18    and I can't remember the name of the commission.

19                    THE COURT:  The Christopher Commission?

20                    PROSPECTIVE JUROR:  That's the one.

21                    THE COURT:  And what was your role?

22                    PROSPECTIVE JUROR:  Sorting papers and matching up

23    things, you know, basically handling whatever they gave me to

24    do.

25                    THE COURT:  Oh, okay.  Was that because someone who
```

```
  1   was a member of the commission was at Akin Gump?
  2              PROSPECTIVE JUROR:  Yeah.  Actually, I was doing
  3   this when I was working at Gibson, Dunn & Crutcher.
  4              THE COURT:  Oh.
  5              PROSPECTIVE JUROR:  And I believe it was William
  6   Christopher who was the head of the commission.
  7              THE COURT:  Right.
  8              PROSPECTIVE JUROR:  Okay.
  9              THE COURT:  Was there anything about your work doing
 10   clerical work for the Christopher Commission or doing corporate
 11   transactions as a paralegal that would cause you not to be able
 12   to be fair and impartial in this case?
 13              PROSPECTIVE JUROR:  Absolutely not.
 14              THE COURT:  Are there any other legal employment
 15   employers that you had, besides the ones that you have
 16   mentioned, during the course of your career?
 17              PROSPECTIVE JUROR:  Wyman Bouncer for a while before
 18   they disappeared, and Gibson Dunn, and then I was with Helium
 19   Troop & Meisenger until they merged with Akin Gump.
 20              THE COURT:  Was that always doing corporate
 21   transactions?
 22              PROSPECTIVE JUROR:  Yes.
 23              THE COURT:  All right.  Thank you.
 24              PROSPECTIVE JUROR:  Uh-huh.
 25              THE COURT:  Anyone else?
```

1        All right.  Have you or anyone close to you ever been

2   employed as a law enforcement officer or civilian employee of a

3   law enforcement agency?  And by "law enforcement agency," I

4   would include federal agencies, such as the FBI, U.S. Marshals,

5   secret service, Drug Enforcement Administration, immigration

6   agents, border patrol agents, correctional officers at a

7   prison, local or state officers, such as police officers or

8   deputy sheriffs.

9              PROSPECTIVE JUROR:  Juror 13.  My best friend's

10  daughter is a police officer with the Washington

11  Metropolitan -- Washington, D.C. Metropolitan police force.

12             THE COURT:  Okay.  And do you interact with her very

13  much?

14             PROSPECTIVE JUROR:  Somewhat.

15             THE COURT:  How often would you say you interact

16  with her?

17             PROSPECTIVE JUROR:  Well, we --

18             THE COURT:  By that I mean the one who is in the

19  police force.

20             PROSPECTIVE JUROR:  Yes.  We communicate on

21  Facebook.  When she is in town we visit, and that's about it.

22             THE COURT:  And do you talk about the kind of work

23  that she does?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Is there anything about your

```
 1   interactions with your friend's daughter that relates to the

 2   subject of this lawsuit?

 3             PROSPECTIVE JUROR:  Not directly.

 4             THE COURT:  Okay.  Is there anything about your

 5   relationship with your friend's daughter that would cause you

 6   not to be able to be fair and impartial in this case?

 7             PROSPECTIVE JUROR:  No.

 8             THE COURT:  All right.  Thank you.

 9             PROSPECTIVE JUROR:  Juror No. 8.  Most my co-worker

10   are immigration and customs, so I work alongside with them.

11             THE COURT:  Okay.  And those are people who work for

12   the U.S. Department of Agriculture?

13             PROSPECTIVE JUROR:  No.  When we merge over, we in

14   one agency called Custom and Border Protection.  So I am part

15   of that, and I am -- I'm agriculture, one of the -- you know,

16   part of the team.

17             THE COURT:  All right.  But you work with other

18   people who are in Immigration and Customs Enforcement?

19             PROSPECTIVE JUROR:  Yes.  I deal with like people

20   coming in, and then I have to make sure all the paperwork are

21   correct.  If it not correct, I need to turn back to immigration

22   and custom.  If I found them, I need to let them know too.

23             THE COURT:  Okay.  Thank you.

24             PROSPECTIVE JUROR:  You're welcome.

25             PROSPECTIVE JUROR:  Juror 20.  My grandfather is a
```

```
 1   judge.
 2                THE COURT:  Okay.  Where was he a judge?
 3                PROSPECTIVE JUROR:  Ninth Circuit Court of Appeals.
 4                THE COURT:  Who is your grandfather?
 5                PROSPECTIVE JUROR:  Montgomery Koelsch, last name
 6   K-o-e-l-s-c-h.
 7                THE COURT:  Okay.  And did you interact with your
 8   grandfather a lot about the nature of his work?
 9                PROSPECTIVE JUROR:  Some.
10                THE COURT:  What was -- what kind of practice did he
11   have before he was appointed to the Ninth Circuit?
12                PROSPECTIVE JUROR:  He was a state of Idaho judge.
13                THE COURT:  So he was -- was he a state court judge?
14                PROSPECTIVE JUROR:  I think so.
15                THE COURT:  And was he ever a federal district court
16   judge?
17                PROSPECTIVE JUROR:  No.
18                THE COURT:  So he went from state court to the Ninth
19   Circuit Court of Appeals?
20                PROSPECTIVE JUROR:  I think so.  Eisenhower I think
21   appointed him.
22                THE COURT:  Okay.  So this was in the 1950s?
23                PROSPECTIVE JUROR:  '50s, yeah, '50s, '60s.
24                THE COURT:  And into the 1960s?
25                PROSPECTIVE JUROR:  For the appointment?
```

 1              THE COURT:  Yeah.

 2              PROSPECTIVE JUROR:  Maybe early '50s, 1960s, yeah.

 3              THE COURT:  Before he was a state court judge, do

 4   you know what kind of practice he had?

 5              PROSPECTIVE JUROR:  No, I don't.

 6              THE COURT:  So is there anything about the nature of

 7   your grandfather's work that would cause you not to be able to

 8   be fair and impartial in this case?

 9              PROSPECTIVE JUROR:  No.

10              THE COURT:  All right.  Thank you.

11              PROSPECTIVE JUROR:  22.  I work for the County of

12   Ventura Sheriff Department, work with them real close.

13              THE COURT:  Sorry.  What do you do?

14              PROSPECTIVE JUROR:  Sheriff department.

15              THE COURT:  What do you do?

16              PROSPECTIVE JUROR:  IT service.

17              THE COURT:  So you are an IT guy in the Ventura

18   Sheriff's Department?

19              PROSPECTIVE JUROR:  And the whole county of Ventura.

20              THE COURT:  And do you interact with the sheriffs?

21              PROSPECTIVE JUROR:  I have a lot of friends with

22   them.

23              THE COURT:  Okay.  Is there anything about the

24   nature of this case that would cause you not to be able to be

25   fair and impartial to both sides?

1         PROSPECTIVE JUROR:  No, Your Honor.

2         THE COURT:  All right.  Thank you.

3         PROSPECTIVE JUROR:  Number 16.  My father was the

4    chief administrative law judge for the State of California for

5    about ten years.

6         THE COURT:  He was a chief administrative law judge?

7         PROSPECTIVE JUROR:  Yes, for the state of

8    California.

9         THE COURT:  And do you remember what kind of cases

10   he would preside over?

11        PROSPECTIVE JUROR:  Mostly unemployment insurance.

12        THE COURT:  Is there anything about the nature of

13   your --

14      Grandfather?

15        PROSPECTIVE JUROR:  Father.

16        THE COURT:  -- father's work in that regard that

17   would cause you to be not fair and impartial in this case?

18        PROSPECTIVE JUROR:  No.

19        THE COURT:  All right.  Thank you.

20        PROSPECTIVE JUROR:  Juror No. 6.  My first cousin

21   was recently sworn in as a federal immigration judge in

22   Chicago.

23        THE COURT:  Okay.  And do you have a lot of

24   interactions with your cousin?

25        PROSPECTIVE JUROR:  Yes, I do.

```
 1              THE COURT:  Have you talked to him -- is it her or
 2   him?
 3              PROSPECTIVE JUROR:  Her.
 4              THE COURT:  Have you talked to her a lot about the
 5   nature of her work?
 6              PROSPECTIVE JUROR:  Just like a general -- you know,
 7   general, not anything in depth.
 8              THE COURT:  Okay.  Do you know what she did before
 9   she became a federal immigration judge?  Was she an immigration
10   lawyer?
11              PROSPECTIVE JUROR:  She was, yes, in private
12   practice.
13              THE COURT:  Is there anything about the nature of
14   your cousin's line of work that would cause you not to be able
15   to be fair and impartial in this case?
16              PROSPECTIVE JUROR:  No.
17              THE COURT:  Okay.  Thank you.
18          Anyone else?
19              PROSPECTIVE JUROR:  Years ago --
20              THE COURT:  Juror number?
21              PROSPECTIVE JUROR:  Juror 11.  Years ago we went to
22   Europe with some friends, and one of them happened to be an
23   LAPD officer.  We got to be pretty close, and we socialized
24   with he and his buddies occasionally.  I haven't seen him,
25   though, in several years, so I don't really know much more
```

```
 1    about him.  He became a helicopter guy.

 2              THE COURT:  Okay.  Is there anything about your

 3    relationship with him or the things that he might have told you

 4    in conversation that would cause you not to be able to be fair

 5    and impartial in this case?

 6              PROSPECTIVE JUROR:  No.

 7              THE COURT:  Thank you.

 8         Anyone else?

 9         All right.  Do any of you have any special knowledge or

10    expertise with respect to the law or procedures relating to the

11    use of force by law enforcement personnel?

12         Have any of you ever belonged to any group which is

13    organized to support or advocate for law enforcement, crime

14    prevention or victim's rights?

15         Do any of you belong to any organization whose mission is

16    to monitor or critique the work of law enforcement?

17         Would any of you be inclined to give either greater or

18    lesser weight to the testimony of a law enforcement officer

19    just because that person is a law enforcement officer?  In

20    other words, are you biased either in favor of or against law

21    enforcement officers?

22              PROSPECTIVE JUROR:  Juror 4.  It's probably fair,

23    from my earlier comments, I have bias against.  I never heard

24    another police officer speak against another police officer who

25    was part of the same -- what do you call it -- jurisdiction,
```

```
 1    where you group.  So yeah, it's a little less weight for me.
 2              THE COURT:  Well, in this case both sides happen to
 3    be law enforcement officers.
 4              PROSPECTIVE JUROR:  Yeah, but I know one side has a
 5    lot more people.
 6              THE COURT:  Yes, that's because they all belong to
 7    the Long Beach Police Department.
 8              PROSPECTIVE JUROR:  That's what I'm saying.  If they
 9    belong to the same group, I have never heard them speak against
10    each other, the greater group of law enforcement, but one is
11    South Gate; one is Long Beach.
12              THE COURT:  So you are saying you, because of your
13    previous experiences that you have talked about --
14              PROSPECTIVE JUROR:  Uh-huh, and others.
15              THE COURT:  -- you are biased against police
16    officers?
17              PROSPECTIVE JUROR:  Yeah.
18              THE COURT:  All right.  Thank you.
19         Anyone else?
20              PROSPECTIVE JUROR:  Juror 12.  I just have quite a
21    few friends that, unfortunately, have had to have interactions
22    with the Ventura and L.A. Police Department.  And not too in
23    favor with police departments in general after seeing what they
24    have had to go through and listening to them and their
25    dealings.
```

1          THE COURT:  Okay.  And these are stories that your

2   friends have told you, not your personal experience; is that

3   right?

4          PROSPECTIVE JUROR:  That's correct.  And then there

5   have been some personal when I was with them.

6          THE COURT:  Okay.  Like I said before, everybody

7   comes to this with all kinds of experiences.

8          PROSPECTIVE JUROR:  Right.

9          THE COURT:  But that doesn't mean that what you're

10  going to see here in court has anything to do with anything

11  that you've had any experiences with.

12      So the question is can you set aside those interactions

13  that you've had with your friends or these potentially negative

14  interactions you've had with the Ventura --

15      Or is it L.A. County police forces?

16          PROSPECTIVE JUROR NO. 12:  Yeah.

17          THE COURT:  -- and decide this case solely on the

18  evidence presented in this case and the law as I give it to

19  you?

20          PROSPECTIVE JUROR:  I don't feel I can, no.

21          THE COURT:  And why is that?

22          PROSPECTIVE JUROR:  Just what I have seen and what

23  I've been told, and this is through the years.

24          THE COURT:  All right.  But you realize that this

25  case has nothing to do with what you have seen or what you've

 1   been told?

 2          PROSPECTIVE JUROR:  Yes, yes, I do.

 3          THE COURT:  And yet you think that the experiences

 4   that you've had would color your judgment so greatly that you

 5   would not be able to objectively see the facts that are

 6   presented in this case and apply the law as I give it to you?

 7          PROSPECTIVE JUROR:  I -- I have my concerns, yeah.

 8   I'm pretty -- I don't think I can.

 9          THE COURT:  All right.  Thank you.

10      Anyone else?

11      All right.  I think some of you have already told us this,

12   but in case any of you have not felt the question specifically

13   asked for it, have you or anyone close to you ever been treated

14   unfairly by police officers?  And you don't have to tell us

15   again if you have already told us before.

16          PROSPECTIVE JUROR:  My experience --

17          THE COURT:  Juror number?

18          PROSPECTIVE JUROR:  Oh, Juror No. 5.  Sorry,

19   Your Honor.

20      As a teenager, I was stopped by sheriff's department, L.A.

21   County Sheriff's Department, questioned I felt unfairly.  On

22   another occasion I had members of the sheriff's department pull

23   up to a vehicle where a friend -- couple of my friends and I

24   were leaving my home, and we were detained at gunpoint,

25   questioned what we were doing.

1     The funny thing about it is we were meeting for some Boy

2  Scout issues, and they wouldn't believe us.  So I guess being a

3  member of the Boy Scouts is being a member of a gang.  I do

4  have relatives, nephew-in-law, who is a member of law

5  enforcement and a neighbor who is also a member of the

6  sheriff's department.  So just in full disclosure, I have had

7  those experiences.  No, I don't believe they would bias me one

8  way or the other.

9        THE COURT:  All right.  Thank you.

10    Anyone else?

11        PROSPECTIVE JUROR:  Juror 4.

12        THE COURT:  You want to hammer that nail into the

13  coffin.

14        PROSPECTIVE JUROR:  Well, I didn't really speak in

15  specifics, so that's why I don't know if I really need to.

16  There's been a bunch of instances, so I will just give one.

17  Unmarked car, plainclothes police.  I'm riding my bike home at

18  night in Long Beach.  If you know anything about me, I'm

19  probably the farthest from a gang member, but you don't, so --

20  they just pull -- well, almost on the sidewalk, I will sensor

21  myself there, and hop out.  One grabs me from behind.

22     And if you know the area where I'm living -- or lived,

23  it's like I'm getting ready to kind of defend myself.  I think

24  I'm about to be mugged by a bunch of plainclothes bald heads.

25  They look familiar over there, but there's probably a bunch of

1    police like that.  I thought they were esses or something, but

2    I looked closer, and these guys don't look like esses, but I'm

3    getting ready to defend myself.  They are pulling out guns and

4    whatnot.  I'm like, okay, a bunch of esses wouldn't be this

5    official with their gun formation, so that was my first clue

6    they were police.  But yeah, and other instances, but I have a

7    few stories.

8              THE COURT:  All right.  Thank you.

9              PROSPECTIVE JUROR:  Juror No. 3.  Both my brother

10   and sister have had altercations with the police, being pulled

11   over and detained just because of the color of their skin.  And

12   I believe my sister was arrested -- not like arrested, but she

13   was put in the back seat of the car, handcuffed, just because

14   her car looked similar to a car of somebody that they were

15   looking for.

16             THE COURT:  Okay.  Well, that does sometimes happen,

17   when a car looks similar to a car that they are looking for.

18     Do you feel that was unfair?

19             PROSPECTIVE JUROR:  I do because it wasn't even the

20   same color car.

21             THE COURT:  So it wasn't similar to the car they

22   were looking for?

23             PROSPECTIVE JUROR:  Like -- I don't know how to

24   explain it.  You know, a lot of cars they look the same, but

25   it's like a Honda or a Toyota, and it wasn't the same car.  It

```
 1   wasn't even the same color.  But she got pulled over,
 2   handcuffed and put in the back seat of a car.
 3             THE COURT:  Okay.  How long ago did this happen?
 4             PROSPECTIVE JUROR:  Like eight months ago.
 5             THE COURT:  Okay.  And given the experiences of your
 6   brother and your sister, do you think that you can be fair to
 7   both sides in this case?
 8             PROSPECTIVE JUROR:  I can try.
 9             THE COURT:  Knowing that this case has nothing to do
10   with either the incidents that you're talking about or your
11   brother or your sister or none of the people involved in the
12   incident that you are talking about have anything to do with
13   this case.
14             PROSPECTIVE JUROR:  I can try.
15             THE COURT:  All right.  Can I get your assurance
16   that you will not just try, but that you will, in fact, be fair
17   and impartial?
18             PROSPECTIVE JUROR:  Yeah.
19             THE COURT:  All right.  Thank you.
20             PROSPECTIVE JUROR:  Juror 22.  I was retained by
21   Oxnard police officers.  Domestic violence call.  No evidence.
22             THE COURT:  Were you mistaken for someone else?
23             PROSPECTIVE JUROR:  No.  Lady just called, and they
24   actually retained me.  They did not arrest me.
25             THE COURT:  You mean someone called specifically
```

```
 1   about you?
 2             PROSPECTIVE JUROR:  Yes.  I was working, actually.
 3             THE COURT:  So the police came and arrested you?
 4             PROSPECTIVE JUROR:  Well, you can say they arrested
 5   me.  They retained me 24 hours until the investigation.
 6             THE COURT:  I see.  So they investigated you?
 7             PROSPECTIVE JUROR:  Yes.
 8             THE COURT:  And then until they determined what the
 9   facts were, they released you?
10             PROSPECTIVE JUROR:  Actually, I have to go to court
11   for that in order to clean my name.
12             THE COURT:  I see.
13             PROSPECTIVE JUROR:  Working for the County of
14   Ventura.
15             THE COURT:  But this was as a result of a call from
16   a neighbor?
17             PROSPECTIVE JUROR:  Actually, it was my ex-wife.
18   She was actually living in my house.
19             THE COURT:  All right.  So your ex-wife called in
20   this report?
21             PROSPECTIVE JUROR:  Yes.
22             THE COURT:  All right.  So do you blame the ex-wife
23   more or the police officer more?
24             PROSPECTIVE JUROR:  Actually, the police officer.
25   There was no evidence at all.  I was working at the time she
```

1 called.

2          THE COURT:  Except for what your ex-wife told them.

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  That is evidence.  It might not be true,

5 but there is some evidence.

6          PROSPECTIVE JUROR:  Well, when she called, I was at

7 work.  So I wasn't home when she called, so I don't know if

8 that's evidence or not.

9          THE COURT:  How would the police know if you were

10 telling the truth or your ex-wife were telling the truth?

11          PROSPECTIVE JUROR:  When I got home, they were home

12 already, so he can tell.

13          THE COURT:  How could they tell?

14          PROSPECTIVE JUROR:  Well, I was at work, and they

15 were at home already waiting for me.

16          THE COURT:  Okay.  So --

17          PROSPECTIVE JUROR:  I proved to them I was working.

18          THE COURT:  So your ex-wife said you engaged in

19 domestic violence that day?

20          PROSPECTIVE JUROR:  Correct.

21          THE COURT:  But you were at work?

22          PROSPECTIVE JUROR:  I was at work, and they still

23 retain me.

24          THE COURT:  Do you have any resentments against the

25 Oxnard Police Department as a result of that?

```
 1            PROSPECTIVE JUROR:  I have a lot of friends on the
 2  same department as well, but I think they're totally unfair.
 3            THE COURT:  Okay.  You have a lot of friends who
 4  work for the Oxnard Police Department?
 5            PROSPECTIVE JUROR:  Yes.
 6            THE COURT:  And you think your friends are unfair?
 7            PROSPECTIVE JUROR:  Some of them, yes.  I tell them.
 8            THE COURT:  Well, as you heard, this case does not
 9  involve the Oxnard Police Department.
10            PROSPECTIVE JUROR:  Correct.
11            THE COURT:  It does not involve domestic violence in
12  particular.  Can you set aside your experiences with the Oxnard
13  Police Department and be fair and impartial in this case?
14            PROSPECTIVE JUROR:  Absolutely.
15            THE COURT:  All right.  Thank you.
16        Anyone else?
17        All right.  Have you or anyone close to you ever filed a
18  complaint against a law enforcement officer?
19        If you have, Juror No. 4, you can say "yes" or "no."
20            PROSPECTIVE JUROR:  It wasn't me.
21            THE COURT:  All right.  How close was the
22  relationship?
23            PROSPECTIVE JUROR:  Juror 4.  It was my friend.  He
24  got shot up with the pepper balls when he was at one of the
25  protests.
```

```
 1                    THE COURT:  Okay.

 2                    PROSPECTIVE JUROR:  But he really shouldn't have

 3    been there, so --

 4                    THE COURT:  All right.  Thank you.

 5         All right.  Have any of you ever filed a lawsuit or been

 6    sued in a lawsuit?

 7         All right.  Are any of you opposed to or have any concerns

 8    about awarding damages against a law enforcement officer or a

 9    governmental entity, such as the City of Long Beach, regardless

10    of what the evidence shows?

11         All right.  Have any of you already decided which side

12    should win?

13                    PROSPECTIVE JUROR:  Juror 4.

14                    THE COURT:  You have already decided which side

15    should win?

16                    PROSPECTIVE JUROR:  I'm already leaning one way,

17    yeah.

18                    THE COURT:  I think I can guess which way you're

19    leaning, so --

20         Anyone else?

21         If you are selected as a juror in this case, you will be

22    required to set aside any feeling of passion or prejudice and

23    decide this case solely on the evidence introduced during the

24    trial and the instructions that the Court will give you

25    concerning the law.
```

```
 1        Is there anyone here, other than Juror No. 4, who feels
 2   that he or she cannot do that?
 3            PROSPECTIVE JUROR:  Juror 12.  I would have a very
 4   difficult time with that, kind of like what I was saying
 5   earlier.
 6            THE COURT:  All right.  Thank you.
 7            PROSPECTIVE JUROR:  Number 23.  Also, as I
 8   previously stated, I would have difficulty with that.
 9            THE COURT:  All right.  Thank you.
10        If I give you an instruction regarding the law and you
11   believe the law is unfair or you simply disagree with it, I
12   need your assurance that you will be able to put aside your
13   personal feelings and apply the law to the evidence which has
14   been presented.
15        Is there anyone here who is unable to give me that
16   assurance?
17        Yes, we know.
18            PROSPECTIVE JUROR:  I do.
19            THE COURT:  And the ones who just answered before, I
20   will assume that your answer is that you cannot apply the law
21   as I give it to you.  That would be Juror No. 12 and number 23;
22   is that correct?
23            PROSPECTIVE JUROR:  Yes.
24            THE COURT:  Let the record reflect that both of them
25   nodded their heads.
```

```
1          All right.  Do any of you have anything to disclose that

2    was not touched upon in any of the prior questions that could

3    affect your service as a juror in this case?

4               PROSPECTIVE JUROR:  Number 10.  When I was on

5    another jury they asked me if I was ever arrested, and I asked

6    them to define "arrest."  And I haven't been arrested, but I

7    have been thrown in a drunk tank twice and in the back of a

8    police car in handcuffs once, but not necessarily in this

9    country.

10              THE COURT:  Oh, okay.  Where was that?

11              PROSPECTIVE JUROR:  Once was in Germany, once was in

12   Israel, and once was in Kuwait.

13              THE COURT:  Okay.  And you were thrown into a drunk

14   tank because you were drunk or you were misidentified?

15              PROSPECTIVE JUROR:  Drunk and disorderly, yeah.

16              THE COURT:  And as a result of those experiences, do

17   you have some resentment against law enforcement?

18              PROSPECTIVE JUROR:  Not particularly, no.

19              THE COURT:  All right.  Thank you for disclosing

20   that.

21          Anyone else have any similar experiences that they would

22   like to disclose?

23              PROSPECTIVE JUROR:  My husband is a journalist.

24              THE COURT:  Juror number?

25              PROSPECTIVE JUROR:  6.  My husband is a journalist,
```

```
 1    and if this case got a lot of attention, it could be possible
 2    that he would be assigned to cover it.  I suppose if I was on
 3    the jury, he could not cover it.
 4              THE COURT:  Right.  Nor would you be able to talk
 5    with him about it.
 6              PROSPECTIVE JUROR:  Right.  Just for disclosure.
 7              THE COURT:  For whom does your husband work?
 8              PROSPECTIVE JUROR:  The Washington Post.
 9              THE COURT:  Okay.  So he works for the Washington
10    Post but is stationed here in Los Angeles?
11              PROSPECTIVE JUROR:  Yes, that's correct.
12              THE COURT:  But as you sit here today, you're not
13    aware of any media accounts about this case?
14              PROSPECTIVE JUROR:  That's correct.
15              THE COURT:  All right.  Anyone else?
16         All right.  At this time I would like you to look on the
17    screen that will be in front of you shortly that will have a
18    number of specific questions, and I will ask you to start with
19    Juror No. 1 and go through each of those categories and respond
20    to those items.
21              PROSPECTIVE JUROR:  I'm Juror No. 1.  I live in the
22    city of Glendora.  I went to college, junior college, took a
23    few courses there.  I'm a maintenance mechanic foreman for a
24    company that makes big rows of plastic.
25              THE COURT:  That makes what?
```

        1              PROSPECTIVE JUROR:  Makes big rows of plastic, trash

        2    bags and so forth.  I'm the foreman there.  I am married.  Have

        3    three children of ages 28, 30 and 32.

        4              THE COURT:  What does your wife do?

        5              PROSPECTIVE JUROR:  She works for an envelope

        6    company as a machine operator.

        7              THE COURT:  An envelope company?

        8              PROSPECTIVE JUROR:  Envelope company that makes --

        9    yeah, makes envelopes, and she is a machine operator there.

       10              THE COURT:  Do any of your children live with you?

       11              PROSPECTIVE JUROR:  Yes, my son does.  He's 30 years

       12    old, and he's still living with me.

       13              THE COURT:  And what does he do?

       14              PROSPECTIVE JUROR:  He's a manager for a warehouse.

       15              THE COURT:  What do your other two children do?

       16              PROSPECTIVE JUROR:  Okay.  Well, my oldest daughter,

       17    she works for OSHA in San Francisco, but yet she's in the Navy.

       18    And she's -- she's been in since before 9/11, so it's been 16

       19    years.  She just went to Bahrain, which is a small country in

       20    the Persian Gulf.  She is going to be there for 18 months.  She

       21    just left a couple weeks ago.  My youngest daughter is a nurse

       22    at the Los Angeles Children's Hospital.  I have served on a

       23    jury before, civil and criminal.

       24              THE COURT:  Did you reach a verdict in both cases?

       25              PROSPECTIVE JUROR:  Yes.

```
 1              THE COURT:  All right.  Thank you for your service.
 2              PROSPECTIVE JUROR:  Juror No. 2.  I live in the city
 3    of El Monte.  My highest level of education is some college.  I
 4    am a receptionist at a tax office.  I'm single and no kids.
 5    And I have never served on a jury before.
 6              THE COURT:  When you say "a tax office," is it a law
 7    office?
 8              PROSPECTIVE JUROR:  No, just taxes.
 9              THE COURT:  Okay.  Thank you.
10              PROSPECTIVE JUROR:  Juror No. 3.  I live in West
11    Covina.  Highest education is some college.  I am single.  I
12    have one three-year-old son.  And I have never been on a jury
13    before.
14              THE COURT:  Okay.  And where are you employed?
15              PROSPECTIVE JUROR:  Panera bread.
16              THE COURT:  What do you do there?
17              PROSPECTIVE JUROR:  Make the food.
18              THE COURT:  Okay.  And did you say you had gone to
19    college?
20              PROSPECTIVE JUROR:  Yeah.
21              THE COURT:  Was there a particular topic that you
22    studied?
23              PROSPECTIVE JUROR:  Psychology.
24              THE COURT:  And you have never served as a juror?
25              PROSPECTIVE JUROR:  No.
```

```
 1              THE COURT:  Thank you.

 2              PROSPECTIVE JUROR:  Juror 4.  Glendale, California.

 3    GED.  Self-employed, event lighting; so installing/programming

 4    of intelligent lights.  Single and no kids.

 5              THE COURT:  And I presume you have never served as a

 6    juror before.

 7              PROSPECTIVE JUROR:  You got it.

 8              PROSPECTIVE JUROR:  Juror No. 5.  I live in the city

 9    of Norwalk.  I have completed law school.  I work for the law

10    firm of Atkinson, Andelson, Loya, Ruud & Romo.  I am an

11    attorney partner with the firm.  I am presently married, going

12    through a dissolution of marriage.  I have one son; he's eight

13    years old.  My wife is employed as a file clerk with a workers'

14    comp insurance law firm in Santa Ana, California.  And I have

15    not been empaneled on a jury before.

16              PROSPECTIVE JUROR:  Hi.  I live in Los Angeles.

17              THE COURT:  Juror number?

18              PROSPECTIVE JUROR:  Juror No. 6.  I have a

19    bachelor's degree in communications.  I'm self-employed.  I own

20    an Internet marketing company.  My husband is a journalist,

21    like I said before.  He also works for USC.  And we have no

22    children.  Oh, and I have not served on a jury.

23              PROSPECTIVE JUROR:  Juror No. 7.  I live in Los

24    Angeles and employed as a cashier.  I'm single.  I have one

25    child.
```

```
 1              THE COURT:  I'm sorry, what?
 2              PROSPECTIVE JUROR:  One child.
 3              THE COURT:  And how old is your child?
 4              PROSPECTIVE JUROR:  Only one.
 5              THE COURT:  One years old?
 6              PROSPECTIVE JUROR:  Yeah.
 7              THE COURT:  And have you ever served as a juror
 8  before?
 9              PROSPECTIVE JUROR:  No.
10              THE COURT:  I'm sorry, before you go on, are you
11  married, Juror No. 7?
12              PROSPECTIVE JUROR:  Yeah, no, I'm single.
13              THE COURT:  Single.  Thank you.
14              PROSPECTIVE JUROR:  I'm Juror No. 8.  I live in city
15  of San Gabriel.  I have a bachelor degree of science, and I
16  work for Department of Homeland Security under Custom and
17  Border Protection.  I'm married.  I have two boy:  One is 14,
18  one is 9.  And my wife is a housewife.  I never served in a
19  jury before.
20              PROSPECTIVE JUROR:  Juror No. 9.  I live in El
21  Monte, California.  I have a bachelor's degree in business
22  marketing.  I am part of a promotion and social media team for
23  Spanish broadcasting system.  I'm single.  No kids.  And I have
24  never done jury duty before.
25              PROSPECTIVE JUROR:  Jury No. 10 -- Juror No. 10.  I
```

live in Torrance.  I did five years apprenticeship aircraft

mechanic, retired from Northrop Grumman.  Married with three

children:  36, 33 and 26.  Wife is a Torrance special aid

teacher, retired.  Occupation of my children:  One works for

Disney, one's in real estate, one is a missionary in Romania.

And I haven't served on a jury before.

PROSPECTIVE JUROR:  Juror 11.  I live in Los

Angeles.  I have a bachelor of fine arts degree in theater.  My

employer is Akin Gump Strauss Hauer & Feld.  I am a paralegal,

corporate paralegal.  I am married for 40 years.  I was

divorced once before that, and I don't know what she does now.

My wife works as the director of technology for a parochial

school on the west side.  I have one adult daughter who is 24

and a granddaughter who is 3.  I served on a criminal trial in

New York before I moved out here.  The defendant was released.

And I have been called to jury duty several times here in Los

Angeles, but I have never actually sat on a trial.

THE COURT:  Okay.  So the criminal case that you sat

on in New York, there was a verdict of acquittal?

PROSPECTIVE JUROR:  That's correct.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  I'm Juror 12.  I live in

Ventura.  I have a bachelor of science degree.  I work for

Anka.  I'm in administration.  I am married.  I have one child;

he's 30.  My husband is retired.  And my son is a chief

 1  financial analyst for a company.  And I have not served on a

 2  jury before.

 3          PROSPECTIVE JUROR:  Juror 13.  I live in Northridge.

 4  I hold a bachelor of music degree.  I work as a stage manager

 5  for the Los Angeles Opera and the L.A. Philharmonic.  I am

 6  married.  I have ten-year-old twin boys.  My wife is a

 7  professor of and chair of theater and dance department at Cal

 8  State Los Angeles.  And I have never served on a jury.

 9          PROSPECTIVE JUROR:  I'm Juror 14.  I live in Venice.

10  I have a degree in computer science.  I work for Snap, Inc. as

11  an engineering manager.  I'm not married, but I live with my

12  girlfriend.  We don't have any kids.  She is unemployed.  I

13  have never served on a jury before.

14          PROSPECTIVE JUROR:  Juror No. 15.  I live in

15  Ventura.  I have a bachelor of science degree in interior

16  design.  I work for a Steelcase furniture dealership as a

17  designer.  I'm single.  I do not have any children.  And I have

18  never served on a jury before.

19          PROSPECTIVE JUROR:  Juror No. 16.  I live 200 miles

20  north of here in San Luis Obispo.  I have a master's degree in

21  architecture.  I work for Cal Poly in San Luis Obispo, and have

22  my own private practice, Lean Architects.  I am married.  A

23  daughter 12, son 14.  My wife is a high school teacher in

24  history.  And I don't have any adult children.  And I have

25  never been selected to be on a jury before.

```
 1            PROSPECTIVE JUROR:  Juror 17.  I live in Oxnard,

 2   California.  I have some college.  I have studied criminal

 3   justice and business.  I work for Bed, Bath & Beyond in Oxnard;

 4   my position there is operational manager.  I am married.  I

 5   have three children:  One's six, one's two, and one's one.  My

 6   wife's occupation, she works for the Home Depot.  She is a

 7   district specialty manager.  And I have never served on a jury

 8   before.

 9            PROSPECTIVE JUROR:  I'm Juror 18.  I live in West

10   Lake Village.  I have a bachelor of science in economics.  I'm

11   a retired insurance broker.  I'm divorced.  I have one son

12   who's 47.  He's a safety manager.  I have served on a jury

13   before.  It was attempted murder, and we did reach a verdict.

14            PROSPECTIVE JUROR:  Jury 19.  I live in Glendale.  I

15   went to years of college.  I'm working for Hydroelectric in

16   Burbank.  I'm married.  I have two girls:  One is 27, and one

17   25.  My husband is work for wholesale jewelry for assessment.

18   And I have two children:  One is occupational therapist, and

19   second one is human resource.  He work in Santa Monica.  And I

20   never select for jury before.

21            PROSPECTIVE JUROR:  Juror 20.  Live in Calabasas.  I

22   have an MBA.  I work for Lowe Enterprises Investors in finance.

23   Married.  Two children:  9 and 13.  My wife is a consultant.

24            THE COURT:  What does she consult on?

25            PROSPECTIVE JUROR:  She does entitlements for
```

```
 1    development projects and restaurants, so she's a liaison with
 2    the private sector to the public sector.  And then I have not
 3    served on a jury before.
 4              PROSPECTIVE JUROR:  Juror 21.  Live in West
 5    Hollywood.  I have a four-year degree in fine arts.  And I work
 6    at UCLA Anderson School of Management as a designer for online
 7    marketing materials.  I am married.  I have one daughter; she's
 8    19.  My husband is a painting conservator, and -- well,
 9    daughter's in her second year of college.  And I have served on
10    a bunch of juries, most of them criminal, I think maybe just
11    one civil, and reached verdicts in all of them.
12              THE COURT:  Thank you for your service.
13              PROSPECTIVE JUROR:  Juror No. 22.  Live in Oxnard,
14    California.  Went to Great River High School.  Went to
15    technical school, voiceover IP engineering installation and
16    programmer.  Work for the County of Ventura.  I'm divorced.
17    Four daughters; they are at my house.  Never served as a juror.
18              THE COURT:  How old are your daughters?
19              PROSPECTIVE JUROR:  My older one, she's 29, 26, 22
20    and 19.
21              THE COURT:  And what do they do?
22              PROSPECTIVE JUROR:  My older one, she's -- she
23    worked for a doctor.  She -- I'm not sure.  And that one, the
24    26 years old, she's a manager in a uniform company, and the
25    youngest one is in college.
```

```
 1            PROSPECTIVE JUROR:  Juror 23.  I live in Glendale.
 2    I work in animation studios as an animator.  Single.  No
 3    children.  And I have not served on a jury.
 4            THE COURT:  All right.  Thank you.
 5        At this time I would allow counsel to have 15 minutes of
 6    voir dire.
 7        Mr. Pachowicz?
 8            MR. PACHOWICZ:  Thank you, Your Honor.
 9        Good morning.
10    (Members of the jury responded, "Good morning.")
11            MR. PACHOWICZ:  Here's the deal.  If I ask a group
12    question, the idea is to get a group answer as quickly as
13    possible, and having faith that you were going to answer, if I
14    asked you the question, and as if I asked you, and you weren't
15    going to hide in the back row like you did when you were in
16    school.
17        So good morning.
18    (Members of the jury responded, "Good morning.")
19            MR. PACHOWICZ:  Just a few things I would like to
20    follow up on with the Court.
21        Juror No. 5, do you know whether or not your firm has ever
22    engaged in work in Ventura County?
23            PROSPECTIVE JUROR:  Yes, we have.
24            MR. PACHOWICZ:  And have you ever played any role in
25    the work that was done in a number of lawsuits that were in
```

```
 1   Ventura County?
 2            PROSPECTIVE JUROR:  I have not handled any lawsuits
 3   in Ventura County.  Presently I represent a school district in
 4   Ventura County.
 5            MR. PACHOWICZ:  And which district would that be?
 6            PROSPECTIVE JUROR:  It's the Santa Paula Unified
 7   School District.  Other than I have other partners and other
 8   attorneys serving other districts in the county.
 9            MR. PACHOWICZ:  Is there -- I don't want to get into
10   privileged information or anything like that, so -- but in
11   terms of partnerships meetings where litigation would be
12   discussed?
13            PROSPECTIVE JUROR:  No, I have no knowledge of any
14   of the ongoings of any active litigation in Ventura County.
15            MR. PACHOWICZ:  And where did you go to law school,
16   sir?
17            PROSPECTIVE JUROR:  UCLA Law.
18            MR. PACHOWICZ:  Thank you, sir.
19            PROSPECTIVE JUROR:  Thank you.
20            MR. PACHOWICZ:  Juror No. 10, can you tell us how is
21   it that you -- or how do you think the Long Beach Police
22   Department became aware that you had planes that they may be
23   able to use?
24            PROSPECTIVE JUROR:  I put in an advertisement on
25   Craig's List.
```

1          MR. PACHOWICZ:  Trying to get rid of planes?

2          PROSPECTIVE JUROR:  Yes.

3          MR. PACHOWICZ:  And do you remember who it was from

4     the Long Beach Police Department who contacted you?

5          PROSPECTIVE JUROR:  Yeah, a guy called Sergeant

6     Steve Smock.

7          MR. PACHOWICZ:  And did you ever have any dealings

8     with the Long Beach City Attorney's Office in terms of

9     paperwork that you had to fill out to transfer title so that

10    they could do whatever they were going to do to the property?

11         PROSPECTIVE JUROR:  No.  It was a scrap airplane,

12    really, so there was no paperwork with it.

13         MR. PACHOWICZ:  And in terms of -- I believe you

14    told us of a couple of instances that have happened in your

15    life.  Would any of those issues in terms of you being taken

16    into custody affect you in any way in terms of this case if it

17    was discovered that Mr. Bedetti was taken into custody?

18         PROSPECTIVE JUROR:  I don't think so because unless

19    Mr. Bedetti was fighting drunk, it's not really the same as my

20    case.

21         MR. PACHOWICZ:  Okay.  And one of the questions that

22    the Court referenced was damages and whether or not you would

23    have any issues or concerns about providing damages, monetary

24    damages, for the harms and losses that have occurred.  You

25    didn't indicate that you would have any problem.  Why is that?

1          PROSPECTIVE JUROR:  Just being fair and reasonable,

2     I would think.

3          MR. PACHOWICZ:  Okay.

4          PROSPECTIVE JUROR:  I hope I would be, anyway.

5          MR. PACHOWICZ:  And so if you were to determine that

6     we had proved that it was more likely than not that the

7     allegations were true and you had to evaluate what kind of

8     damages to award, you would follow the law that the Court gives

9     you and be fair and reasonable within the parameters of that

10    law; is that true?

11         PROSPECTIVE JUROR:  I hope so, but, I mean, it

12    doesn't look very good if I have given an airplane to Long

13    Beach Police and then I'm called to judge upon them, then it

14    might be a bit of a sticky wicket there.

15         MR. PACHOWICZ:  Well, can you explain that to me?

16         PROSPECTIVE JUROR:  It might look like I was handing

17    out an airplane with one hand, and then that might cloud my

18    judgment in damages.

19         MR. PACHOWICZ:  Okay.

20         PROSPECTIVE JUROR:  I'm just saying that's what

21    someone on the outside looking in might think.

22         MR. PACHOWICZ:  Well -- and that's important, but

23    the process that we're interested in right now is trying to

24    understand what you think and how that might affect you.  If

25    you go into it thinking -- the analogy I'll use, sometimes my

```
 1    son, when I coached, he always thought I was harder on him than

 2    the other kids, right?  So do you think you might be harder on

 3    the Long Beach Police Department to avoid any appearance, or

 4    you would be easier on the Long Beach Police Department to

 5    avoid any appearance of impropriety or doing something?

 6              PROSPECTIVE JUROR:  Well, I would hope I would be

 7    completely neutral, but being a human being, who knows.

 8              MR. PACHOWICZ:  Can you share with us what the

 9    concern in terms of what side you think you would be more

10    concerned in trying to make sure didn't view anything that you

11    did as inappropriate?

12              PROSPECTIVE JUROR:  Again, you know, I'm just sort

13    of neutral on it, I hope, but --

14              MR. PACHOWICZ:  Okay.  Juror No. 13, you indicated

15    that one of your daughters -- one of your friend's daughters is

16    a police officer.  Is that in Washington, D.C.?

17              PROSPECTIVE JUROR:  Yes.

18              MR. PACHOWICZ:  And you indicated that you could be

19    fair.  What concerns do you have, if any at all, about not

20    being fair?

21              PROSPECTIVE JUROR:  I really don't have any

22    concerns.

23              MR. PACHOWICZ:  Okay.  And is there anything about

24    the communications that you've had with her over her perception

25    of how society sees her?
```

```
 1              PROSPECTIVE JUROR:  We haven't really discussed
 2    that.
 3              MR. PACHOWICZ:  Is there anything in terms of -- I
 4    know this question was asked, but in terms of police officers
 5    testifying, do you think that a police officer who testifies
 6    starts out almost with a little bit more credibility than a
 7    civilian?
 8              PROSPECTIVE JUROR:  Not necessarily.  I mean, if
 9    we're talking about something that is particular to the police
10    department, I would think that they would have more knowledge
11    than someone who's not in the police department.
12              MR. PACHOWICZ:  All right.  But if it has to do with
13    observations of just events?
14              PROSPECTIVE JUROR:  I would not think that a police
15    officer would have an advantage over someone who isn't in the
16    police department.
17              MR. PACHOWICZ:  And do you have any concerns about
18    the fact that Mr. Bedetti is a police officer, and he's over on
19    this side of the courtroom, and there's other police officers
20    over on this side of the courtroom, in that dynamic?
21              PROSPECTIVE JUROR:  I don't have any concerns.  I
22    find it intriguing and sort of interested to see how this might
23    play out.
24              MR. PACHOWICZ:  Thank you very much.
25          Can everybody that's here -- and this is one of those
```

```
 1   group questions.  Can everybody that's here do as the Court

 2   instructed and follow the law?

 3       (Members of the jury responded, "Yes" and "No.")

 4           MR. PACHOWICZ:  And it was number 4 that said "no,"

 5   correct?

 6           PROSPECTIVE JUROR:  Can I clarify just a little bit?

 7           MR. PACHOWICZ:  Sure.

 8           PROSPECTIVE JUROR:  Only because, I mean, the law is

 9   different every day, it seems, and depending on where you are

10   and who you are.  So that's why I'm saying that, not just so I

11   sound all boorish in here.

12           THE COURT:  Since you have never been a juror

13   before, how do you know what the law is?

14           PROSPECTIVE JUROR:  Here's another story, then.  I

15   have been falsely accused of something before, and I have had

16   to be in court almost two years just for them to finally ask

17   the kid and for him to say "no."  I was on probation, not

18   allowed to leave California and all this stuff, go on

19   vacations, before they knew I was even guilty.  So yeah.

20       It's -- there's -- there's some grays.  I know people who

21   haven't had to wait that long and have been resolved

22   immediately.  I know people got benefit of the doubt.  People

23   got different times.  I could go on and on, but I don't think

24   we have the time to be doing that, so I will just leave it at

25   that story.
```

1            THE COURT:  No, we don't, sir.

2            MR. PACHOWICZ:  Juror No. 16, one of the things that

3    you made a comment about was that you are coming from about 200

4    miles away.

5            PROSPECTIVE JUROR:  Uh-huh.

6            MR. PACHOWICZ:  Is that going to be, obviously,

7    difficult, but is that something you are willing to do to be

8    part of this, understanding that that's --

9            THE COURT:  Actually, if you are living more than 60

10   miles away, you will be able to obtain lodgings here.

11           PROSPECTIVE JUROR:  Okay.  Yes.

12           MR. PACHOWICZ:  So would that, the fact that you're

13   200 miles away from home, will that be something that will be

14   impacting you as you are here throughout this particular

15   proceeding?

16           PROSPECTIVE JUROR:  No.

17           MR. PACHOWICZ:  So even though we applaud you for

18   being here and willing to do this, any reason of concern at all

19   that will interfere with your desire to be a juror here?

20           PROSPECTIVE JUROR:  No.

21           MR. PACHOWICZ:  Thank you, Your Honor.

22           THE COURT:  All right.  Thank you.

23       Mr. Russell?

24           MR. H. RUSSELL:  Thank you, Your Honor.

25       Good morning.

```
 1          (Members of the jury responded, "Good morning.")

 2              MR. H. RUSSELL:  You guys got it.

 3      I want to start in the back row, just a couple of

 4  questions.  Mr. --

 5              THE COURTROOM DEPUTY:  No.

 6              MR. H. RUSSELL:  Number 22, sir, if you were to

 7  learn that any of the witnesses in this case worked anytime for

 8  the Ventura County Sheriff's Department, do you believe that

 9  your relationship with that agency would make it difficult for

10  you not to give that witness a little bit more believability

11  than somebody who is not from that agency?

12              PROSPECTIVE JUROR:  No.

13              MR. H. RUSSELL:  So you know enough people there

14  that you're just going to judge them like every other witness?

15              PROSPECTIVE JUROR:  Correct.

16              MR. H. RUSSELL:  All right.  Thank you.

17      And, Juror No. 17, good morning, sir.

18              PROSPECTIVE JUROR:  Good morning.

19              MR. H. RUSSELL:  You said you studied some criminal

20  justice in college?

21              PROSPECTIVE JUROR:  That's correct.

22              MR. H. RUSSELL:  Did you have plans to pursue a

23  legal or law enforcement career?

24              PROSPECTIVE JUROR:  That is correct.

25              MR. H. RUSSELL:  What did you want to do if you
```

```
 1   continued with that line of schooling?
 2              PROSPECTIVE JUROR:  An investigator, detective type
 3   of thing.
 4              MR. H. RUSSELL:  Oh, okay.  And did you try to
 5   become a law enforcement officer at any point?
 6              PROSPECTIVE JUROR:  No.
 7              MR. H. RUSSELL:  Is there anything about wanting to
 8   do that for a line of work but choosing to do something else
 9   that you think might make it difficult for you to be a juror in
10   this case?
11              PROSPECTIVE JUROR:  No.
12              MR. H. RUSSELL:  Okay.  Thank you.
13         Juror No. 7, please.
14         Good morning.
15              PROSPECTIVE JUROR:  Hi.  Good morning.
16              MR. H. RUSSELL:  Ma'am, I didn't get the name of the
17   company that you worked for.
18              PROSPECTIVE JUROR:  CM Corporation.
19              MR. H. RUSSELL:  And where is that located?
20              PROSPECTIVE JUROR:  In Huntington Park.
21              MR. H. RUSSELL:  Sorry.  Can you say that again?
22              PROSPECTIVE JUROR:  Huntington Park.
23              MR. H. RUSSELL:  Oh, Huntington Park, okay.
24         And what kind of company is it?
25              PROSPECTIVE JUROR:  It's --
```

```
 1                    THE REPORTER:  I'm sorry.

 2                    PROSPECTIVE JUROR:  It's money transfer.

 3                    MR. H. RUSSELL:  Money transfer company?

 4                    PROSPECTIVE JUROR:  Uh-huh.

 5                    MR. H. RUSSELL:  And I've asked this question for a

 6      lot of witnesses who may be have English as a second

 7      language --

 8                    PROSPECTIVE JUROR:  Yeah.

 9                    MR. H. RUSSELL:  -- have you understood everything

10      that everyone has said so far this morning?

11                    PROSPECTIVE JUROR:  Yeah.

12                    MR. H. RUSSELL:  Okay.  And did you go to school in

13      the United States at all?

14                    PROSPECTIVE JUROR:  Yeah.  It's three or four year

15      only.

16                    MR. H. RUSSELL:  At your work do you speak English

17      at work or Spanish?

18                    PROSPECTIVE JUROR:  Spanish.

19                    MR. H. RUSSELL:  Spanish.

20           And at home you speak Spanish?

21                    PROSPECTIVE JUROR:  Yeah.

22                    MR. H. RUSSELL:  If you are a juror in this case and

23      you don't understand something that somebody said, can you let

24      us know so we make sure you do understand?

25                    PROSPECTIVE JUROR:  Not that -- no.
```

1           MR. H. RUSSELL:  I am asking, though, if you become

2   a juror in this case, once you start hearing from the

3   witnesses, if you don't understand something a witness said,

4   will you let us know so we can make sure you understand?

5           PROSPECTIVE JUROR:  No.

6           MR. H. RUSSELL:  Okay.  Thank you.

7           THE COURT:  Juror No. 7, can you read English?  Can

8   you read the English language?

9           PROSPECTIVE JUROR:  Yeah, a little bit.

10          MR. H. RUSSELL:  Juror No. 8, please.

11      Sir, I just want to make sure I understand.  I know that

12  you work for the Department of Homeland Security, correct?

13          PROSPECTIVE JUROR:  Yes.

14          MR. H. RUSSELL:  And you're an agricultural

15  specialist, correct?

16          PROSPECTIVE JUROR:  Yes.

17          MR. H. RUSSELL:  Are you actually a sworn officer?

18          PROSPECTIVE JUROR:  Yes.

19          MR. H. RUSSELL:  Did you go to -- let's see.

20          PROSPECTIVE JUROR:  Before we merge over, we were

21  under USDA department.  So when they merge over, we were

22  trained by USDA, so pretty much in Fredrick, Maryland.

23          MR. H. RUSSELL:  In your job do you have any peace

24  officer powers?

25          PROSPECTIVE JUROR:  I have the power to fine people.

```
 1    I have the power to -- like if they bring stuff in and they did

 2    not declare, I have the power to fine people by money, stuff

 3    like that.

 4            MR. H. RUSSELL:  Do you carry a gun as part of your

 5    job?

 6            PROSPECTIVE JUROR:  No.

 7            MR. H. RUSSELL:  Have you ever carried a gun as part

 8    of your job?

 9            PROSPECTIVE JUROR:  No.

10            MR. H. RUSSELL:  Okay.  Thank you.

11        Number 14, please.

12        Good morning, sir.

13            PROSPECTIVE JUROR:  Good morning.

14            MR. H. RUSSELL:  You live in Venice?

15            PROSPECTIVE JUROR:  Yes.

16            MR. H. RUSSELL:  And occasionally there might be

17    some encounters between people on the Venice boardwalk and Los

18    Angeles Police Department officers.

19            PROSPECTIVE JUROR:  Sure.  I work on the boardwalk.

20            MR. H. RUSSELL:  Have you seen any of that in

21    person?

22            PROSPECTIVE JUROR:  Sure, plenty of times.

23            MR. H. RUSSELL:  Is there anything about any of the

24    encounters that you've witnessed, good or bad, that you think

25    might influence you as a juror in this case at all?
```

**UNITED STATES DISTRICT COURT**

1        PROSPECTIVE JUROR:  No, I don't think so.

2        MR. H. RUSSELL:  And have you had any encounters

3   yourself, positive or negative, with LAPD while living in

4   Venice?

5        PROSPECTIVE JUROR:  I called the police once.  I

6   called 911 because I saw somebody get jumped and he was being

7   viciously beaten by many -- several people, and so I gave a

8   statement to the police.  That was it, really, my only

9   interaction with the police since I moved to Venice.

10        MR. H. RUSSELL:  Okay.  Thank you.

11        Juror No. 15, please.

12        Good morning.

13        PROSPECTIVE JUROR:  Good morning.

14        MR. H. RUSSELL:  I know you don't work for Ventura

15   County, but you live there?

16        PROSPECTIVE JUROR:  Yes, correct.

17        MR. H. RUSSELL:  If you heard that any witnesses had

18   worked for a Ventura County law enforcement agency, would you

19   give them any sort of a hometown boost in terms of their

20   credibility?

21        PROSPECTIVE JUROR:  No, sir.

22        MR. H. RUSSELL:  Have you had any negative

23   interactions with any Ventura County law enforcement?

24        PROSPECTIVE JUROR:  No, sir.

25        MR. H. RUSSELL:  Okay.  Thank you.

1        Juror No. 11, please.

2        Good morning, sir.

3              PROSPECTIVE JUROR:  Good morning.

4              MR. H. RUSSELL:  Sir, when you were working along

5    with the Christopher Commission --

6              PROSPECTIVE JUROR:  Yes.

7              MR. H. RUSSELL:  -- did your opinion of the Los

8    Angeles Police Department change at all through the course of

9    your work and whatever documents you reviewed?

10             PROSPECTIVE JUROR:  The work that I was doing was

11   totally clerical, and I did not get involved in anything.  I

12   did not gain any knowledge from what I was doing.  I was

13   shuffling paper.

14             MR. H. RUSSELL:  And in any of your legal work, have

15   you had any work-related information come to you about the Long

16   Beach Police Department?

17             PROSPECTIVE JUROR:  No.

18             MR. H. RUSSELL:  Okay.  Thank you.

19        Juror No. 9, please.

20             PROSPECTIVE JUROR:  Good morning.

21             MR. H. RUSSELL:  Good morning, sir.

22        I heard you say that you have some role through your job

23   of working with Spanish broadcasting.

24             PROSPECTIVE JUROR:  Right.

25             MR. H. RUSSELL:  Can you just tell me a little bit

1    about that, please.

2            PROSPECTIVE JUROR:  So it's a company that works

3    with two radio stations.  They are both Hispanics.  One is Mega

4    96.3 and the other is LaRaza 97.9.

5            MR. H. RUSSELL:  So music stations primarily?

6            PROSPECTIVE JUROR:  Right.

7            MR. H. RUSSELL:  And what do you do for the

8    stations?

9            PROSPECTIVE JUROR:  I'm currently part of the

10   promo -- promotions team.  We handle the social media content

11   and the Web content for the website.  That's pretty much it.

12           MR. H. RUSSELL:  Sometimes jurors who are a little

13   bit younger than I am, and I will count you in that group, have

14   different experiences with law enforcement than maybe some of

15   the older jurors do, just because we have a much more diverse

16   community now.

17           PROSPECTIVE JUROR:  Right.

18           MR. H. RUSSELL:  And I know you said you haven't had

19   any encounters of note with the police, but anybody that you

20   know or close to you have any experiences with the police,

21   positive or negative, that you think we should know about to

22   decide whether you would be the right kind of juror here?

23           PROSPECTIVE JUROR:  Not anything that comes to mind

24   that can affect anything.

25           MR. H. RUSSELL:  Okay.  Thank you very much.

1        Let's see.  Number 6, please.

2        Good morning.

3            PROSPECTIVE JUROR:  Good morning.

4            MR. H. RUSSELL:  Are there particular types of

5   stories that your husband works on primarily as a journalist?

6            PROSPECTIVE JUROR:  No.

7            MR. H. RUSSELL:  Maybe I can ask a better question.

8   I know that some journalists might specialize on the crime beat

9   or some might be foreign correspondents or some might work with

10   the economy.  Is there anything that your husband does, sort of

11   his specialty?

12            PROSPECTIVE JUROR:  He covers just Southern

13   California and Los Angeles and issues that may be national but,

14   you know, local, local issues that also may be national.

15            MR. H. RUSSELL:  So, for example, yesterday in

16   Downtown Los Angeles there were a number of demonstrations

17   because it was May Day.  Did your husband, to your knowledge,

18   work on any stories involving any of the demonstrations in

19   Downtown Los Angeles?

20            PROSPECTIVE JUROR:  He didn't yesterday.  He did

21   cover the protests, the one -- I think it was right after the

22   election, not the Inauguration Day, not the women's march, but

23   the one right after the election, I think he did cover that one

24   for The Washington Post.  He does cover protests and stuff like

25   that on occasion, not always.

1          MR. H. RUSSELL:  Do you ever talk to your husband

2    about anything he's learned through his work about police work,

3    for example?

4          PROSPECTIVE JUROR:  No, not specifically.  I help

5    him with his work sometimes.

6          MR. H. RUSSELL:  What kind of help would you give

7    him?

8          PROSPECTIVE JUROR:  Just logistics because he is

9    covering things for The Washington Post, but he is in Los

10   Angeles.  So if I'm at home and he's covering something, I will

11   Google something for him, whatever, find a phone number, that

12   kind of thing.  I have gone to the courthouse before to get

13   documents for him, that kind of stuff.

14         MR. H. RUSSELL:  Thank you.

15       And Number 5, please.  Sorry, before I get to Number 5,

16   Number 9.

17         PROSPECTIVE JUROR:  I would just like you to know I

18   covered the May Day yesterday for social media, and most likely

19   I will be asked to do an article on that for the station West

20   Side.

21         MR. H. RUSSELL:  So I just want to follow up with

22   you for a moment, if I can.  When you say that you've covered

23   it for the social media, was that for the station's social

24   media?

25         PROSPECTIVE JUROR:  Correct.

```
 1                MR. H. RUSSELL:  And to do a follow-up article for
 2   the station?
 3                PROSPECTIVE JUROR:  Correct.
 4                MR. H. RUSSELL:  Sometimes when you're covering a
 5   story, it can come from the demonstrator's perspective, it can
 6   come from the police perspective, or it can come from sort of
 7   the neutral perspective.  How would you characterize your
 8   coverage of yesterday's events?
 9                PROSPECTIVE JUROR:  Yesterday, the event was more
10   towards -- it was an immigration.  Our -- where I work it's
11   obviously Hispanic, so I lean towards more that side.  I always
12   try to be neutral, but there is some favoring for Hispanics.
13                MR. H. RUSSELL:  Did you see anything yourself
14   yesterday when you were out covering the demonstrations that
15   you thought was inappropriate on the part of any of the police
16   that were out?
17                PROSPECTIVE JUROR:  No.
18                MR. H. RUSSELL:  Okay.  Thank you.
19          And just real quick, Number 5.
20          Good morning.
21                PROSPECTIVE JUROR:  Good morning.
22                MR. H. RUSSELL:  Lawyers, like Mr. Pachowicz and I
23   are, don't like to have lawyers in the jury box.
24                PROSPECTIVE JUROR:  No offense taken.
25                MR. H. RUSSELL:  And you might end up there any way.
```

1    My question is you have never been on a jury, correct?

2              PROSPECTIVE JUROR:  Correct.

3              MR. H. RUSSELL:  One of the challenges if you are on

4    the jury, the jurors might ask you, "What does all this stuff

5    mean?" when we get the jury instructions.  It's sort of common

6    sense.

7              PROSPECTIVE JUROR:  Right.

8              MR. H. RUSSELL:  But you can't be an extra judge in

9    the room.  All you can say is "The instructions are the way the

10   Court explained them.  And if you don't understand the

11   instructions, you have to ask the judge.  We don't know what

12   this means."  Do you foresee any difficulty trying to navigate

13   that difficult water, perhaps?

14             PROSPECTIVE JUROR:  No.

15             MR. H. RUSSELL:  Okay.  Thank you.

16        That's all I have, Your Honor.

17             THE COURT:  All right.  Thank you.

18        At this time we will take a brief break, and I would ask

19   that the jurors, when you're out in the corridor, that you not

20   speak with each other or anyone else about this case.  You

21   never know who's out there that might be a witness in this case

22   or something related, so -- and also, if you happen to run into

23   any of the parties or their attorneys, please don't speak to

24   them.  They have been instructed or will be instructed not to

25   speak with you, so don't hold that against them.  They're just

```
 1   following orders.
 2        So we will be returning at 11:30.
 3             THE COURTROOM DEPUTY:  Jurors, take all your
 4   belongings.  The restroom is outside to your left.  Do not come
 5   back in.  I will come get you guys.
 6        (Out of the presence of the jury.)
 7             THE COURT:  Please be seated.
 8        After the break I'm going to go over the challenges for
 9   cause with you before we bring the jurors back in.  After we
10   bring them in, I will have you do your peremptory challenges,
11   so please think about that during your break so that we don't
12   have to take any more time giving you time to relive that.  So
13   we will return without the jury at 11:30, and I will give you a
14   chance to talk about the challenges for cause, and then we will
15   bring them back in and do peremptory challenges.
16        (Recess taken from 11:13 a.m. to 11:30 a.m.)
17             THE COURTROOM DEPUTY:  Please remain seated and come
18   to order.
19             THE COURT:  All right.  Let me tell you who I am
20   going to challenge for cause.  Some of these will not be a
21   surprise to you.  Juror No. 4, Juror No. 12 and Juror No. 23.
22        Are there any objections?
23             MR. H. RUSSELL:  No, Your Honor.
24             MR. PACHOWICZ:  No objections, Your Honor.
25             THE COURT:  All right.  The only one that I wanted
```

1    to discuss with you is Juror No. 5.  It wasn't entirely clear

2    to me whether the City of Long Beach, the City of South Gate

3    and the County of Los Angeles are his clients, but from what he

4    said, it does sound like his firm does receive compensation

5    from these entities.  So because he's a partner in the firm,

6    even if he doesn't work on the cases involving those entities,

7    I think that it might be appropriate to challenge him for cause

8    as well.

9              MR. PACHOWICZ:  I agree.  In fact, he was one of the

10   people that I was going to ask the Court to talk about because

11   I actually have dealt with his firm in the past.  I know that

12   they have represented the County of Ventura in a number of

13   actions that I was part of.  And I believe he did say that he

14   was -- that his firm does represent the City of Long Beach, and

15   I don't believe that a client and an attorney should have that

16   juror/defendant relationship.

17             THE COURT:  All right.

18             MR. H. RUSSELL:  And, Your Honor, I have no

19   objection.  And for the record, that firm has been retained by

20   the City.  I know in the past they have provided the

21   state-mandated training to managers on sexual harassment, and I

22   think they also may have been outside counsel on at least one

23   wage-and-hour-type case.  So I have no objection to him being

24   excused.

25             THE COURT:  All right.  Then I will challenge him

1   for cause as well.

2       Are there any other comments on challenges for cause?

3           MR. H. RUSSELL:  There is, Your Honor.  Juror No. 7,

4   I have some concerns about her level of understanding.  I know

5   that she said that she reads English.  She said that she has

6   understood everything so far, but her responses to some of my

7   questions about her promising us to let us know during the

8   trial if she understood what was happening, she seemed not to

9   understand that question at all, and her response was not

10  appropriate for someone who understood that.

11      And so I don't want to -- I don't want to say that anybody

12  whose language is not English first shouldn't be a juror.  In

13  fact, Juror No. 8 seems to have a good understanding of the

14  proceedings even though he's got a very strong accent, but

15  Juror No. 7 I really don't think is sure of what's been said.

16  I think she's going to have a hard time reading the jury

17  instructions and understanding the evidence, and we would like

18  to challenge her for cause on those grounds.

19          THE COURT:  All right.  Mr. Pachowicz?

20          MR. PACHOWICZ:  I don't want to make a habit of

21  this, but I agree with him.

22          THE COURT:  It is usually my practice not to

23  challenge them for cause if they can at least make it through

24  the list of questions and respond to them accordingly, but I do

25  have to say that from her interaction with Mr. Russell in

1   response to his questions, that did give rise to some concern

2   on my part as to whether she was fully able to understand.  So

3   I will challenge her for cause.

4       If there's nothing else, then we will call the jury venire

5   in and we will start with the peremptory challenges.

6           MR. H. RUSSELL:  Your Honor, the only thing we would

7   ask is your courtroom deputy had indicated before when a juror

8   is excused, the jurors will just slide down.  Are we going to

9   do that before we start exercising the peremptories, or do we

10  just keep track of their original -- we just count empty seats?

11          THE COURT:  My practice is to have them fill the

12  seats as people leave.

13          MR. H. RUSSELL:  Okay.

14          THE COURT:  All right?

15          MR. H. RUSSELL:  Yes.  Thank you.

16          THE COURT:  All right.  Can you bring the jurors in.

17      (Pause in proceedings.)

18          THE COURTROOM DEPUTY:  All rise for the jury panel.

19      (In the presence of the prospective jury.)

20          THE COURTROOM DEPUTY:  Please be seated and come to

21  order.

22          THE COURT:  At this time I will thank and excuse the

23  following jurors.  And when I call your number, you should go

24  back to the jury assembly room on the first floor.  All right.

25  Jurors Number 4, 5, 7, 12 and 23.  Thank you.  You may be

1   excused.  Please return to the first floor jury assembly room.

2       All right.  Mr. Pachowicz, do you wish to exercise your

3   first peremptory?

4               MR. PACHOWICZ:  I do, Your Honor.

5               THE COURT:  First, share that information with

6   Mr. Russell first before you announce it.

7               MR. PACHOWICZ:  And just in terms of numbering, have

8   they changed to these numbers?

9               THE COURT:  No.

10              MR. PACHOWICZ:  Okay.  Thank you.

11      (Discussion off the record.)

12              MR. PACHOWICZ:  The plaintiff would like to thank

13  and excuse Juror No. 11.

14              THE COURT:  Juror No. 11, thank you.  You are

15  excused.  Please return to the first floor jury assembly room.

16      Mr. Russell.

17      (Discussion off the record.)

18              MR. H. RUSSELL:  Your Honor, the defense would like

19  to thank and excuse Juror No. 3.

20              THE COURT:  All right.  Thank you, Juror No. 3.

21  Please return to the first floor jury assembly room.

22      Mr. Pachowicz.

23      (Discussion off the record.)

24              MR. PACHOWICZ:  Your Honor, the plaintiffs would

25  like to thank and excuse Juror No. 10.

1          THE COURT:  All right.  Juror No. 10, thank you.
2   You are excused.  Please return to the jury assembly room.
3        Mr. Russell.
4        (Discussion off the record.)
5          MR. H. RUSSELL:  Your Honor, the defense would like
6   to thank and excuse Juror No. 3.
7          THE COURT:  All right.  Juror No. 3 -- wait.  Juror
8   No. 3 was already excused.
9          MR. H. RUSSELL:  The one that's sitting in seat
10  number 3 now.  I believe it is Juror No. 6.
11         THE COURT:  Juror No. 6.  Thank you, Juror No. 6.
12  You may be excused.  Please return to the first floor.
13       Mr. Pachowicz, your final peremptory.
14         MR. PACHOWICZ:  Yes, Your Honor.  Can I have just
15  one second?
16       (Discussion off the record.)
17         MR. PACHOWICZ:  Plaintiff would like to thank and
18  excuse Juror No. 16.
19         THE COURT:  All right.  Juror No. 16, thank you.
20  You may be excused.  Please return to the first floor.
21         THE COURTROOM DEPUTY:  Juror No. 17 has entered the
22  box.
23       (Discussion off the record.)
24         MR. H. RUSSELL:  Your Honor, the defense would like
25  to thank and excuse Juror No. 9.

1        THE COURT:  Juror No. 9, thank you.  You may be

2   excused.  Please return to the first floor jury assembly room.

3        THE COURTROOM DEPUTY:  Juror No. 18 has entered the

4   box.

5        THE COURT:  All right.  Are there any objections to

6   the jury as constituted?

7        MR. PACHOWICZ:  No, Your Honor.

8        MR. H. RUSSELL:  No, Your Honor.

9        THE COURT:  All right.  Last chance to give your

10  final word as to some reason why we can't empanel you as our

11  jury.

12       All right.  Very good.

13       Would the clerk please administer the oath.

14       THE COURTROOM DEPUTY:  Please stand and raise your

15  right hand.

16                      **THE JURY WAS SWORN**

17       (Members of the jury responded, "I do.")

18       THE COURTROOM DEPUTY:  Thank you.  You may be

19  seated.

20       THE COURT:  Those who are in the gallery, we thank

21  you for your service coming in.  You may be excused.  Please

22  return to the first floor jury assembly room.

23       At this time I'm going to read the preliminary

24  instructions.  And after that, we will take our lunch break,

25  and we will begin the trial after lunch.

1          Ladies and gentlemen, you are now the jury in this case.

2     It is my duty to instruct you on the law.  You must not infer

3     from these instructions or from anything I may say or do as

4     indicating that I have an opinion regarding the evidence or

5     what your verdict should be.

6          It is your duty to find the facts from all the evidence in

7     the case.  To those facts you will apply the law as I give it

8     to you.  You must follow the law as I give it to you whether

9     you agree with it or not, and you must not be influenced by any

10    personal likes or dislikes, opinions, prejudices or sympathy.

11    That means that you must decide the case solely on the evidence

12    before you.  You will recall that you took an oath to do so.

13         In following my instructions you must follow all of them

14    and not single out some and ignore others.  They are all

15    important.

16         To help you follow the evidence, I will give you a brief

17    summary of the positions of the parties.  Plaintiff Marcelo

18    Bedetti asserts that defendants Long Beach Police Department,

19    Officers Douglas Bacon, Roque Foster, David Corcoran, Alexander

20    Saldana, Randy Beach and Jason Lehman violated the United

21    States Constitution by arresting him without probable cause and

22    deprived him of his right to exercise free speech by arresting

23    him in retaliation for his criticism of the defendant officers'

24    conduct.

25         Plaintiff also asserts that Defendants Corcoran, Saldana,

Beach and Lehman used, or caused to be used, excessive force while arresting him.  In addition, plaintiff asserts state law claims for negligence, battery, and false imprisonment.  Plaintiff has the burden of proving these claims.

Defendants deny those claims and allege the affirmative defense that plaintiff was negligent in causing his own injury.  Defendants have the burden of proving their affirmative defense.  Plaintiff denies defendants' affirmative defense.

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that a claim or affirmative defense is more probably true than not true.  You should base your decision on all of the evidence regardless of which party presented it.  You should decide the case as to each party separately.  Unless otherwise stated, the instructions apply to all parties.

The evidence you are to consider in deciding what the facts are consists of:  1, the sworn testimony of any witnesses; 2, the exhibits which are received in evidence; and 3, any facts to which the lawyers have agreed.  In reaching your verdict you may consider only the testimony and exhibits received into evidence.

Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you: 1, arguments and statements by lawyers are not evidence.  The

lawyers are not witnesses.  What they will say in their opening

statements, in their closing arguments, and at other times is

intended to help you interpret the evidence, but it is not

evidence.  If the facts as you remember them differ from the

way the lawyers have stated them, your memory of them controls.

2, questions and objections by lawyers are not evidence.

Attorneys have a duty to their clients to object when they

believe a question is improper under the rules of evidence.

You should not be influenced by the objection or by the Court's

ruling on it.

3, testimony that has been excluded or stricken or that

you have been instructed to disregard is not evidence and must

not be considered.  In addition, sometimes testimony and

exhibits are received only for a limited purpose.  When I give

a limiting instruction, you must follow it.

4, anything you may have seen or heard when the Court was

not in session is not evidence.  You are to decide the case

solely on the evidence received at the trial.

Some evidence may be admitted for a limited purpose only.

When I instruct you that an item of evidence has been admitted

for a limited purpose, you must consider it only for that

limited purpose and for no other purpose.

Evidence may be direct or circumstantial.  Direct evidence

is direct proof of a fact, such as testimony by a witness about

what that witness personally saw or heard or did.

Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.  Opinion testimony should be judged just like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion and all the other evidence in the case.

There are rules of evidence that control what can be received into evidence.  When a lawyer requests a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That

means that when you are deciding the case, you must not

consider the stricken evidence for any purpose.

In deciding the facts in this case, you may have to decide

which testimony to believe and which testimony not to believe.

You may believe everything a witness says, or part of it, or

none of it.  Proof of a fact does not necessarily depend on the

number of witnesses who testify about it.

In considering the testimony of any witness you may take

into account:  1, the opportunity and the ability of the

witness to see or hear or know the things testified to; 2, the

witness's memory; 3, the witness's manner while testifying; 4,

the witness's interest in the outcome of the case and any bias

or prejudice; 5, whether other evidence contradicted the

witness's testimony; 6, the reasonableness of the witness's

testimony in light of all the evidence; and 7, any other

factors that bear on believability.

Sometimes a witness may say something that is not

consistent with something else he or she said.  Sometimes

different witnesses will give different versions of what

happened.  People often forget things or make mistakes in what

they remember.  Also, two people may see the same event but

remember it differently.  You may consider these differences,

but you do not necessarily have to decide that testimony is

untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately

testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses were and how much weight you think their testimony deserves.

I will now say a few things about your conduct as jurors. First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.  Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.

Thus, until the end of the case or until I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, tweet or any Internet chat room, blog, website or application, including,

but not limited to, Facebook, YouTube, Twitter, Instagram,
LinkedIn, Snapchat or any other forms of social media.

     This applies to communicating with your fellow jurors
until I give you the case for deliberation, and it applies to
communicating with everyone else, including your family
members, your employer, the media or the press, and the people
involved in the trial, although you may notify your family and
your employer that you have been seated as a juror in the case
and how long you expect the trial to last.

     But if you are asked or approached in any way about your
jury service or anything about this case, you must respond that
you have been ordered not to discuss the matter and to report
the contact to the Court.

     Because you will receive all the evidence and legal
instruction you properly may consider to return a verdict, do
not read, watch or listen to any news or media accounts or
commentary about the case or anything to do with it.  Do not do
any research, such as consulting dictionaries, searching the
Internet or using other reference materials, and do not make
any investigation or in any way try to learn about the case on
your own.

     Do not visit or view any place discussed in this case, and
do not use Internet programs or other devices to search for or
view any place discussed during the trial.  Also, do not do any
research about this case, the law, or the people involved until

1   you have been excused as jurors.  If you happen to read or hear

2   anything touching on this case in the media, turn away and

3   report it to me as soon as possible.

4       These rules protect each party's right to have this case

5   decided only on evidence that has been presented here in court.

6   Witnesses here in court take an oath to tell the truth, and the

7   accuracy of their testimony is tested through the trial

8   process.  If you do any research or investigation outside the

9   courtroom, or gain any information through improper

10  communications, then your verdict may be influenced by

11  inaccurate, incomplete or misleading information that has not

12  been tested by the trial process.

13      Each of the parties is entitled to a fair trial by an

14  impartial jury, and if you decide the case based on information

15  not presented in court, you will have denied the parties a fair

16  trial.  Remember, you have taken an oath to follow the rules,

17  and it is very important that you follow these rules.  A juror

18  who violates these restrictions jeopardizes the fairness of

19  these proceedings.  If any juror is exposed to any outside

20  information, please notify the Court immediately.

21      If there is any news media account or commentary about the

22  case or anything to do with it, you must ignore it.  You must

23  not read, watch or listen to any news media account or

24  commentary about the case or anything to do with it.  The case

25  must be decided by you solely and exclusively on the evidence

1    that was received in the case and on my instructions as to the

2    law that applies.  If any juror is exposed to any outside

3    information, please notify me immediately.

4          During deliberations, you will have to make your decision

5    based on what you recall of the evidence.  You will not have a

6    transcript of the trial.  I urge you to pay close attention to

7    the testimony as it is given.  If at any time you cannot hear

8    or see the testimony, evidence, questions or arguments, let me

9    know so that I can correct the problem.

10         If you wish, you may take notes to help you remember the

11   evidence.  If you do take notes, please keep them to yourself

12   until you and your fellow jurors go to the jury room to decide

13   the case.  Do not let note-taking distract you.  When you

14   leave, your notes should be left in the courtroom.  No one will

15   read your notes.  Whether or not you take notes, you should

16   rely on your own memory of the evidence.  Notes are only to

17   assist your memory.  You should not be overly influenced by

18   your notes or those of your fellow jurors.

19         From time to time during the trial it may become necessary

20   for me to talk with the attorneys out of the hearing of the

21   jury, either by having a conference at the bench when the jury

22   is present in the courtroom or by calling a recess.  Please

23   understand that while you are waiting, we are working.  The

24   purpose of these conferences is not to keep relevant

25   information from you, but to decide how certain evidence is to

1    be treated under the rules of evidence and to avoid confusion

2    and error.  Of course we will do what we can to keep the number

3    and length of these conferences to a minimum.

4        I may not always grant an attorney's request for a

5    conference.  Do not consider my granting or denying a request

6    for a conference as any indication of my opinion of the case or

7    of what your verdict should be.

8        Trials proceed in the following way:  First, each side may

9    make an opening statement.  An opening statement is not

10   evidence.  It is simply an outline to help you understand what

11   the party expects the evidence will show.  A party is not

12   required to make an opening statement.

13       Plaintiff will then present evidence, and counsel for

14   defendant may cross-examine.  Then defendant may present

15   evidence, and counsel for plaintiff may cross-examine.  After

16   the evidence has been presented, I will instruct you on the law

17   that applies to the case, and the attorneys will make closing

18   arguments.  After that, you will go to the jury room to

19   deliberate on your verdict.

20       All right.  At this time we will have our lunch recess,

21   and we will return at 1:15.

22            THE COURTROOM DEPUTY:  All rise.

23            THE COURT:  We are in recess.

24        (Proceedings concluded at 12:02 p.m.)

25                    ---oOo---

1             **CERTIFICATE OF OFFICIAL REPORTER**

2

3 COUNTY OF LOS ANGELES   )
                             )
4 STATE OF CALIFORNIA     )

5

6           I, CAROL JEAN ZURBORG, Federal Official Realtime

7 Court Reporter, in and for the United States District Court for

8 the Central District of California, do hereby certify that

9 pursuant to Section 753, Title 28, United States Code that the

10 foregoing is a true and correct transcript of the

11 stenographically reported proceedings held in the

12 above-entitled matter and that the transcript page format is in

13 conformance with the regulations of the judicial conference of

14 the United States.

15

16 Date:  May 30, 2017

17

18

19                     /s/ CAROL JEAN ZURBORG

20               CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                 Federal Official Court Reporter
21

22

23

24

25