```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3           HONORABLE DOLLY M. GEE, U.S. DISTRICT JUDGE

 4

 5   MARCELO OSCAR BEDETTI,            )
                                       )
 6                   Plaintiff,        )
                                       )            Case No.
 7        vs.                          )   CV14-09102 DMG (JCx)
                                       )
 8   CITY OF LONG BEACH, et al.,       )      (Pages 1 - 130)
                                       )
 9                   Defendants.       )
     _____)

10

11

12           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                  TRIAL DAY 2 - MORNING SESSION
13                 WEDNESDAY, MAY 3, 2017
                          8:51 A.M.
14               LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23        CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
               FEDERAL OFFICIAL COURT REPORTER
24             350 WEST 1ST STREET, SUITE 4311
             LOS ANGELES, CALIFORNIA 90012-4565
25                    (213) 894-3539
```

1     **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       LAW OFFICES OF MARK PACHOWICZ, APLC
        BY:  MARK PACHOWICZ
5       BY:  JONNY RUSSELL
             Attorneys at Law
6       771 Daily Drive, Suite 230
        Camarillo, California 93010
7       (805) 987-4975

8

    **FOR THE DEFENDANTS:**
9
        LONG BEACH CITY ATTORNEY'S OFFICE
10      BY:  HOWARD D. RUSSELL
             Deputy City Attorney
11      333 West Ocean Boulevard, 11th Floor
        Long Beach, California 90802
12      (562) 570-2200

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                          **I N D E X**

2

3       --------------------------------------------------------

4                **CHRONOLOGICAL INDEX OF WITNESSES**

5 **EXAMINATIONS**                                         **PAGE**

6   DAVID CORCORAN
        DIRECT EXAMINATION BY MR. PACHOWICZ        8
7         CROSS-EXAMINATION BY MR. H. RUSSELL      47
        REDIRECT EXAMINATION BY MR. PACHOWICZ    91
8
  DOUGLAS BACON
9         DIRECT EXAMINATION BY MR. PACHOWICZ     96
        CROSS-EXAMINATION BY MR. H. RUSSELL   110
10         REDIRECT EXAMINATION BY MR. PACHOWICZ   125

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## INDEX OF EXHIBITS

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| G | 107 | |
| C-1-1 | 10 | |
| C-1-2 | 35 | |
| C-1-3 | 19 | |
| P-2 | 48 | 48 |
| P-4 | 49 | 50 |
| P-5 | 51 | 51 |
| V-5A | 79 | |
| C-19 | 9 | |
| V-21 | 52 | 52 |
| V-46 | 63 | 64 |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 3, 2017**

2                         **8:51 A.M.**

3                         --oOo--

4          THE COURTROOM DEPUTY:  Calling Item No. 1:

5    CV 14-9102-DMG; Marcelo Oscar Bedetti versus City of Long

6    Beach, et al.

7       Counsel, your appearances, please.

8          MR. PACHOWICZ:  Good morning, Your Honor.  Mark

9    Pachowicz on behalf of Mr. Bedetti.

10         MR. J. RUSSELL:  Good morning, Your Honor.  Johnny

11   Russell on behalf of the plaintiff.

12         MR. H. RUSSELL:  Good morning, Your Honor.  Howard

13   Russell for defendants.

14         THE COURT:  Good morning.

15      All right.  There are some light housekeeping matters?

16         MR. PACHOWICZ:  I have an issue, and that is can I

17   know, from the Court's perspective, the amount of time that we

18   used yesterday?

19         THE COURT:  Yes.  You have used 81 minutes, and

20   defendants have used 38.

21         MR. PACHOWICZ:  For the Court's information, I had

22   estimated 45, I think, for the opening.  I think I took 20.  I

23   didn't use all the time for voir dire.  I'm trying to move this

24   as quickly as possible having everything premarked.  I spent

25   probably two hours last night trying to cut things and

```
 1   streamline things and calculate minutes that I have to divvy up
 2   between the defendants, my client expert, doctor and a
 3   civilian, not to mention I have two videotapes that are
 4   probably ten minutes long and another one that's five minutes
 5   long, and I'm trying to figure out how to make that happen.
 6           THE COURT:  Well, the key is that we should be
 7   finished with the first phase by Friday.
 8           MR. PACHOWICZ:  Well, I'm doing -- I just want the
 9   Court to know, I'm doing everything I can to make that happen,
10   but at some point I just feel that I'm doing a disservice to
11   him when I spend two hours trying to calculate minutes.  And
12   that's my only concern, and I just wanted to advise the Court
13   of that.  Thank you.
14           THE COURT:  I appreciate your efforts.  I'm not
15   going to be overly rigid about it, but I do want to have the
16   first phase completed by Friday.  All right?
17       Anything else?  Oh, I did receive the proposed limiting
18   instruction.  Is that agreed upon, or is there a
19   counterproposal?
20           MR. PACHOWICZ:  That's agreed upon.  We had, I
21   think, gone back and forth with the disputed instructions.  We
22   had provided one, and counsel provided one.  We provided an
23   alternate.  He provided that one last night, and I'm fine with
24   it.
25           THE COURT:  All right.  That limiting instruction
```

1   will be used only with respect to the third paragraph.  I don't

2   think it's necessary to repeat the preliminary instruction

3   about limiting instructions, which I have already stated and

4   will state again in the final instructions.

5            MR. PACHOWICZ:  All right.  I understand.  Thank

6   you.

7            THE COURT:  All right.  If there's nothing else,

8   then we will recess and wait until all of the jurors have

9   arrived.

10           MR. J. RUSSELL:  Thank you, Your Honor.

11      (Recess taken from 8:54 a.m. to 9:09 a.m.)

12           THE COURTROOM DEPUTY:  All rise for the jury.

13      (In the presence of the jury.)

14           THE COURTROOM DEPUTY:  You may be seated.

15      (Pause in proceedings.)

16           THE COURTROOM DEPUTY:  Please remain seated and come

17   to order.

18           THE COURT:  Good morning, ladies and gentlemen of

19   the jury.

20      (Members of the jury said, "Good morning.")

21           THE COURT:  Mr. Pachowicz, are you ready with your

22   next witness?

23           MR. PACHOWICZ:  I am, Your Honor.

24      Officer Corcoran.

25           THE COURTROOM DEPUTY:  Please raise your right hand.

1 **<u>DAVID CORCORAN, DEFENDANT, WAS SWORN</u>**

2 THE WITNESS: I do.

3 THE COURTROOM DEPUTY: Thank you. You may be

4 seated.

5 Please state and spell your full name for the record.

6 THE WITNESS: My first name is David, D-a-v-i-d;

7 last name Corcoran, spelled C-o-r-c-o-r-a-n.

8 **DIRECT EXAMINATION**

9 BY MR. PACHOWICZ:

10 Q Sir, who do you work for?

11 A City of Long Beach.

12 Q How long have you worked for the City of Long Beach?

13 A 19-1/2 years.

14 Q And what position do you hold with the City of Long Beach?

15 A I'm a police officer.

16 Q You had your deposition taken in this case on December 6,

17 2016; is that correct?

18 A Yes.

19 Q And after the deposition was taken, you had an opportunity

20 to review that deposition, correct?

21 A Yes.

22 Q And then you signed that deposition under penalty of

23 perjury, correct?

24 A Yes.

25 Q And is it true during that deposition, sir, that you

1    stated that "No, he..." referring to Mr. Bedetti "...never told

2    me he was going to shoot me"?

3    A    Not in those words, no.

4    Q    Okay.  I would like you to look in front of you.  There is

5    a binder, just -- it's open, right there.  Yeah, that one.

6         And if I could have you look at your deposition, which I

7    believe is marked as Exhibit C-19.

8         (Exhibit C-19 for identification.)

9              MR. PACHOWICZ:  And for the Court, I will be

10   directing his attention to page 40, lines 5 and 6.

11   Q    Are you there, sir?

12   A    Yes.

13   Q    Did you say under oath, at line 5, quote, "No, he never

14   told me he was going to shoot me"?

15   A    That's correct.

16   Q    You then further said -- you were asked, "Okay.  He told

17   you he was going to defend himself?"

18        And you answered, "That's correct"; is that true?

19   A    Yes.

20   Q    And on page 39, if I can direct your attention there, at

21   line 19, you were asked, "Did he, like, say, 'I'll shoot you

22   tomorrow'?  'I'm going to shoot you right now'?"

23        And your answer was "No, he never told me that.  If I

24   tried to detain him" --

25        There's a question, "He would shoot you?"

1          "He would defend himself."

2          "Oh, okay."

3          So your testimony under oath during your deposition was

4    Mr. Bedetti never told you that he would shoot you, correct?

5    A    Not in those words, no.

6    Q    Were the words that I just read from the deposition not

7    accurate, sir?

8    A    He said he would defend himself, that's correct.

9    Q    He said he would defend himself?

10   A    That's correct.

11   Q    That's different than he would shoot you, correct?

12   A    Yes.

13   Q    And so we're clear, under penalty of perjury, at your

14   deposition you testified that Mr. Bedetti never said he would

15   shoot you, correct?

16   A    Not in those words.

17   Q    So you're saying he used other words to say, "I'm going to

18   shoot you," other than, "I'm going to shoot you"; is that

19   your --

20   A    Yes.

21   Q    Now, you wrote a report in this case, correct?

22   A    Yes.

23   Q    And that report, in front of the book that you have in

24   your hand, and that is Exhibit C-1-1.

25          (Exhibit C-1-1 for identification.)

1    BY MR. PACHOWICZ:

2    Q     Do you see that?

3    A     I have C-1.

4    Q     Okay.  Now, in that report -- first, is that your report?

5    A     Yes.

6    Q     Did you spend approximately two hours at the scene, after

7    you had contact with Mr. Bedetti, talking to the other officers

8    involved in this case about what happened?

9    A     I don't know how long I spent there.

10   Q     Was it more than an hour, sir?

11   A     I would say yes.  I would be guessing how long.

12         THE COURT:  We don't want you to guess, but we're

13   entitled to your best estimate.

14         THE WITNESS:  I would say it was at least an hour,

15   if not more.

16   BY MR. PACHOWICZ:

17   Q     According to the time logs we looked at in your

18   deposition, it said that you were on scene for about two hours

19   after the incident, correct?

20   A     That's what the logs say, yes.

21   Q     Now, in this report that you prepared, did you write down

22   information accurately as it happened?

23   A     I wrote down the information as I remembered it from the

24   incident.

25   Q     Is how you remembered it different than accurate?

1  A    Could you say that one more time?

2  Q    Sure.  You said -- I asked you if you wrote it -- if what

3  you wrote was accurate, and you said "It was how I remembered

4  it," and I was wondering if there was a difference there for

5  you.

6  A    It's probably as accurate as it can be.  I mean, I was

7  there when it happened.  I wrote down what I remembered from

8  the incident.

9  Q    All right.  Can you show me in this report, sir, where you

10  wrote down that Mr. Bedetti said he was going to shoot you?

11  A    I don't need to look.  I never said that.  I didn't write

12  that.

13  Q    You didn't write down in your report two hours -- well,

14  strike that.

15       When did you write this report, sir?

16  A    After the incident occurred.

17  Q    You spent about an hour or so at the scene with the other

18  defendants, and then you go to the police station and you write

19  your report, correct?

20  A    Two hours?  Did you say two hours?

21  Q    I said an hour or so because I thought that was your best

22  estimate of the time you spent at the scene talking to the

23  other individuals.

24  A    Okay.  I wrote the report immediately after, or the next

25  thing I did was write the report.

```
1   Q    And you didn't, in this report that you wrote, write that
2   Mr. Bedetti said that he would shoot you, correct?
3   A    That's correct, I never wrote that in the report.
4   Q    And that's because Mr. Bedetti never told you he would
5   shoot you, correct?
6   A    That's correct, not in those words.
7   Q    You keep saying "not in those words."  What words did
8   Mr. Bedetti use, according to you, that are the same as "I'm
9   going to shoot you"?
10  A    He told me that he was going to defend himself, and he
11  said, "I have a gun."  He said, "You have a gun; I have a gun."
12  He said he was going to defend himself.  I made the inference
13  he was going to defend himself by shooting with a gun.
14  Q    And he told you he had a gun.  He also told you he was a
15  police officer, correct?
16  A    No.
17  Q    He never told you he was a police officer?
18  A    No.
19  Q    Did anyone -- when did you first learn, according to you,
20  that he was a police officer?
21  A    After he was handcuffed and sitting on the ground in the
22  parking lot of where the incident occurred.
23  Q    And would you agree, sir, with Officer Saldana, who has
24  said it is a courtesy, that most officers will let another
25  officer know that's in uniform that he's either a -- he's an
```

1    officer or that he's armed?

2    A    Are you saying that's something Officer Saldana told me?

3    Q    No.  I'm asking you if you agree with that statement.

4    A    I don't understand.  He said something, and you're asking

5    me if I agree with what he said?

6    Q    Yes, sir.

7    A    I mean, not in every instance.  I don't understand how you

8    are asking me that.

9    Q    Do you carry a weapon off duty?

10   A    Sometimes.

11   Q    And if you have contact with a fellow law enforcement

12   officer while you are not on duty, do you advise them that

13   you're a police officer?

14   A    Not always, no.

15   Q    Sometimes?

16   A    Usually if I'm pulled over on a traffic stop situation and

17   my gun is near my driver's license, I will let the officer know

18   that "I have a gun in my possession.  It's near my wallet, and

19   I'm a police officer."  In that instance I would, yes.

20   Q    And that's as a courtesy to them so there's no

21   misunderstanding that "I am a police officer.  I have a gun;

22   you have a gun.  Don't be alarmed," correct?

23   A    No, that's if I reach for my driver's license and there is

24   a gun next to it, he doesn't shoot me.

25   Q    When you tell the officer that, you're not threatening to

1   shoot him, are you?

2   A    No.  I'm just letting him know so he doesn't believe I'm

3   attempting to reach for my handgun instead of my license.

4   Q    Now, at no point did you say in your report, "Mr. Bedetti

5   said he was going to defend himself, and I took that to mean he

6   was going to shoot me," correct?

7   A    Not in those words I didn't write that in my report, no.

8   Q    In no words did you write that in your report, correct?

9   A    I quoted him in my report.  I could read the quote.

10  Q    Did you write in a quote, "He's going to shoot me"?

11  A    No, because he didn't say that, no.

12  Q    Did you write in the report that "He said this, which I

13  took to mean he was going to shoot me"?

14  A    I would have to look at my report how it's exactly worded.

15  Q    When you apparently took this as a threat to shoot you,

16  did you take out your gun?

17  A    No.  I unsnapped the safety holster portion of it, put my

18  hand on my gun and advanced towards him and asked him to

19  produce ID that would allow him to carry a gun on his person.

20  Q    Did you write that in your report, that you unsnapped the

21  holster of your gun?

22  A    I would have to look to see if I did.

23  Q    Well, did you read your report before you came here today?

24  A    Yes, but if you would like me to quote my report, I would

25  like to look at it.

1    Q     Well, you can look at it.

2              THE REPORTER:  One at a time.

3              THE COURT:  Please do not speak at the same time.

4    Each person needs to wait until the other person is finished so

5    the court reporter can take down one person talking at a time.

6              THE WITNESS:  Sorry.

7    BY MR. PACHOWICZ:

8    Q     You can look in your report and tell me where you said in

9    there, if you did, where you unsnapped your holster.

10   A     I might not have written it, but it's what I did.  If you

11   are asking me what I did at the scene that night, that's what I

12   did.  Whether I wrote it in there or not, I unsnapped my

13   holster.

14   Q     And unsnapping your holster is a show of force, correct?

15   A     It shows readiness, I guess, in case something happens.  I

16   don't know if I would call it force.

17   Q     You have -- were you doing an investigation when

18   Mr. Bedetti pulled into the parking lot?

19   A     Yes.

20   Q     And what were you investigating?

21   A     Possible domestic violence incident.

22   Q     When did that investigation start?  What was the first

23   event that started that investigation?

24   A     A citizen approached our police vehicle that me and

25   Officer Bacon were sitting in and informed us that a gentleman

1    in the parking lot next to where we were parked had punched his

2    fist through a window of a car and was in a heated verbal

3    altercation with a female that was seated in the vehicle.

4    Q    And when did that investigation end?

5    A    When the female drove out of the parking lot, I assume.

6    Q    Well, you were conducting the investigation, so I don't

7    want you to assume when you concluded your investigation.  I

8    want to know when it ended.

9    A    Well, my interview -- or the interviews ended when she

10   drove out of the parking lot, but other officers went back to

11   their residence and conducted another interview at another

12   time.  So when she drove out of the parking lot, to me I had

13   nothing more to say at that point.

14   Q    Well, even before she drove out of the parking lot, you

15   had nothing to say to her at all, correct?  You didn't speak to

16   her during your investigation, correct?

17   A    No.

18   Q    You spoke to her?

19   A    I said "no," I didn't speak to her.

20   Q    And Officer Bacon spoke to her, correct?

21   A    That's correct.

22   Q    And you documented the fact that Officer Bacon spoke to

23   her, correct?

24   A    Yes.

25   Q    In your report you wrote that Officer Bacon had talked to

1  her, correct?

2  A    Yes.

3  Q    And the investigation you were conducting was to determine

4  whether a violation of law took place, correct?

5  A    Yes.

6  Q    And the section that you were investigating was a 273.5,

7  which is domestic violence, correct?

8  A    If we have to give it a penal code section, we could use

9  that one, sure.

10  Q    All right.  So the elements of that require an injury,

11  correct?

12  A    Yes, I guess you could say there has to be some sort of

13  visible injury, but there were times we have taken people to

14  jail for domestic violence where there were a female or male

15  involved that didn't have anything visible on their person as

16  far as injury.

17  Q    Well, doesn't the elements of 273.5 require a, quote,

18  traumatic injury, end quote?

19  A    I don't know how the section -- if you want to quote, I

20  will read it, but if a woman tells me, "He hit me.  I want him

21  to go to jail," and they're married, California law requires

22  that he be taken to jail for domestic violence.

23  Q    Did Ms. -- what was the lady's name?

24  A    Suzy Hacopian.

25  Q    And that's what Officer Bacon told you, correct?

```
 1   A     Yes.

 2   Q     And Officer Bacon told you that Suzy Hacopian said she was

 3   never hit, correct?

 4   A     I don't think I wrote that in my report.  I don't recall

 5   what he told me as far as the incident, without looking.  Is it

 6   all right if I look?

 7   Q     I would like you to look at Exhibit C-1-3, the first full

 8   paragraph that begins, "As I began."

 9         (Exhibit C-1-3 for identification.

10              THE WITNESS:  I'm there.

11   BY MR. PACHOWICZ:

12   Q     The sentence that says "During this time Officer Bacon

13   informed me that the dispute between Hacopian and his wife was

14   very heated but only verbal."

15   A     Okay.

16   Q     Do you see that?

17   A     Yes, sir.

18   Q     So Officer Bacon told you that there was no injury.  It

19   was only a verbal argument, correct?

20   A     Yes.

21   Q     "And that Officer Bacon informed me that we were going to

22   stand by in a keep-the-peace capacity," correct?

23   A     Yes.

24   Q     That's the end of your, quote, investigation, correct?

25   A     It wasn't the end of the incident, but as far as I was
```

1   concerned, there was no further need to interview her regarding

2   what had occurred.

3   Q    And in an investigation, according to the police officers

4   standard and training, is a systematic gathering of evidence,

5   correct?

6   A    Honestly, I don't know.  If you're asking me to quote

7   that, I would probably need to read it.

8   Q    Well, you're a field training officer for the City of Long

9   Beach, correct?

10  A    I have been, yes.

11  Q    And that means you train other officers, correct?

12  A    That's correct.

13  Q    And so have you taught anyone what the definition of an

14  investigation is?

15  A    No.

16  Q    Why not?

17  A    I just show them how to do a proper investigation.  I

18  don't ask them to quote the definition of what an investigation

19  is.

20  Q    All right.  So when you show them how to conduct an

21  investigation into, let's say, an alleged 273.5, do you tell

22  them to identify the suspect by name?

23  A    I tell the recruit, or whoever I'm training, to get their

24  name, yes.

25  Q    Did you tell them to get Mr. Hacopian's name during your

1    investigation?

2    A     I thought I had his correct last name, but I didn't.

3    Q     And how did you end up writing "Hacopian" in your report

4    all the time?

5    A     I made the mistake of believing, when he said they were

6    married, that they shared the same last name.  That was my

7    fault.

8    Q     So you didn't ask him what his name was?

9    A     I made the assumption.  I made the mistake of assuming

10   since they were married, that they shared the same last name.

11   Q     Did you ask him for his driver's license or any form of

12   identification so you would know who you were talking to?

13   A     Apparently not.

14   Q     Did you ask for his date of birth so you could run him in

15   the criminal justice system databases and find out whether he

16   had any wants or warrants?

17   A     I don't believe I obtained his driver's license, no.

18   Q     Did you take any notes of your, quote, interview with him?

19   A     I might have done an FI card on him, but I don't know.  I

20   didn't write any report if I did an FI or not.

21   Q     Well, if you wrote an FI card on him -- and "FI" stands

22   for field information card -- you would have his name, correct?

23   A     Not necessarily, not in the beginning.  I would have just

24   written down what had occurred, his injuries to his hand, how

25   long they had been married, if they had any children together,

```
 1   they are currently living together and maybe what had just
 2   occurred.
 3   Q    Where is that -- sorry.
 4   A    It depends on the chronological way I do it.  There's no
 5   set pattern of how I have to do it as long as it gets done.
 6   Q    You have no memory of doing that, correct?
 7   A    You are asking me how to conduct an investigation.  That's
 8   what I would normally do --
 9   Q    No, I'm asking you --
10   A    -- in conducting an FI investigation.
11   Q    I'm sorry.  I asked you if you filled out an FI card.
12   A    I don't remember if I did or not.  Sorry, I thought you
13   were asking me what would be on the FI card because you were
14   asking me did I write his name down, did I write down his date
15   of birth.  So if I had done an FI card and I had his name wrong
16   in the report, I probably started with the story of what had
17   occurred before I wrote down who he was.
18   Q    And that's why in your hypothetical you included a fact
19   about the gentleman having blood on his hands, correct, because
20   it was just a hypothetical and you weren't talking about this
21   case?
22   A    No, he had blood on his hands.  I thought we were talking
23   about this case.
24   Q    That's what I'm asking.
25   A    Sorry about that.
```

```
 1   Q    When you were giving this answer to these people, were you
 2   telling them about a hypothetical when you said "blood on the
 3   hands," or were you talking about this case like you filled out
 4   an FI card in this case?
 5   A    I was just talking about what had occurred in the parking
 6   lot and he had blood on his hands.
 7   Q    Which hand had blood?
 8   A    I don't know if I wrote in my report.  If I did, it would
 9   be in the report.  I don't know which hand he punched through
10   the window, if it was his left or his right.
11   Q    Well, you didn't see him punch through the window, right?
12   A    No, but I know his hand was bleeding, and I asked him if
13   he needed paramedics.  If you are asking me which hand was
14   bleeding, I would have to look in the report.
15   Q    Well, it's in front of you, sir.
16   A    Okay.  I didn't know we were going that way at this point.
17   Q    I'm sorry?
18   A    I didn't understand we were changing the line of
19   questioning.  I didn't know we were doing that.
20        THE COURT:  Are you asking him to refresh his
21   recollection?
22        MR. PACHOWICZ:  Yes, I am.
23        THE COURT:  All right.
24        THE WITNESS:  I asked him if he needed paramedic
25   assistance.  That's what my report says.
```

1  BY MR. PACHOWICZ:

2  Q    It doesn't say anything about which hand was bloody,

3  correct?

4  A    He stated he punched the window out of anger, and then I

5  asked him if he needed paramedics, but I do recall from the

6  evening that his hand was bleeding.

7  Q    Have you watched a videotape of Mr. Bedetti being on the

8  ground at the scene?

9  A    Yes, I've seen a videotape of that.

10  Q    And the gentleman that is shown in that video who comes by

11  and asks Mr. Foster -- or Officer Foster for a cab is the

12  gentleman that you were talking to, this Mr. Hacopian, even

13  though it's not his real name, but that's what you called him

14  so we will stay with that.  That was Mr. Hacopian, correct?

15  A    Yes.

16  Q    And he was wearing a black shirt, correct?

17  A    He was wearing a dark-colored shirt, button-down, I

18  believe.

19  Q    And Officer Foster actually got him a cab, correct?

20  A    I don't know if a cab came and picked him up or not.  I

21  don't know.

22  Q    But Officer Foster hailed a cab for this suspect in this

23  investigation you were conducting, correct?

24  A    I don't know if he ever did or not.  I didn't know he had

25  hailed a cab for him.

```
1    Q     I'm sorry?

2    A     I didn't know he had hailed a cab for him.   Sorry.

3    Q     Now -- I'm sorry.   At the time Officer Bacon told you that

4    the dispute was verbal only and your investigation is no longer

5    going on, to put that in a point in time, that is when

6    Mr. Bedetti is backing his vehicle out of his parking space,

7    correct?

8    A     Is it all right if I look.

9    Q     Yes, sir, Exhibit C-1-3.

10   A     C-1-3?

11   Q     Yes, sir, the third page of your report, the top full

12   paragraph.

13   A     No, it's probably going to be the second page.   The third

14   page is only one sentence, and there's really nothing on there.

15   Q     It says page 3 of 4 of your report.

16   A     I've got the first page.   I've got --

17   Q     Down at the bottom right-hand corner it says page 3 of 4.

18   A     I've got 2 of 4.

19   Q     Then go to 3 of 4.

20   A     No, it actually starts on 2 of 4.

21         I'm sorry, what was the question again so I can --

22   Q     Would you please go to page 3 of 4 of your report, the

23   first full paragraph which begins, "As I began talking to

24   Hacopian..."

25   A     Okay.   I'm there.
```

1  Q     Do you see that?

2  A     Yes, sir.

3  Q     "...I saw Bedetti backing his vehicle out of the parking

4  space."  Do you see that?

5  A     Yes.

6  Q     A couple sentences later you said "During this time

7  Officer Bacon informed me that the dispute between Hacopian and

8  his wife was very heated but only verbal," true?

9  A     Yes.

10  Q     And the next paragraph begins, "While Officer Foster stood

11  in space 17, Bedetti began screaming at him."  Do you see that?

12  A     Yes.

13  Q     So before Mr. Bedetti began screaming at Mr. --

14  Officer Foster, using your term, the investigation is over,

15  correct?

16  A     The investigation into the 273.5 is over.

17  Q     Now, what was Mr. Bedetti screaming at Officer Foster?

18  A     I don't really know what he was saying.  If you're asking

19  me what specific words he was saying, I don't know what he was

20  saying.  He was just screaming at Officer Foster.  I wasn't

21  really paying attention.  I could just see it peripherally.

22  Q     And how far away were you from Mr. Bedetti when he was

23  screaming at Officer Foster?

24  A     Well, he did it several times.  So sometimes he was by his

25  vehicle, which would have put him probably 20 to 30 feet away,

```
 1    and then sometimes when he approached Officer Foster and he was

 2    screaming at him, he was probably 10, 15 feet away.

 3    Q    Well, how many times did Mr. Bedetti, according to you,

 4    scream at Officer Foster?

 5    A    I saw him screaming at him from his door of his vehicle,

 6    when he was sitting in it, and when he got out he was screaming

 7    at him, and when he walked up to him and approached him and

 8    handed him something, he was screaming at him then.

 9    Q    And how far away were you -- I'm sorry.

10         How far away from you was Officer Foster when Mr. Bedetti

11    is screaming at him and he hands him something?

12    A    10 feet.  I'm guessing, though, if you're asking me for

13    exacts.  It's about 10 feet, probably from here to that

14    gentleman, maybe a little farther.

15    Q    And you are referring to one of the jurors in the front

16    row in the blue shirt who is seated in position 5?

17    A    Yes, sir.

18              THE COURT:  Again, we don't want you to guess.  You

19    can give an estimate.  There's a difference.

20              THE WITNESS:  Yes, ma'am.

21    BY MR. PACHOWICZ:

22    Q    And you wrote in your report, sir, that you, quote, "I saw

23    Bedetti walking quickly over to Foster."  Is that your

24    testimony?

25    A    Yes.
```

1  Q     And Mr. Bedetti was in a cast when he was walking over

2  there, correct?

3  A     He was in a half cast, like from the knee down or from the

4  calf down.

5  Q     And you described him as walking quickly over to Foster;

6  is that correct?

7  A     Yes.

8  Q     And you told Mr. Bedetti that you would handcuff him and

9  place him in the back seat of the car, your patrol car,

10 correct?

11 A     Yes.

12 Q     And what -- when you told him that, Mr. Bedetti was free

13 to leave the area, correct?

14 A     Yes.  I believe I had asked him to leave, and if he

15 continued to interfere, then he would be handcuffed and placed

16 in the back seat of the car until I could finish with the

17 incident that I was dealing with.

18 Q     Finish with what incident?  The investigation?

19 A     Officer Bacon was still with Suzy Hacopian at her vehicle.

20 We are going to call him Mr. Hacopian because I got his last

21 name wrong, was at the vehicle getting some of his personal

22 possessions out of the vehicle.  So I was watching

23 Officer Bacon and them, how they were interacting.  So I was

24 still involved in the incident, but I was no longer

25 interviewing anybody.

```
 1   Q     In fact, the truth is, sir, that throughout your encounter
 2   with Mr. Hacopian, he was never detained, correct?
 3   A     Yes, he was.
 4   Q     And so what did you do to detain him?
 5   A     I told him, "Come over here" when I initially contacted
 6   him and I started to speak to him about what occurred.
 7   Q     And was he free to walk around the parking lot?
 8   A     He was not free to leave, but he was free to move in front
 9   of me back and forth if he chose to.  That's just how I chose
10   to have him decompress, I guess.
11   Q     You never handcuffed him, correct?
12   A     No.  He wasn't under arrest at that point.
13   Q     You never told him to sit down, correct?
14   A     Sit down on the ground in the parking lot?
15   Q     Yes, sit down on the ground, sit down on your front
16   bumper.
17   A     Oh, his car was down the parking lot.  His car wasn't
18   where I was standing.
19   Q     But Officer Foster's and Officer Saldana's was right near
20   where you were at, right?
21   A     I chose not to have him sit down.
22   Q     You chose to have him walk around, correct?
23   A     I chose to let him decompress by walking back and forth
24   while he told me what was going on.
25   Q     Now, you chose not to have the domestic violence suspect
```

```
 1   handcuffed.  Did you ever pat him down before making that
 2   decision?
 3   A     No, I didn't pat him down.
 4   Q     And you threatened to place Mr. Bedetti in handcuffs.  And
 5   what crime do you think he had committed when he was free to
 6   leave and you threatened to put him in handcuffs?
 7   A     He was becoming obstructive to what I was trying to do.
 8   He was interfering and divided my attention in what I needed to
 9   do with the first incident that I was dealing with, and he just
10   continued to yell and scream, and it just became where he was
11   dividing my attention.  And I felt that was the best way to
12   deal with him at the time.
13   Q     Do you recall my question, sir?  What crime was
14   Mr. Bedetti committing when you threatened to handcuff him and
15   put him in the back of your patrol car?
16   A     He was interfering.
17   Q     Interfering with what?
18   A     With what I was trying to do, with the incident I was
19   dealing with.
20   Q     What were you trying to do?
21   A     I was trying to make sure that both parties involved in
22   the incident were separated, that they both went their separate
23   ways, that Officer Bacon was safe when he was over there, when
24   both parties involved in what was -- possibly was a domestic
25   violence incident, and at that point he was obstructing my
```

1    investigation or --

2              THE REPORTER:  One at a time.

3    BY MR. PACHOWICZ:

4    Q    Your investigation was over, correct, sir?

5    A    My investigation was over, but the incident was still

6    ongoing, and he was still interfering.

7    Q    Now, you did -- you eventually approached Mr. Bedetti,

8    correct?

9    A    Yes.

10   Q    And you did a leg sweep on him, correct?

11   A    Not immediately, no.

12   Q    At what point -- well, did you do a leg sweep on him?

13   A    Yes.

14   Q    And you did a leg sweep on him to take him to the ground,

15   correct?

16   A    Yes.

17   Q    And when you did a leg sweep, were you holding on to his

18   body in any other place?

19   A    I was controlling his right hand.

20   Q    How were you controlling his right hand?

21   A    I was using a pain compliance hold.  It's called a twist

22   lock.

23   Q    And that's a reportable use of force if it's a pain

24   compliance hold, correct?

25   A    That's correct.

```
1    Q     And then you did the leg sweep, correct?

2    A     No, not at that point.

3    Q     How long were you using the wrist lock for pain compliance

4    before you did a leg sweep and took him to the ground?

5    A     I don't know exactly how long, if you want a time frame.

6    It got to a point where he wouldn't let us handcuff him, so

7    after trying several attempts to get his hands behind his back

8    for him to be handcuffed, then I utilized the leg sweep.

9    Q     Did anyone from the department set him down softly?

10   A     Did anyone from -- there was probably four or five police

11   officers that set him down softly on to his stomach.

12   Q     When you did the leg sweep, did you kick out the leg that

13   had the cast on or the other leg?

14   A     The other.

15   Q     You wrote in your report that he had a soft cast, correct?

16   A     Yeah.  I was guessing, though.  I'm not a medical expert.

17   Q     So do you think you have to be a medical expert in order

18   to write -- to accurately know whether a cast is soft or hard?

19   A     When I handled the cast, it felt like it was not your

20   traditional hard, rigid cast.  It felt like a soft cast.

21   Q     So did you write it down because you just guessed, or did

22   you write it down when you were holding on to it with your

23   hands it felt soft?

24   A     It felt soft.

25   Q     And it felt soft when it was in your hands because you
```

```
 1    were holding on to it and twisting it, putting his heel to his

 2    buttocks, correct?

 3    A     Yes, I was bending his leg so his heel was touching his

 4    buttocks.

 5    Q     And you were twisting it so that you would gain compliance

 6    and he would, in your view, stop resisting being handcuffed,

 7    correct?

 8    A     No, that's not true.

 9    Q     When you were holding on to his foot, cast, were you also

10    putting weight on it with your knee?

11    A     No, I was not.

12    Q     Did your knee touch his cast?

13    A     No, I believe my knee touched his inner thigh.

14    Q     When Mr. Bedetti was on the ground, did you straddle --

15    straddle his uncasted leg to where your left leg is in between

16    his two legs and you were on your right knee with his left leg

17    in between -- in your crotch area?

18    A     I hadn't finished the first part of that line of

19    questioning.  You had said I had twisted his leg to gain pain

20    compliance to get him handcuffed, and that's not true.  I

21    didn't twist his leg.  I wasn't doing to gain pain compliance,

22    and at that point I believe he was already handcuffed.

23    Q     Did you hear the question?  Were you straddling his right

24    leg?

25    A     Yes, sir, I heard that.  I just wanted to finish the
```

1   answer from the first part of the question, and now I can

2   answer the second part.  I was standing over him with my -- I

3   believe it was my right leg was against his inner thigh between

4   his legs.

5   Q    You weren't standing.  You kneeled?

6   A    Well, kneeling, sorry.

7   Q    There's a difference between standing and kneeling.  You

8   were on your right knee, which is on the outside of his right

9   leg, and your crotch is directly over his right leg, correct?

10  A    I don't remember where my crotch was.  I just know my knee

11  was not on his leg, as you had asked me, but it was alongside

12  of his inner thigh.

13  Q    And you were holding Mr. Bedetti's casted leg up so he --

14  to keep Bedetti from thrashing his injured leg on the ground;

15  is that correct?

16  A    Yes, because his toes were exposed so I didn't want him

17  banging his leg on the ground, and I also didn't want him to

18  hit me in the face with his cast either if he started kicking

19  his leg.

20  Q    Well in your report, the same page we are on, page C-1-3,

21  did you write, quote, "To keep Bedetti from thrashing his

22  injured leg on the ground, I bent it upwards so that his left

23  heel was pointed up towards his buttocks"?

24  A    Yes.

25  Q    And did you testify at his criminal trial that you held up

```
 1  his foot to protect it?

 2  A    Honestly, that was years ago, so I don't know how I

 3  phrased it.  Do you have it?  Do you want me to look or --

 4  Q    Did you ever say in your deposition or in the trial

 5  transcript that you were holding his leg up to protect it?

 6  A    Yes, I did.

 7  Q    When you wrote your report, you knew they were going to go

 8  to the City of Long Beach prosecutor, correct?

 9  A    I believe at some point, yes.

10  Q    You wrote in your report that Hacopian had blood on his

11  hands, correct?

12  A    In this report?

13  Q    Yes.

14  A    I didn't see it in this report.  I think it just says I

15  asked him if he needs -- he told me he put his fist through the

16  window, and I asked him if he needed paramedics.

17  Q    I'm sorry, did you just say he didn't have blood on his

18  hands?

19  A    No, I didn't say that.

20  Q    Okay.

21  A    I said I don't think I wrote he had blood on his hands in

22  this report, but I remember him having blood on his hands from

23  the incident.

24  Q    Look at page 1 of your report, please, C-1-2.

25        (Exhibit C-1-2 for identification.)
```

```
 1   BY MR. PACHOWICZ:
 2   Q    It's page 2 of 4 on the bottom, using your system.  Do you
 3   see it?
 4   A    Yes.
 5   Q    Second paragraph down, "I saw that Hacopian had blood on
 6   his hands."  You see that, paragraph that begins "Officer
 7   Bacon"?
 8   A    Yes, I see that.
 9   Q    That's what you wrote, correct?
10   A    Yes.
11   Q    You also wrote in the next paragraph, "Believing that the
12   vehicle had his high beam lights on, Officer Foster signaled
13   the driver, later identified as defendant Marcelo Bedetti, with
14   his spotlight to get Bedetti to dim his lights."  Did you write
15   that?
16   A    Okay.  I'm going to have to catch up with you a little
17   bit.
18   Q    Last sentence in the third paragraph, sir.
19   A    Yes.
20   Q    Did you get that information from Officer Foster as to why
21   he signaled the driver?
22   A    No, he didn't tell me why he did it.
23   Q    Then why did you write that Officer Foster did it to
24   signal the driver to dim his lights?
25   A    It's a universal signal, where I grew up on the East Coast
```

```
 1    you flick your headlights on and off, that someone has their

 2    high beams on to signal that they have their high beams on and

 3    to dim them.  I don't know if that's why he did it.  I made the

 4    assumption that's why he did it.

 5    Q    So you just wrote down in your report what you assumed

 6    Officer Foster thought?

 7    A    That's correct.

 8    Q    And is it your testimony, sir, that you saw Mr. Bedetti

 9    had his lights on when Officers Foster and Saldana turned on

10    their headlights -- their spotlights on his car?  Is that your

11    testimony, or did you assume that, too?

12    A    You're asking me if he turned his lights off, or are you

13    asking me --

14    Q    No.

15    A    -- did he dim his lights when he was signaled to do so?

16    Q    I will rephrase it, okay, so we are clear about this.

17         You never talked to Officer Foster as far as why he turned

18    his spotlight on to Mr. Bedetti's car; is that true?

19    A    No, I never turned to Officer Foster and said, "Why did

20    you turn your spotlight on and off?"  I never did that.

21    Q    And so when you wrote it in the report, you were just

22    making an assumption what he did without asking him, correct?

23    A    Yes.

24    Q    The next question is, your opinion, did Officer -- did

25    Officer Foster and Saldana turn their spotlights on while
```

1   Mr. Bedetti's headlights were on or off?

2   A     They were on.

3   Q     Did you ever radio anyone and tell them that you were

4   involved in an investigation, you know, like dispatch?

5   A     I don't think I did.

6   Q     Did you turn your back at any point in time during your,

7   quote, investigation on Mr. Hacopian?

8   A     Yes.

9   Q     Is that normal police practice for your safety, to turn

10  your back on individuals that you're investigating for a

11  domestic violence?

12  A     It's how I do police work.

13  Q     Did you tell Mr. Bedetti that you were going to arrest him

14  for F?

15  A     No.

16  Q     647(f) is slang for -- I'm sorry, F is slang for violation

17  of penal code 647(f), correct?

18  A     Yes.

19  Q     Did you arrest Mr. Bedetti for violating section 422?

20  A     Yes.

21  Q     When did you place him under arrest?

22  A     As soon as I put my hand on his right wrist, he was under

23  arrest.

24  Q     And did you tell him he was under arrest?

25  A     No.

```
1   Q      Did you tell anyone else, any other police officers that
2   were around you that Mr. Bedetti was now under arrest for 422?
3   A      No.
4   Q      What are the elements of 422?
5   A      422, the elements are --
6                THE REPORTER:  I'm sorry, say that again.
7                THE WITNESS:  It has to be an unconditional,
8   credible, immediate threat of violence to another, and there
9   can't be any time lapse between it, can't come back later,
10  another day and say it was a terrorist threat or 422.  It has
11  to be, again, immediate.
12  BY MR. PACHOWICZ:
13  Q      Did you arrest Mr. Bedetti for 148?
14  A      No.
15  Q      Did you tell Officer Kent that you arrested Mr. Bedetti
16  for 148?
17  A      I never spoke to Officer Kent.
18  Q      You didn't arrest Mr. Bedetti for violating Penal Code
19  Section 148 because there was no evidence that he committed
20  such a crime, correct?
21  A      That's not correct.
22  Q      So why didn't you arrest him for 148?
23  A      Because he told me he had a gun and that he was going to
24  defend himself if I attempted to detain him.  So I went with
25  422 as opposed to just a simple obstruction charge.
```

1    Q    So you just picked one instead of all of them?

2    A    At the time I was placing handcuffs on him, I wasn't even

3    thinking about 148.  I was thinking about his threat, and I was

4    thinking about the 422 section.

5    Q    Did you verbalize that thought to anyone?

6    A    No.  It was pretty self-explanatory to those around me.

7    Q    So the answer is "no," you didn't verbalize it to anyone?

8    A    No, I never went to any specific officer and said, "He is

9    now currently under arrest for 422 of the penal code."

10   Q    Did you arrest him for 23152, driving under the influence?

11   A    No, sir.

12   Q    Why not?

13   A    Because I arrested him for 422.

14   Q    You would agree you didn't have any evidence to arrest him

15   for driving under the influence?

16   A    I didn't do any investigation into that.  I don't know if

17   he had been drinking.

18   Q    So you had no evidence to support an arrest for 23152,

19   correct?

20   A    No, I didn't do an investigation.  I don't know if he had

21   been drinking or was on drugs.  I didn't start that type of

22   investigation.

23   Q    Mr. Bedetti criticized you, correct?

24   A    I don't know if he criticized me.  He made a derogatory

25   comment, but I don't know if he was criticizing me.

```
 1   Q     What derogatory comment did he make?
 2   A     When I questioned the way he had parked his vehicle, he --
 3   he asked me if I was fucking parking enforcement.  What was I
 4   going to do, write him a ticket?  I don't know if it's
 5   criticizing, if it's called criticism or not.
 6   Q     Did he say anything else to you?
 7   A     I don't know.  I stopped paying attention to him at that
 8   point.
 9   Q     And did he just out of the blue ask you, "Are you fucking
10   parking enforcement" or --
11   A     Yes.
12   Q     I'm sorry?
13   A     I said yes.
14   Q     So you didn't say anything to him; he just began a
15   conversation with you while you're standing in the parking lot
16   with, "Hey, are you fucking parking enforcement and going to
17   write me a ticket?"  Is that your testimony?
18   A     No.  I said I made a comment about the way he had parked,
19   and that was his response.  I don't know if that was criticism
20   or not or a derogatory comment.
21   Q     What comment did you make about his parking?
22   A     He had parked his vehicle in such a way that the vehicle
23   to the west of him would not be able to get into their driver's
24   side of the vehicle.  So he had wedged his car between the two,
25   and it was going to be a problem I was going to have to deal
```

1    with later, so I just asked him how the other driver was going

2    to get in their car when they leave, and that's when he made

3    his comment.

4    Q    Did he tell you you needed retraining?

5    A    I didn't hear him say that.

6    Q    Did he tell you you were unprofessional?

7    A    I didn't hear him say that.

8    Q    Did he tell Officer Foster that he was a police officer?

9    A    I didn't hear him say that.

10   Q    Did he show Officer Foster a police ID?

11   A    I saw him hand something to Officer Foster that I thought

12   at the time was a business card, but I don't know what he was

13   showing him.  I actually thought he was a lawyer, to be honest

14   with you.

15   Q    Why did you think he was a lawyer?

16   A    Because the way he was acting, and then he handed a

17   business card.  And most people would just show police ID or

18   some form of ID, and they wouldn't act that way in the first

19   place.  So I just made, I guess, the wrong assumption, but I

20   didn't know he was a police officer.

21   Q    Well, why were you expecting him to act like a police

22   officer and show police ID if you didn't think he was a police

23   officer?

24   A    Because he was a police officer, and the way he was acting

25   didn't present to me like someone who was an off-duty police

```
 1   officer out on a Saturday night.
 2   Q    I'm sorry, I thought you were done.
 3   A    I just said he acted different from that, so --
 4   Q    There was an individual that was with him in the Jeep,
 5   correct?
 6   A    Yes.
 7   Q    And that individual was standing next to you when
 8   Mr. Bedetti handed a business card, according to you, to
 9   Officer Foster, correct?
10   A    I thought it was a business card.  I don't know what he
11   handed to him.  To me, I thought it was a business card.  And I
12   don't know whether his friend or his passenger was standing at
13   the time he handed him -- I lost sight of the guy.  I was
14   looking at him.
15   Q    You lost sight of which guy?
16   A    His passenger.  You are asking me where he was standing
17   when he handed him what I believe was a business card, and I
18   don't know where he was standing.
19   Q    Did you tell his passenger, "So he's a cop, and he can act
20   like a dick"?
21   A    I didn't say that to him.
22   Q    Did you say anything like that, anything even close like
23   that?
24   A    No.  I don't believe I even spoke to that guy at any
25   point.
```

1   Q    Once you had Mr. Bedetti on the ground, you didn't pat him

2   down for weapons, did you?

3   A    No.  I retrieved his wallet from his pocket, but I didn't

4   pat him down for a weapon search, no.

5   Q    Did you instruct any of the other officers there to

6   immediately pat him down because you were concerned he had a

7   gun on his person?

8   A    I didn't instruct them to do it.  They just started doing

9   it.

10  Q    And you took out his wallet from his pants, correct?

11  A    From his shorts, yes.

12  Q    And you then went through his wallet, correct?

13  A    Yes.

14  Q    Did you see Mr. Bedetti -- I'm sorry.

15       Did you see Mr. Hacopian run at the car that Ms. Hacopian

16  was in?

17  A    Did I see him run at the car?

18  Q    Yes, sir.

19  A    At what point?

20  Q    At any point in time did you see this guy, who is an

21  alleged suspect, sprint towards the car where the alleged

22  victim is?

23  A    I remember him walking back to the car, or running,

24  jogging back to the car.  I don't remember which one it was.

25  Q    Which is it, sir?  Running and jogging?  Walking?

**UNITED STATES DISTRICT COURT**

```
 1   A     I don't remember how he approached the vehicle.  Sorry.

 2   Q     You don't know what the word "objective" means, do you?

 3   A     At the time of my deposition I didn't, but I looked it up,

 4   so --

 5   Q     Good.

 6         And at the time of your deposition, you didn't know what

 7   the word "subjective" means, correct?

 8   A     That's correct, but I looked it up.

 9   Q     And at your deposition you were asked a question that

10   involved both of those terms, and you were asked, quote, "Do

11   you know whether the use of force is analyzed using an

12   objective standard or a subjective standard?"  And you said --

13   A     Sorry.  I don't know where you are quoting from.

14   Q     Do you want to read it?  It's page 86 of your deposition,

15   sir.

16   A     If you are going to quote, I don't want to just assume.

17   Sorry, what page, sir?

18   Q     86 of your deposition, and your deposition would be

19   Exhibit C-19 in front of you, sir.

20   A     I'm sorry, what line did you say?

21   Q     Line 12 through 15, sir.

22   A     I'm there, sir.  Go ahead.

23   Q     You were asked, "Do you know whether the use of force is

24   analyzed using an objective standard or subjective standard?"

25   And you said "No"?
```

1    A      Correct.

2    Q      Now, you would agree, sir, that the term "objective use of

3    force" has been taught to you since you walked into the academy

4    until today, correct?

5    A      The way you're using the word, it has never been expressed

6    to me in that form, so no one has ever asked me whether a use

7    of force is analyzed as a subjective or in that term.  It's

8    probably the way you're using the word that I'm not

9    understanding, more than how you're asking me.  No one in the

10   academy has ever said it in that way you're wording it, and so

11   I don't understand what you're talking about.

12   Q      And no one in law enforcement has ever taught you that the

13   analysis on the use of force is an objective standard?  Is that

14   your testimony?

15   A      You're asking me if anyone in law enforcement has ever

16   given a class and used that terminology?

17   Q      Yes.

18   A      I don't know.  I don't know if someone ever has.  Maybe

19   they did.  I have been in law enforcement since before 1997.

20   I'm sure I have been to a class where it has been, but I don't

21   recall using it in that form or seeing it in that form.

22   Q      And so since 1997, when you began in law enforcement,

23   until you went and got a dictionary after your deposition, you

24   never looked up the word "objective"?

25            MR. H. RUSSELL:  It's argumentative as phrased.

1       THE COURT:  Sustained.

2   BY MR. PACHOWICZ:

3   Q    Did you testify at your deposition on page 89, line 25, to

4   page 90, line 1, that Mr. Bedetti --

5   A    I'm sorry, 89 what?

6   Q    89, line 25.

7   A    Okay.  I'm there.

8   Q    The question starts at line 22.  The question was

9   "Mr. Bedetti, when you drove into that parking lot, he was not

10  speeding, was he?"  And you testified, "He was approaching us

11  at a high rate of speed, but there is no speed limit, I don't

12  believe, in that parking lot.  It's private property."

13  A    Yes.

14       MR. PACHOWICZ:  I don't have any other questions.

15       THE COURT:  All right.  Cross-examination?

16                  **CROSS-EXAMINATION**

17  BY MR. H. RUSSELL:

18  Q    Good morning, Officer Corcoran.

19  A    Good morning, sir.

20  Q    Officer Corcoran, there should be a binder up there that's

21  Volume IX, 9.

22  A    Is it the same binder?

23  Q    It's a different binder than the one you have right now.

24  A    There's one down here.  Is it this one that says "IX"?

25  Q    Yes.  It should be Volume 9, Roman numeral IX.

```
 1   A     I'm sorry, all of these are related.
 2   Q     And if you could, take a look in the binder at the
 3   photograph behind tab P, like in Papa, 2.
 4         (Exhibit P-2 for identification.)
 5              THE WITNESS:  I'm there, sir.
 6   BY MR. H. RUSSELL:
 7   Q     Do you recognize what's shown in that photograph?
 8   A     Yes, sir.
 9   Q     Is that the parking lot where the incident took place?
10   A     Yes.
11              MR. H. RUSSELL:  May I publish and admit Exhibit
12   P-2, Your Honor?
13              THE COURT:  Yes.
14         (Exhibit P-2 received into evidence.)
15   BY MR. H. RUSSELL:
16   Q     So if you could, just orient us a little bit as to where
17   things are in this photograph.  So, for example, I have my pen
18   pointed at this street that's to the right of the parking lot
19   in the photograph.  Do you see that?
20   A     Yes.
21   Q     And what street is that?
22   A     That's Pine Avenue.
23   Q     And so in terms of directions, right now my pen is on --
24   parallel to Pine Avenue.  So the clicker part of the pen where
25   my finger is pointing, what direction is that pointing?
```

```
 1    A     North.

 2    Q     And then obviously south would be where the ball point is?

 3    A     Correct.

 4    Q     And then from that pen going into the parking lot, that is

 5    what direction?

 6    A     That would be east.

 7    Q     Okay.  Can you take a look at Exhibit P-4 in the book.

 8          (Exhibit P-4 for identification.)

 9              THE WITNESS:  I'm there, sir.

10    BY MR. H. RUSSELL:

11    Q     And do you recognize what's in P-4?

12    A     This says Exhibit 4?

13    Q     Exhibit P-4.

14    A     Okay.  So I'm right because it's in the P-5 tab.  I'm

15    sorry.  Should it be like a large electrical box with multiple

16    short yellow bolts?

17    Q     Right.

18    A     I'm on the right page there.

19    Q     And do you recognize the area that's shown in the

20    photograph?

21    A     Yes, sir.

22    Q     And is that essentially the area where your encounter with

23    Mr. Bedetti took place that night, more or less?

24    A     Yes, sir.

25              MR. H. RUSSELL:  May I publish and admit Exhibit
```

```
 1    P-4, Your Honor?

 2              THE COURT:  Yes.

 3         (Exhibit P-4 received into evidence.)

 4    BY MR. H. RUSSELL:

 5    Q    So in this photograph there is an alleyway where my pen is

 6    that is to the -- I guess above space 18 in the photograph.  Do

 7    you see that alleyway?

 8    A    Yes, sir.

 9    Q    And what direction does the alleyway run?

10    A    It's a north-south alley.

11    Q    And is that alleyway where Officers Foster and Saldana had

12    parked their car, essentially, during this incident?

13    A    Yes.

14    Q    Now, right here is space 16.  Do you know if that's the

15    space that Mr. Bedetti tried to park in initially?

16    A    Yes.

17    Q    And then next to space 16 is space 17.  Do you know if

18    Mr. Bedetti ever tried to park in space 17 that night?

19    A    Yes.

20    Q    And if you can, where in relation to space 16 were you

21    when you first saw Mr. Bedetti's vehicle pull into the parking

22    lot?  And you can mark on the screen with your finger.

23    A    Oh, you can?

24    Q    Where were you when you first saw him?

25    A    When I first saw --
```

```
 1   Q     The Jeep pull in.

 2   A     The Jeep pull in, I was probably right here, and

     Officer Saldana and Officer Foster's vehicle was like in this

 3

 4   kind of direction, facing this way as they came into the alley.

 5   Q     Okay.

 6   A     I was standing at the front of their car.

 7   Q     So the longer line that you just drew would represent the

 8   police car, and the sort of circle figure would be you?

 9   A     Yes, sir.

10   Q     Okay.  And just take a look real quick at Exhibit P-5 in

11   your book.

12         (Exhibit P-5 for identification.)

13   BY MR. H. RUSSELL:

14   Q     Do you recognize that?

15   A     Yes, sir.

16   Q     Just a different angle of the same area?

17   A     Yes, sir.  It's pretty much the parking lot.  It's facing

18   south.

19             MR. H. RUSSELL:  I would like to publish and admit

20   P-5, Your Honor.

21             THE COURT:  It is admitted, and you may publish.

22         (Exhibit P-5 received into evidence.)

23   BY MR. H. RUSSELL:

24   Q     So I want you to take a look now, if you could, at Exhibit

25   V, like in Victor, 21.
```

```
 1              (Exhibit V-21 for identification.)
 2                  THE WITNESS:  I'm there, sir.
 3    BY MR. H. RUSSELL:
 4    Q    Okay.  You've seen videos from the security cameras on the
 5    surrounding buildings from the night of the incident; is that
 6    correct?
 7    A    Yes.
 8    Q    And you've seen the photographs that were made from those
 9    videos, correct?
10    A    Yes.
11    Q    Okay.  So what I would like to do now is ask you do you
12    recognize the area that's shown in exhibit Victor 21, V-21?
13    A    Yes, sir.
14    Q    And is that the way the parking lot looked the night of
15    the incident as you were going to encounter Mr. Bedetti?
16    A    Yes.
17                  MR. H. RUSSELL:  Your Honor, I would like to publish
18    and admit Exhibit V-21.
19                  THE COURT:  It is admitted.  You may publish.
20         (Exhibit V-21 received into evidence.)
21    BY MR. H. RUSSELL:
22    Q    Now, in this photograph my pen is pointing at a vehicle
23    that's to the left of the photograph with its lights on.  Do
24    you know which vehicle that is?
25    A    That's Officer Saldana's and Foster's vehicle.  That's a
```

```
 1   police vehicle.

 2   Q    And then there are -- it looks like two people here to the

 3   right of the photograph of the police vehicle.  Do you know who

 4   those people are?

 5   A    She doesn't want me to guess, so --

 6   Q    Let me ask you this:  Do you know if from the time

 7   Officers Foster and Saldana arrived until your encounter with

 8   Mr. Bedetti was over, if you ever left the general area of

 9   space 16, 17 and 18?

10   A    No, sir.

11   Q    Do you know if Officer Bacon was ever outside of that area

12   during your investigation?

13   A    Yes.

14        (Pause in proceedings.)

15   BY MR. H. RUSSELL:

16   Q    And do you know in this photograph where Officer Bacon was

17   speaking with the woman that was part of the domestic incident?

18             MR. PACHOWICZ:  Objection; vague as to time.

19   BY MR. H. RUSSELL:

20   Q    Well, do you know if Officer Bacon stayed near the police

21   car when he spoke to the woman?

22   A    No, he did not.

23   Q    Do you know the farthest point away from the area of space

24   16, 17 and 18 that Officer Bacon went?

25   A    He was there.
```

```
 1   Q     And that's the red mark you indicated in the top left of
 2   the photograph?
 3   A     Yes.
 4   Q     Okay.  And in this photograph that's shown, V-21, do you
 5   see where space 16 is?
 6   A     Yes.
 7   Q     Can you mark space 16, the one that Mr. Bedetti pulled
 8   into at first.
 9         And that's where you made the red mark?
10   A     Correct.
11   Q     Now, in that photograph, just to the right of your red
12   mark, there's a light-colored car?
13   A     Yes.
14   Q     Do you see where my pen is pointed?
15   A     Yes.
16   Q     Was that car parked there in space 15 the entire time that
17   Mr. Bedetti was trying to park in space 16?
18   A     Yes.
19   Q     So when you and Officer Bacon were informed that there was
20   this potential domestic violence, what did you actually do?
21   A     We were sitting in our police vehicle when a citizen told
22   us about the incident.  We exited our vehicle and walked into
23   the parking lot because it was occurring immediately to the
24   south and to the east of our vehicle.
25   Q     And while we still have Exhibit V-21 up, can you show us
```

1    where the car was that the woman was in as you began the

2    investigation, if it's even shown in the photograph?

3    A    It's not shown.  It's -- it is on this -- it's in this

4    line of cars, but it's way farther down, at the beginning of

5    the parking lot.

6    Q    Toward the right of the photograph?

7    A    It's -- sorry.  Can you erase that or --

8    Q    Yeah.

9    A    Sorry.  It's like here.

10   Q    Okay.  So let me start over here.  So looking at

11   Exhibit V-21, can you tell if any of the cars shown in the

12   photograph were the car that the woman and the man that you

13   were investigating were involved with?

14   A    Right there.

15   Q    Okay.  So are we talking about this car here?

16   A    No, I'm sorry, it's this one, along the wall.

17   Q    Okay.

18   A    Sorry about that.

19   Q    So you and Officer Bacon walk over.  And how do you decide

20   who's going to do what?

21            MR. PACHOWICZ:  I just want -- for the record,

22   that's the third car from space 16, so that reflects that,

23   before these things disappear.

24            MR. H. RUSSELL:  I'll just verify that.

25   Q    So space 16 is where I'm pointing my pen right now,

1    correct?

2    A     Yes.

3    Q     And then to the right of space 16 in the photograph

4    there's a light-colored car.  You see that?

5    A     Yes.

6    Q     To the right of the light-colored car in the photograph

7    there is a darker colored car?

8    A     Yes.

9    Q     And then to the right of that darker colored car, there

10   looks to be some type of station wagon or SUV.  Do you see

11   that?

12   A     Yes.

13   Q     And then there's another lighter colored car to the right

14   of the SUV?

15   A     That's correct.

16   Q     So was it the SUV-looking car that's two to the right of

17   the first light-colored car next to space 16 that you were

18   talking about?

19   A     It's this car right here.

20   Q     The one that you marked with the X?

21   A     Yes, a Dodge Magnum.

22   Q     Okay.  So how did you and Officer Bacon decide what you

23   were going to do?

24   A     Well, we initially approached.  We walked into the parking

25   lot.  I went for him.  He kind of checked on her, but we didn't

1    really have -- been working together a long time; it was kind

2    of unspoken a lot of stuff we do, but I went for him, and he

3    went to check on her.

4    Q    And what did you see Officer Bacon actually do to check on

5    her?

6    A    He followed her down this area down here and followed her

7    down to here because the gentleman had already almost had

8    gotten to her at the alley point, so I stopped him here before

9    he got to her.  I'm sorry.  Correction.  He had already

10   contacted her in that alley, and Officer Bacon interceded and

11   contacted her, and I contacted him.  That's hopefully clear

12   enough.

13   Q    So when you first contacted the man and the woman, was the

14   man in the car?

15   A    No.

16   Q    How did you know that they were the people that you were

17   talking -- or that had been talked about to you by the citizen?

18   A    Well, initially when we entered the parking lot, we saw

19   the broken glass and the broken window, and we just kind of

20   followed the trail of blood and screaming, I guess, because his

21   hand was bleeding and she was hysterical, and he was going at

22   her, and he was -- we didn't really need to stop and clarify

23   who they were and what -- it was kind of like self-explanatory

24   at that point.

25   Q    So at that point, if she's screaming and you know there's

| | |
|---|---|
| 1 | a broken window, why didn't you grab hold of the man and |
| 2 | handcuff him or do anything like that? |
| 3 | A   Because I needed to find out what was going on first. |
| 4 | Q   Well, your safety is important, isn't it? |
| 5 | A   Yes. |
| 6 | Q   So did you -- why didn't you feel that for your safety |
| 7 | that you needed to pat him down or handcuff him or do any of |
| 8 | that? |
| 9 | A   The clothing he was wearing at the time to me didn't |
| 10 | require -- I could visually see his person, so I could tell |
| 11 | that he wasn't wearing a huge down jacket where I would need to |
| 12 | make sure he didn't have anything in his waistband.  He was |
| 13 | compliant.  When I told him to come over, he didn't argue or |
| 14 | fight with me about it.  I just asked him what happened. |
| 15 |     He was obviously agitated, but there was no need to make |
| 16 | the situation worse by grabbing him and manhandling him and |
| 17 | then wrenching him into handcuffs and then seating him in the |
| 18 | back of the car and then say, "Can you tell me what happened, |
| 19 | sir?"  It just seemed a little excessive until I found out what |
| 20 | was going on. |
| 21 | Q   Then you see the Jeep pull in, and you see the Jeep pull |
| 22 | into space 16? |
| 23 | A   Yes. |
| 24 | Q   And did the Jeep actually fit in space 16? |
| 25 | A   It wedged itself in there, and it did fit.  It did fit. |

```
 1   Q    And when you saw that, did that -- or what did you think

 2   when you saw that it had wedged itself into space 16, the Jeep?

 3   A    How was the vehicle next to it going to get out?  How was

 4   the driver of the vehicle going to get out when the time came?

 5   Q    And why was that important to you, if at all?

 6   A    Because there's only three police units, two officer units

 7   per car, and they are assigned for three blocks of that

 8   entertainment district, and it's going to be something that I'm

 9   going to eventually have to deal with.

10        The safety and everything going on in that three-block

11   radius is my responsibility.  That's why they bring me on

12   overtime to do it.  So asking him how are they going to get out

13   is just solving a problem before the owners of the car come out

14   and call the police and have to deal with it later.  So since

15   he was still in the vehicle, I figured I would just mention it

16   to him and he would move his car to a bigger space.

17   Q    To the best of your ability, can you recall what it was

18   that you actually said to the driver of the Jeep?

19   A    I said, "How is the vehicle next" -- "How is the

20   driver" -- "How is the vehicle next to you going to get out

21   when it comes time to leave?"

22   Q    Did you call the driver a dumb ass?

23   A    No.

24   Q    In what tone of voice did you use when you spoke to the

25   driver?
```

```
1   A    Matter of fact, just form of a question.
2   Q    Now, when you said to the driver, "How's that car going to
3   get in there?" did the driver say anything to you about being a
4   police officer?
5   A    No.
6   Q    Did the driver say, "Okay.  Fine.  I will back out and try
7   it again"?
8   A    No.
9   Q    What did the driver say to you?
10  A    He said, "What the fuck are you?  Parking enforcement?
11  What are you going to do?  Write me a ticket?"
12  Q    Now, when you heard the driver say that, did you get
13  upset?
14  A    No.
15  Q    When you heard the driver say that, did you ignore the
16  comment and continue finishing up the -- the encounter between
17  the man and the woman?
18  A    Yes.
19  Q    So what's the next involvement that you had with the
20  driver then?
21  A    I -- I didn't have any until a significant time had
22  passed, and his passenger climbed out of the vehicle, the Jeep
23  that they were driving, had to climb out through the back of
24  the vehicle, and then they backed out.  And I didn't have any
25  contact with the driver until he was later taken into custody.
```

1    Q    Okay.  At some point did you see Officer Foster get out of

2    the police car?

3    A    Yes.

4    Q    And did you see Officer Foster interacting with the driver

5    of the Jeep?

6    A    At some point I did.

7    Q    Did you ever see the Jeep back out of space 16?

8    A    Yes.

9    Q    And when you saw the Jeep back out of space 16, did you

10   see it try to or appear to want to back into space 17?

11   A    Yes.

12   Q    Did you do anything to prevent it from backing out and

13   parking in space 17?

14   A    No, but I believe at the time I was standing in the space,

15   so it might have been implied that I was impeding his ability

16   to back into it by standing there because I don't think I

17   moved.

18   Q    Now, where was the man that we will call Mr. Hacopian

19   while the Jeep was in space 16?

20   A    He was standing in front of me.

21   Q    And at that time was he still able to walk around the

22   parking lot?

23   A    He was standing in front of me, and then when I saw that

24   Mr. Bedetti was going to back into the space, I kind of

25   escorted Mr. Hacopian out of the way and kind of moved him out

1    of the way a little.

2    Q    Okay.  So Mr. Bedetti's parking, space 16, and trying to

3    get into space 17, did that affect your ability at all to do

4    whatever it was you were doing with Mr. Hacopian?

5    A    His attempt, no.

6    Q    And the parking did?

7    A    As he's -- it's obvious he wants to back into the space.

8    I can see his vehicle is positioning in such a way that he was

9    going to back into the space, but I didn't pay any attention to

10   it.  I just continued talking to Mr. Hacopian.  I moved

11   Mr. Hacopian out of the way, and I just continued to talk to

12   him, but I wasn't paying any attention to Mr. Bedetti at all.

13   Q    And then at some point did you become aware that

14   Mr. Bedetti was outside of the Jeep?

15   A    Yes.

16   Q    And what brought your attention to the fact that he was

17   outside of the Jeep?

18   A    Well, initially he was sitting in the Jeep, and he was

19   looking back, and he was yelling something to Officer Foster.

20   And then I looked a quick glance over because it caught me --

21   caught my attention, and then he exited the Jeep.  And he was

22   saying some kind of banter back and forth with Officer Foster,

23   but I still, again, wasn't paying much attention to him.

24   Q    Now, I would like you to look at Exhibit V, as in Victor,

25   46, please.

 1          (Exhibit V-46 for identification.)

 2              THE COURT:  Before we do that, Mr. Russell, can we

 3   go ahead and take our morning break?

 4              MR. H. RUSSELL:  Absolutely.

 5              THE COURT:  Let's go ahead and take our break until

 6   10:50.

 7              THE COURTROOM DEPUTY:  All rise.

 8              THE COURT:  We are in recess.

 9          (Recess taken from 10:35 a.m. to 10:54 a.m.)

10              THE COURTROOM DEPUTY:  All rise for the jury.

11          (In the presence of the jury.)

12              THE COURTROOM DEPUTY:  You may be seated.

13          (Pause in proceedings.)

14              THE COURTROOM DEPUTY:  Please remain seated and come

15   to order.

16              THE COURT:  All right.  Mr. Russell, you may resume.

17              MR. H. RUSSELL:  Thank you, Your Honor.

18   Q    Officer, Corcoran, take a look at Exhibit V, as in Victor,

19   46, please.

20   A    I'm there.  Go ahead.

21   Q    And does that photograph depict Mr. Bedetti's Jeep, where

22   it was when he got out of it?

23   A    Yes.

24              MR. H. RUSSELL:  May I publish and admit Exhibit

25   V-46, Your Honor?

1          THE COURT:  Yes.

2      (Exhibit V-46 received into evidence.)

3  BY MR. H. RUSSELL:

4  Q    So, Officer Corcoran, I want to talk to you about the

5  comment that Mr. Bedetti made about defending himself.  What

6  were the circumstances of him making that comment?  What, if

7  anything, did you say to him before he said that?

8  A    I told him if he didn't get back in his vehicle and move

9  to another parking space -- we were in the middle of an

10 investigation -- that I would handcuff him and detain him in

11 the back seat of a police car until we were completed.

12 Q    Now, when you made that comment to Mr. Bedetti, was his

13 Jeep parked where it's shown in this exhibit?

14 A    Yes.

15 Q    And how, if at all, was his Jeep being parked there

16 interfering with any of the police activity you were

17 conducting?

18 A    Officer Foster was standing immediately behind the Jeep in

19 that parking space that he wanted, and I was directly -- I

20 guess I was west of the Jeep, pretty much almost in the same

21 spot, maybe a little bit farther west.

22 Q    What I don't understand is how was Mr. Bedetti either

23 parking the Jeep there or being outside of the Jeep somehow

24 impacting your police activity with the man and the woman?

25 A    Because he continued to scream and yell at Officer Foster.

1    Q    When you say "he," do you mean Mr. Bedetti?

2    A    Mr. Bedetti, as he backed or attempted to back, he was

3    screaming at him while seated behind the wheel of the vehicle,

4    and then he exited the vehicle and screamed at him from the

5    door of the vehicle.  And then he approached Officer Foster and

6    was yelling at him at that point.

7    Q    How did that impact your ability, if at all, to

8    concentrate on what was happening with the man, Mr. Hacopian as

9    we're calling him?

10   A    I was constantly having to stop paying attention to what

11   was going on with the initial incident or Mr. Hacopian and have

12   to turn to see what was going on with the interaction between

13   him and Officer Foster.

14   Q    And while Mr. Bedetti was interacting with Officer Foster,

15   did you observe Mr. Hacopian do anything with regard to the

16   vehicle he and his wife had initially been involved with?

17   A    He approached the vehicle while she was still at the

18   vehicle with Officer Bacon.

19   Q    Did that concern you at all?

20   A    That concerned me.

21   Q    And did you make any effort to go contact Mr. Hacopian to

22   prevent him from doing anything to his wife?

23   A    No.  I let Officer -- Officer Bacon know that he was

24   coming towards the vehicle, and then I had to turn back to

25   Mr. Bedetti who was still yelling at Officer Foster.  So my

1  attention was divided, I guess you could say.

2  Q    So then you make the comment to Mr. Bedetti, "If you don't

3  leave, I'm going to handcuff you and put you in a car"?

4  A    I don't know if I actually told him to leave.  I told him

5  to basically just move to another space to stop the interaction

6  between him and the screaming back and -- just screaming and

7  the interaction between him and Officer Foster.  I told him to

8  move.  I just told him to move to another place.

9  Q    And did you believe you would have had the legal

10  justification to put him in a police car if he didn't leave?

11  A    Yes.

12  Q    Based on what actions of Mr. Bedetti would you have the

13  legal right to do that?

14  A    He was interfering and obstructing my ability to do my job

15  and to watch Officer Bacon and to watch the parties involved in

16  the initial incident, so he was obstructing my ability to do my

17  job.

18  Q    Now, when you said to Mr. Bedetti, "Leave or move to a

19  parking spot or I'm going to put you in a police car," did he

20  respond to that?

21  A    Yes.

22  Q    What did he say?

23  A    He said if I attempted to handcuff him, he would defend

24  himself.

25  Q    And up to that point, had he identified himself as a

```
 1   police officer to you?

 2   A    No.

 3   Q    When you heard him say, "If you attempt to do this, I'm

 4   going to defend myself," did you respond?

 5   A    Yes.

 6   Q    And what was your response?

 7   A    I -- I asked him what he meant by that.

 8   Q    Did he say anything when you asked him what he meant?

 9   A    Yes.

10   Q    What did he say?

11   A    He said, "You have a gun; I have a gun."

12   Q    Did that concern you?

13   A    Yes.

14   Q    And before he said, "You have a gun; I have a gun," did he

15   say, "I'm a police officer"?

16   A    No.

17   Q    Did he tell you, "I have a gun, and it's in the right

18   front pocket of my shorts"?

19   A    No.

20   Q    Did he say, "I have a gun on my person"?

21   A    No.

22   Q    He just said, "I have a gun"?

23   A    Yes.  He just said, "You have a gun; I have a gun."

24   Q    Now, at that point what was his tone of voice?  Was it

25   joking, for example?
```

A     No.

Q     Was it sort of matter of fact, meaning, "Okay.  Well, I see you have a gun; I have a gun too"?

A     It seemed confrontational to me.  He says he is going to defend himself, and then he says, "You have a gun; I have a gun," kind of "Let's go" attitude.

Q     Now, have you ever heard another police officer in your 19 years say anything like that to you?

A     No, no.

Q     So when he says, "You have a gun; I have a gun," what did you do next?

A     On my holster there's a strap.  It's considered a safety. I used my thumb, pushed that down so it was no longer secure in the holster, but it remained in my holster.  I advanced towards him with my hand on my weapon, and I asked him to produce some form of ID that would allow him to possess a weapon concealed on his person because mentally, to me, it just -- people don't talk like that.  I never heard that from anybody, so --

Q     Why didn't you actually pull your gun out of the holster and point it at him?

A     Two reasons:  One, it was just a very strange comment to make, so something about it just -- I don't know, it just didn't seem right almost, but then Officer Saldana was standing immediately behind him, so pulling my weapon and pointing it at him would have been pointing at Officer Saldana as well.  And

1   it's Saturday night, Pine Avenue, a lot of people coming and

2   going out of the parking lot, it wasn't like we had the area

3   cordoned off.  We had people coming into the area, so I was

4   concerned with background people coming and going.  I didn't

5   want to shoot somebody else.

6   Q    Did you ask Mr. Bedetti anything to the effect of "Do you

7   mean that you have a gun?"  "Do you want to fight me?"

8   Anything like that?

9   A    I asked him if he had a gun.  I said, "Are you telling me

10  you have a gun in your possession?"

11  Q    Did he respond?

12  A    Yes.

13  Q    What did he say?

14  A    He didn't respond anything.  He responded by backing away

15  from me and reaching his left hand behind the seat of his

16  vehicle.  He reached his hand inside his vehicle.

17  Q    Now, how far from his vehicle were you when he made the

18  comment, "I have a gun; you have a gun"?

19  A    15 feet, approximately.

20  Q    That you were 15 feet away?

21  A    Yes.

22  Q    How far away from the vehicle was him -- was Mr. Bedetti?

23  A    He was right up alongside the step to go into the vehicle,

24  so almost like his leg was almost touching the side of the

25  vehicle.  He was at the door, the driver's side door of the

1  vehicle.

2  Q    Did you have any concern about a gun being in the vehicle?

3  A    I -- absolutely.  When he put his hand inside the vehicle,

4  my first thought was the gun wasn't on his person; the gun was

5  in the car.

6  Q    Now, did you give Mr. Bedetti any direction about the

7  vehicle, meaning did you tell him, "Get in and go away"?

8  "Don't move"?  Did you tell him anything?

9         MR. PACHOWICZ:  Objection; vague as to time.

10        MR. H. RUSSELL:  I'll specify.

11 Q    This is after he makes the comment, "You have a gun; I

12 have a gun," and you see him backing toward his vehicle.

13 A    As he backed towards his vehicle, I walked with it, like I

14 advanced towards him.

15 Q    Why did you do that?

16 A    Because I thought he was accessing a weapon.

17 Q    Did you tell him anything as he's moving toward the

18 vehicle?

19 A    No.  There wasn't time.

20 Q    What, if any, plan did you have to keep him out of the

21 vehicle?

22 A    I didn't.  There was just not time to formulate it.  As

23 soon as I asked him to produce ID, he immediately went behind

24 the seat of the vehicle or reached his hand inside the vehicle,

25 so there wasn't time to say anything to him.

```
 1   Q     And up to that point and you have asked him to produce ID,
 2   did he say, "Hey, man, I'm a cop.  This is -- this is a big
 3   misunderstanding"?  Did he say anything like that?
 4   A     No.
 5   Q     Did he ever say anything like, "I'm a cop.  Don't, you
 6   know -- I'm not threatening you," or anything like that?
 7   A     No, he never said anything like that.
 8   Q     So did you put your hands on him as he was near his Jeep?
 9   A     At some point I did, not immediately.
10   Q     And when you put his hands on him, where did you touch
11   him?
12   A     As soon as he put his hand behind the seat,
13   Officer Saldana immediately took control of his left hand, and
14   I came around his side and took control of his right.
15   Q     When you say you "took control," can you show us what you
16   actually did.
17   A     Grabbed his hand like this, but it would be opposite, and
18   I took his hand in this position.
19   Q     Leave it there for a second.  So your right arm is bent at
20   about a 90-degree angle with your fingers pointing down.  The
21   palm of your hand is facing away from your body, and your left
22   hand is on your right hand with -- it looks like the fingers
23   going back toward your back.  Is that an accurate description
24   of what you are doing?
25   A     Yes, but it would be in opposites because I'm on his right
```

```
 1   side.  So it would be my hand would be at this point of the
 2   elbow, so it would be like this.
 3   Q    Okay.
 4   A    I'm just demonstrating how the wrist would be twisted, but
 5   it would be in an opposite form, where my hand -- the left hand
 6   would be on his elbow, the right hand would be grabbing the
 7   meaty portion of the hand and twisting inward, this way.
 8   Q    And why would you touch him in that manner?
 9   A    To -- I was immediately going to handcuff, and it's the
10   starting position of the handcuffing technique.  So it would be
11   a right twist lock to a rear handcuffing.
12   Q    And why were you going to handcuff him?
13   A    Because at that point he was under arrest.
14   Q    And what was he under arrest for at that point?
15   A    I was going to arrest him for the 422 charge.
16   Q    And what's the 422?
17   A    The threatening with a firearm.
18   Q    Did you believe that his threat was unconditional?
19   A    Yes.
20   Q    What made you believe it was unconditional?
21   A    Because as soon as he said it, he went for his vehicle,
22   and I thought he was accessing a weapon at that point.  So I
23   thought he said, "You have a gun; I have a gun," and at that
24   point when he reached his hand inside of the vehicle, I thought
25   he was going for the gun.
```

UNITED STATES DISTRICT COURT

1    Q     Now, did you have facts known to you at that time, when

2    you decided to handcuff him, of him being under arrest for

3    resisting, obstructing or delaying?

4              MR. PACHOWICZ:  Objection; calls for a legal

5    conclusion.

6              THE COURT:  Overruled.  He's asking him what facts

7    he had.

8              THE WITNESS:  He had already -- he had already

9    committed the act of obstructing for quite some time, but at

10   the point of handcuffing, I wasn't thinking, well, he's

11   obstructing.  At that point I was thinking he is threatening me

12   with a firearm.  That's why I was handcuffing him, but prior to

13   that, he could already be arrested or detained for just simple

14   obstruction.

15   Q     So you put your hand on his right hand as you showed us?

16   A     Yes.

17   Q     And you were attempting to put his right hand behind his

18   back to handcuff him?

19   A     Yes.  Officer Saldana had his left in the same type of

20   position I had mine, and we were both simultaneously trying to

21   get his hands behind his back.

22   Q     Were you able to get his right hand behind his back at

23   that time?

24   A     No.

25   Q     What, if anything, was preventing you from getting his

```
 1   right hand behind his back?  And "his" is Mr. Bedetti,
 2   obviously.
 3   A     Mr. Bedetti was straightening his arms and pushing them,
 4   trying to push them apart and straightening them out in an
 5   effort to try to prevent us from getting handcuffs on him.
 6   Q     So what you just demonstrated is both of your arms would
 7   be straight -- straight, locked out at the elbow?
 8   A     So when it's like this, and I go to bring his hand behind
 9   his back this way, he does that.  He straightens his elbow out,
10   and he does it on both sides.
11   Q     So let me stop you for a second.  What you demonstrated
12   for us is if he had his arm bent at the 90 degrees for that
13   twist lock --
14   A     Uh-huh.
15   Q     -- the goal is with the arms still bent to get it behind
16   his back, correct?
17   A     Yes.
18   Q     While you were attempting to do that, Mr. Bedetti
19   straightened his arm so it couldn't go behind his back?
20   A     Yes.
21   Q     Once somebody has straightened their arm in that manner,
22   are you able to get them into the handcuffing position?
23   A     Not without using additional force of some kind.
24   Q     Did you try to use increased force to get his straight arm
25   behind his back?
```

1  A    Officer Saldana and myself just basically just tried to

2  push his arms back behind his back without any kind of

3  technique, just using some form of strength, see if we could

4  push him without having to do additional use of force or pain

5  compliance, just in a pushing motion, just trying to get it,

6  but it became apparent that -- excuse me, that we would have to

7  use some additional force to do it.

8  Q    What made it apparent that you believed you would need to

9  use additional force?

10 A    Excuse me.  He just wouldn't let us do it and just pure

11 strength -- excuse me.  I ate a cookie, and it's sticking in my

12 throat.  Sorry.

13      When he straightened his arm out, the only way to -- thank

14 you.  The only way to do it would be to use additional force on

15 the arm to get it behind his back.

16 Q    Now, are you talking to Mr. Bedetti at all during this

17 procedure?

18 A    Excuse me.  No.  It was pretty quick.

19 Q    And before you put your hand on him in the twist lock, did

20 you say, "I'm going to put your arm behind your back"?

21 A    No.  I just said to Officer Saldana, "Let's just handcuff

22 him."

23 Q    Why didn't you tell Mr. Bedetti what you were going to do?

24 A    It was self-explanatory that he was going to be

25 handcuffed.  That was probably why he was fighting us to do it.

1   Q    Did you get any sense that Mr. Bedetti's body movements

2   that you were feeling were him being startled by what you were

3   doing?

4   A    No.  He didn't seem surprised or startled by that.

5   Q    I guess what I mean by that is if you grab somebody

6   unexpectedly, they may flinch because they are not expecting to

7   be touched.  Did you perceive that at all in Mr. Bedetti's

8   movements?

9   A    No.  He didn't try to -- most people, like, try to pull

10  out of your grasp to avoid it.  They turn, "What are you doing?

11  What are you doing?" kind of thing.  He didn't do that.  He

12  just straightened his arm out like he knew what he was doing

13  and kept us from cuffing him.

14  Q    So now you have tried to use physical strength to get his

15  straight arm behind his back, and you are unable to do so.

16  What's the next thing that you did?

17  A    I told Officer Saldana that I was going to sweep his leg

18  and take him down to his stomach, down to the ground.

19  Q    So describe for us what you do with a -- how you do a leg

20  sweep.

21  A    Basically while I was holding his arm, and I ended up

22  being behind him with Officer Saldana, I just kind of -- you

23  hook the heel, like I hooked the heel of my right foot in front

24  of his right shin, and pulled his leg back and pushed forward.

25  Q    Okay.  And the cast was on his left foot?

1    A     It was on the opposite foot.

2    Q     So when you're behind Mr. Bedetti, you're on his right

3    side?

4    A     Yes.

5    Q     So which leg did you use to hook around the front of his

6    right leg and pull it back toward you?

7    A     My right leg.

8    Q     Okay.  So if I'm picturing it, you would basically have

9    your foot kind of turned in toward the center of his body, and

10   then you put the foot on his shin and pull back?

11   A     It would be kind of like circling -- here's his leg.  I

12   would circle around this way.  This would be the heel.  I would

13   do this and pull it forward.

14   Q     Okay.  So the microphone in your example is his leg, and

15   your right hand would be your right foot?

16   A     Yes.

17   Q     Okay.  Now, when you did that, did you still have hold of

18   Mr. Bedetti with your hands?

19   A     Yes.

20   Q     And what did you do with your hands while your foot was

21   pulling his right leg back?

22   A     It just remained in control of his right hand because I

23   didn't know where the gun was.  So Officer Saldana maintained

24   control of his left hand; I maintained control of his right.  I

25   attempted to sweep the leg.  But at that point so many officers

```
 1   were there that he actually was just kind of laid down on to
 2   his stomach.  He never really went down to the ground from the
 3   leg sweep.
 4   Q    Now, I asked you before why you didn't pull your gun out
 5   when he first made the comment, "You have a gun; I have a gun."
 6   A    Yes.
 7   Q    When you saw that he was reaching inside the Jeep, did you
 8   think to take your gun out?
 9   A    No.
10   Q    Why?
11   A    Because it would have been directly in the line of fire
12   with Officer Saldana.  Officer Saldana had been -- had worked
13   his way around the front of the Jeep and was already on
14   Mr. Bedetti's left side, so he actually caught his hand as it
15   went into the vehicle and already had control.  So as soon as I
16   saw that Officer Saldana had control of the hand, I immediately
17   just raised up and grabbed the right.
18   Q    Why -- or did you say anything to Mr. Bedetti about, "Put
19   your hands up"?
20   A    No.
21   Q    Why not?
22   A    Because I thought it was safer at that point to get him
23   handcuffed as quick as possible, and I had already advanced
24   towards him.  So leaving his hands free to go up would also
25   leave his hands free to reach into the vehicle, reach into his
```

```
 1   pockets.  So it was just better to cuff him up.
 2   Q    Now, once Mr. Bedetti is handcuffed, I guess at some point
 3   you took control of his casted leg.
 4   A    Yes.
 5   Q    The one with the cast on it.
 6        And you have seen a video that was taken from
 7   Mr. Bedetti's friend that evening; is that correct?
 8   A    Yes, sir.
 9   Q    And we may or may not see that video right now, but let me
10   ask you:  What was your purpose in taking a hold of his leg?
11   What did you think was going to happen?
12   A    I initially thought that he was going to start hitting it
13   on the ground as he's being handcuffed.  It's my experience
14   that people's legs start to flail when officers are at the
15   front of their upper body trying to cuff them.  They try to
16   kick to get out.  They try to get to their feet.  So I grabbed
17   a hold of it, and I also -- I'm not going to lie.  I didn't
18   want to get kicked in the face with it either as I was taking
19   control.
20            MR. H. RUSSELL:  Your Honor, what I would like to do
21   is play a portion of Exhibit -- I think it's Exhibit V-5A, the
22   enhanced version.
23        (Exhibit V-5A for identification.)
24            THE COURT:  All right.  It's a joint exhibit,
25   correct?
```

```
 1                 MR. H. RUSSELL:  It is, Your Honor.

 2                 THE COURT:  You may.

 3                 MR. H. RUSSELL:  I believe we are going to admit the

 4      entire exhibit, but I'm only going to play a portion right

 5      now --

 6                 THE COURT:  All right.

 7                 MR. H. RUSSELL:  -- without the audio.

 8      Q    All right.  So can you see on your screen what's a portion

 9      of this video?

10      A    That's my back.  Do you want me to touch it?

11      Q    Well, let me ask a couple of questions first.  Can you see

12      in this freeze frame where you are?

13      A    Yes, sir.

14      Q    Can you mark with an "X" where you are.

15           So you're the officer that's closest to us in that

16      photograph, correct?

17      A    Yes.

18      Q    And then can you mark with an "O," if you know who the

19      officer to your left is.

20      A    That's Officer Saldana.

21      Q    Okay.  And then do you know who the other officer is to

22      your right?

23      A    No, not really.  I know his head's bald, but -- so no, I

24      don't know which one it is.

25                 MR. H. RUSSELL:  Okay.  And, Your Honor, can I just
```

1    have leave of Court to walk over and just start the video?

2              THE COURT:  Yes.

3              MR. H. RUSSELL:  Thank you.

4         (Video played in open court.)

5    BY MR. H. RUSSELL:

6    Q    Okay.  So the clip that we just saw, were you able to

7    observe yourself have a hold of Mr. Bedetti's casted leg?

8    A    Yes.

9    Q    And Mr. Pachowicz had asked you earlier whether or not you

10   were putting your weight on Mr. Bedetti's casted leg.

11   A    Yes.

12   Q    Did you see yourself put any weight on Mr. Bedetti's

13   casted leg?

14   A    No, I didn't put any weight on it.

15   Q    So in the beginning in that photograph right there, that

16   screen shot, it looks as though your left knee is bent, and

17   it's in the vicinity of that casted leg.

18   A    Yes.

19   Q    Are you putting any of your body weight on it at that

20   time?

21   A    No.  My foot is at my -- my left foot, that's between his

22   legs.  All of my weight is on the ball of my foot.  I'm

23   supporting my weight with that left foot as I control his left

24   leg.

25   Q    Okay.

```
 1   A      And my right leg is on the outside of his right leg.

 2          (Video played in open court.)

 3              MR. H. RUSSELL:  Stop right there, please.

 4   Q    So it looks like in that clip you have moved his leg, his

 5   left leg, Mr. Bedetti's, from where it was initially with the

 6   heel toward his rear end, and now you've moved his leg over to

 7   the right leg, left leg to the right leg.  Do you know why you

 8   did that?

 9   A      Actually, he's moving his own leg.  I'm just holding it

10   from underneath.  If you can see, my hand is under his leg, and

11   I'm starting to bring it down, and he kind of kicks it out so

12   it's in that cross position or "L" position or whatever, and

13   then I let his leg down on the ground with my hand.

14   Q      Okay.

15   A    So he kind of kicked it out.  I didn't swing his leg

16   around like that.  He did that.

17          (Video played in open court.)

18              MR. H. RUSSELL:  Okay.  Stop it right there, please.

19              THE WITNESS:  If you can see when he goes to the

20   ground, he kind of swings out or snaps out.  That's him kicking

21   his leg out.

22   BY MR. H. RUSSELL:

23   Q      Now, in this photograph or this screen shot that's right

24   here, there is an officer that's standing to the left that has

25   kind of a black object on his ear it looks like.  Do you know
```

1    which officer that is?

2    A    I believe that's Officer Saldana.

3    Q    And there's an officer in the middle who's looking down

4    towards Mr. Bedetti.  Do you know who that is?

5    A    That's Officer Beach.

6    Q    And then there is an officer standing to the right of that

7    screen shot.  Do you know who that is?

8    A    That's Officer Lehman.

9    Q    Now, when Mr. Bedetti is in that position on the ground,

10   do you know if any officers are holding his face off the

11   ground?

12   A    No.  They are all standing up -- or holding his face off

13   the ground?

14   Q    Right.  I guess what I'm asking is, what would you call

15   his basic body position when he's handcuffed facedown like

16   that?

17   A    He's -- actually, he's not facedown.  He's laying on his

18   left hip, and his stomach is kind of off the ground.  So he's

19   laying on his side.  He is laying on his left side.

20   Q    And in that position would his head be against the ground,

21   or would his head be supported by any officer?

22            MR. PACHOWICZ:  Objection; calls for speculation.

23            THE COURT:  He can answer if he was able to see

24   that.

25            THE WITNESS:  I didn't see if his head was off the

```
1    ground or it was laying on the ground.  I didn't see.
2    BY MR. H. RUSSELL:
3    Q    Okay.  In your experience, typically when somebody's
4    handcuffed and they're laying on the ground, are the officers
5    supporting his head to keep it off the ground in any way?
6              MR. PACHOWICZ:  Objection; calls for speculation,
7    lack of foundation.
8              THE COURT:  In his experience.
9        You may answer.
10             THE WITNESS:  In my experience they safeguard the
11   head to keep from banging on the concrete, cement, whatever he
12   is laying on.
13   BY MR. H. RUSSELL:
14   Q    When you say guard the head, does that mean the officer is
15   going to keep hold of his head the whole time?
16   A    Usually at this point someone would be under his head, and
17   then he would be seated onto his back side and stood up -- or
18   not standing up, but uprighted onto his back side where he is
19   sitting on the ground.
20             MR. H. RUSSELL:  All right.  Can you play it again,
21   please.  You can play it from there, that's fine.
22       (Video played in open court.)
23             MR. H. RUSSELL:  Stop it right there, please.
24   Q    Now, at that point when you just saw you move his body
25   from where he's laying on his left side to now his stomach is
```

1    against the ground --

2    A     Yes.

3    Q     -- could you see any officers supporting his head in that

4    clip?

5    A     In that clip, no, sir.

6    Q     And then it looks at this point that you are going to

7    reach into his pocket.

8    A     Yes.

9    Q     And what was your purpose in doing that?

10   A     To retrieve some identification.

11   Q     Now, up to this point in the entire encounter, right,

12   including what we've seen so far in the video, has Mr. Bedetti

13   said, "I have a gun in my front pocket"?

14   A     No.

15           MR. H. RUSSELL:  Okay.  Play it, please.

16        (Video played in open court.)

17           MR. H. RUSSELL:  Stop it right there, please.

18   Q     Now, up to this point, has Mr. Bedetti said, "I have a gun

19   in my front pocket"?

20   A     No.

21           MR. H. RUSSELL:  Go ahead and play it, please.

22        (Video played in open court.)

23           MR. H. RUSSELL:  Can you stop it, please.

24   Q     Do you see this gentleman here whose arm is facing the

25   camera?

```
 1   A    Yes, sir.

 2   Q    Do you know who that is?

 3   A    Yes, sir.

 4   Q    And who is that?

 5   A    Mr. Hacopian.

 6   Q    Okay.  The male from the --

 7   A    The male from the incident.

 8   Q    -- incident?

 9        Go ahead and play, please.

10        (Video played in open court.)

11            MR. H. RUSSELL:  Can you stop it for a minute.

12   Q    Did you see the African-American officer speaking to

13   Mr. Hacopian?

14   A    Yes.

15   Q    Who is that?

16   A    Officer Foster.

17            MR. H. RUSSELL:  Okay.  Play it, please.

18        (Video played in open court.)

19            MR. H. RUSSELL:  Can you stop it, please.

20   Q    Now, up to this point in the video -- and again, we will

21   hear the audio later, but up to this point did you hear

22   anything at all about Mr. Bedetti being punched in the face?

23   A    No.

24   Q    At any point while you were there with Mr. Bedetti, did he

25   say anything about being punched in the face?
```

1   A      No.

2   Q      Did you hear Mr. Bedetti say anything about being punched

3   in the head?

4   A      No.

5   Q      Did you hear anybody at the scene say, "Why did you guys

6   punch him in the face?"

7   A      No.

8   Q      Did you see him get punched in the face?

9   A      No.

10  Q      Did you see him get punched in the head?

11  A      No.

12         MR. H. RUSSELL:  Okay.  Please play.

13         (Video played in open court.)

14         MR. H. RUSSELL:  Can you stop it, please.

15  Q      Someone just came into the frame from the left.  Do you

16  know who that is?

17  A      Yes.

18  Q      And who is that?

19  A      Officer Bacon.

20         MR. H. RUSSELL:  Okay.  Go ahead, please.

21         (Video played in open court.)

22         MR. H. RUSSELL:  Stop for a minute.

23  Q      And that's the Jeep that we see in the previous

24  photograph, right?

25  A      Yes, sir.

1    Q    Did the Jeep ever move from where it was stopped when

2    Mr. Bedetti got out until this incident was over?

3    A    No.

4              MR. H. RUSSELL:  Please continue.

5         (Video played in open court.)

6              MR. H. RUSSELL:  Can you stop it for a minute.

7    Q    Do you recall hearing anything while you were at the scene

8    about a drug called Adderall?

9    A    Yes.

10   Q    What do you recall hearing?

11   A    I heard Officer Lehman -- well, I saw Officer Lehman hold

12   up what looked like a prescription bottle.

13             MR. PACHOWICZ:  Objection; hearsay.

14             THE COURT:  Overruled.

15             THE WITNESS:  I'm sorry, ma'am.  Can I answer that?

16             THE COURT:  Yes, you can answer.  You said you saw?

17             THE WITNESS:  Yes, I saw him holding up what

18   appeared to be a prescription bottle in his hand, and he said

19   to Mr. Bedetti, "Are you allowed to take Adderall as a police

20   officer?"

21   BY MR. H. RUSSELL:

22   Q    Did Mr. Bedetti respond to that at all?

23   A    I didn't hear him respond.

24             MR. H. RUSSELL:  Please continue.

25        (Video played in open court.)

```
 1              MR. H. RUSSELL:  Now, stop it right there, please.
 2   Q    Now, it appears as though Officer Beach and
 3   Officer Saldana have taken hold of Mr. Bedetti.  Is that what
 4   you're seeing in the freeze frame?
 5   A    Yes, sir.
 6   Q    Do you know what is happening in the encounter that led
 7   them to put their hands on him again?
 8   A    They hadn't completely searched his pockets, aside from me
 9   retrieving his wallet.  I believe at that point no one had gone
10   through his pockets.
11   Q    When you were going through his pockets, did you --
12              MR. PACHOWICZ:  Objection; assumes facts not in
13   evidence.
14              THE COURT:  Well, you started with "When you were
15   going through his pockets."
16              MR. H. RUSSELL:  Was there an objection?
17              THE COURT:  Yes.  There's an objection that you are
18   assuming facts not in evidence.
19              MR. H. RUSSELL:  Okay.  I'll rephrase the question,
20   Your Honor.
21   Q    So you saw in the video that you reached into
22   Mr. Bedetti's pants and pulled out his wallet, correct?
23   A    Yes, I did that.
24   Q    Now, at the time you reached in and pulled out the wallet,
25   why didn't you search the rest of his person to look for a gun?
```

1    A     I just -- I just wanted to find out who he was and get his

2    information.  I just -- I didn't because there was other

3    officers there.  He was handcuffed, and I felt that that would

4    come in time, but we were safe at that point.

5    Q     At that moment where you're reaching into his pants to

6    pull out the wallet, did you think he had a gun on him?

7    A     No, I didn't.

8    Q     Where did you think the gun was?

9    A     In the vehicle.

10            MR. H. RUSSELL:  So please play it.

11         (Video played in open court.)

12            MR. H. RUSSELL:  And stop it.

13   Q     Up to this point in the entire encounter, did Mr. Bedetti

14   ever say, that you heard, "I have a gun in my right front

15   pocket"?

16            MR. PACHOWICZ:  Objection; compound.

17            THE COURT:  Overruled.

18            THE WITNESS:  No, I never heard him say he had a gun

19   on his person.

20   BY MR. H. RUSSELL:

21   Q     So one of the claims in the case is that you acted toward

22   Mr. Bedetti in retaliation for his criticism of you as a police

23   officer and your professionalism.  So I want to ask you, did

24   any of your actions toward Mr. Bedetti have anything to do with

25   the words that he said, except for the words, "You have a gun;

```
 1    I have a gun" and words related to that statement?

 2    A     Are you asking me was I retaliating for prior comments

 3    before the gun comment?

 4    Q     Yeah.  I'm asking if you took any action against

 5    Mr. Bedetti because of any criticism he claims to have made

 6    toward you as a police officer.

 7    A     No.

 8    Q     Did you take any actions toward Mr. Bedetti based on any

 9    comments he claims to have made about your level of training?

10    A     No.

11    Q     Were there any words that Mr. Bedetti spoke, other than,

12    "I have a gun; you have a gun," and whatever went along with

13    that comment that led you to take action against Mr. Bedetti?

14    A     That was the only time I took any trust in Mr. Bedetti,

15    was during the time he made those comments about possessing a

16    gun and defending himself with it.

17              MR. H. RUSSELL:  That's all the questions I have,

18    Your Honor.

19              THE COURT:  All right.  Redirect?

20              MR. PACHOWICZ:  Thank you.

21                        REDIRECT EXAMINATION

22    BY MR. PACHOWICZ:

23    Q     When did you first learn that Mr. Bedetti was a police

24    officer?

25    A     I don't know exactly what time or what point in the
```

UNITED STATES DISTRICT COURT

1    incident it was.

2    Q    Well, you just watched the video, at least part of it,

3    without the audio.  When did you learn that Mr. Bedetti was a

4    police officer?

5    A    Without the audio, I can't tell what was said, so I don't

6    know if he said it at that point or farther down the road when

7    he was booked, or I don't know.

8    Q    You have no independent recollection as to when you

9    learned he was a police officer?

10   A    When I took his wallet and I took his driver's license to

11   obtain his information, I want to say I saw his ID, but again,

12   I don't want to guess that's at the point when I saw his police

13   ID.

14   Q    And what did you do when you saw his police ID?

15   A    Gave him back his wallet and kept his driver's license.

16   Q    Did you tell anyone?

17   A    I don't recall if I said, "Hey, he's a police officer" to

18   anybody there.

19   Q    Okay.  Because Officer Lehman is the one who asked about

20   Adderall, correct?

21   A    Yes.

22   Q    And it was actually Officer Lehman said, "This is

23   methamphetamine," right?

24   A    I recall him making a comment that -- something along

25   those lines, that it's a stimulant, like methamphetamine, or

1    something along those lines.

2    Q    And then he said, "Are you allowed to take this, dude, as

3    a police officer?"  Right?

4    A    Yes.

5    Q    Now, how did he know, since he was the last one there,

6    that Mr. Bedetti was a police officer if you didn't tell

7    anybody?

8              MR. H. RUSSELL:  Calls for speculation.

9              THE COURT:  Overruled.  He can answer, if he knows.

10             THE WITNESS:  I don't know when I mentioned that he

11   was a police officer or if somebody else mentioned it because

12   he told somebody else.

13   BY MR. PACHOWICZ:

14   Q    Who else would have known, sir?

15   A    I don't know.  There's other officers there.  I didn't

16   hear him say it.

17   Q    Did you exaggerate at all during your testimony today?

18   A    Did I exaggerate?

19   Q    Yes, sir.

20   A    I don't believe so, no.

21   Q    How much did you weigh on November 17, 2013?

22   A    235.

23   Q    Did anyone ask to use a second set of handcuffs on

24   Mr. Bedetti?

25   A    I didn't hear anyone mention anything about a second set.

1   Q     And typically a second set of handcuffs would be used on

2   people, say, Mr. Bedetti's size, who are broader in the

3   shoulders and it's harder to get both hands together in their

4   back, correct?

5   A     At some point after being handcuffed to make him more

6   comfortable, the second set may be used for transportation

7   purposes to make him more comfortable, but at that time I

8   didn't hear anyone mention a second set.  We just were going to

9   handcuff him.

10  Q     When you told Mr. Bedetti you were going to -- you were

11  going to put him in a patrol car, was that the patrol car that

12  you had left about a block away?

13  A     No.  I would probably use the one closest to me, the one

14  that was to my immediate right that was about five to seven

15  feet from me.

16  Q     Oh, you mean Officer Saldana and Officer Foster's car?

17  A     Yeah, that was probably the car I would use.

18  Q     Mr. Bedetti was heading back to his car when you told him

19  that you were going to handcuff him and put him in a patrol

20  car, correct?

21  A     He was engaging with Officer Foster.  I don't know what he

22  was doing, planning on doing.  He was standing there just

23  yelling at Officer Foster, so I don't think he was going back

24  to his car, no.

25  Q     So you interrupted him while he was screaming at Mr. -- at

1    Officer Foster, correct?

2    A    Yes.  I interrupted him and told him to stop and to move.

3    Q    And had Mr. Bedetti already received his ID?

4    A    I don't know what he had received.  I know Officer Foster

5    handed -- he handed something to Officer Foster, to me it

6    looked like a business card, and then he immediately handed it

7    back to Mr. Bedetti.

8    Q    You had an opportunity to review your -- well, let me ask

9    this:  What did you review prior to coming here today?

10   A    Prior to the jury coming out, I believe I read my police

11   report.

12   Q    Anything else?

13   A    No.

14   Q    You didn't say in your police report -- you didn't write

15   at all that when you walked into the parking lot, you followed

16   a trail of blood and screaming, did you?

17   A    No.

18   Q    The first time you've ever used the phrase "trail of

19   blood" and "screaming" is right here, right now on direct

20   examination; is that correct?

21   A    Yes.

22   Q    And you --

23   A    You asked me what I saw, and I told him what I saw.

24   Q    And you have testified in the criminal case, and you

25   didn't say it there, correct?

1    A    I don't know if I mentioned it or not.

2    Q    I'm sorry.  And you testified in your deposition, and you

3    didn't say it there, correct?

4    A    I don't know if you asked me that question or not, so I

5    don't know.

6              MR. PACHOWICZ:  No other questions.

7              THE COURT:  All right.  Recross?

8              MR. H. RUSSELL:  No, thank you, Your Honor.

9              THE COURT:  All right.  Thank you, Officer Corcoran.

10   You may step down.

11             THE WITNESS:  Do you want me to clean this up at

12   all?

13             THE COURT:  No, that's all right.

14        All right.  Mr. Pachowicz, your next witness.

15             MR. PACHOWICZ:  Officer Bacon.

16             THE COURTROOM DEPUTY:  Please raise your right hand.

17             **DOUGLAS BACON, DEFENDANT, WAS SWORN**

18             THE WITNESS:  I do.

19             THE COURTROOM DEPUTY:  Thank you.  You may be

20   seated.

21        Please state and spell your full name for the record.

22             THE WITNESS:  Douglas, D-o-u-g-l-a-s, Bacon,

23   B-a-c-o-n.

24                      **DIRECT EXAMINATION**

25   BY MR. PACHOWICZ:

```
1    Q     Sir, who do you work for?

2    A     City of Long Beach.

3    Q     As?

4    A     Police officer.

5    Q     How long have you been a police officer?

6    A     I start my 25th year in August of this year.

7    Q     On November 16th into the evening of -- or morning of

8    November 17th of 2013, did you see Mr. Bedetti?

9    A     Yes.

10   Q     And did you hear Mr. Bedetti make any criticisms of any

11   police officers with the Long Beach Police Department?

12   A     No.

13   Q     Didn't say anybody needed retraining?

14   A     No.

15   Q     Didn't say anyone was unprofessional?

16   A     No.

17   Q     You would agree that police officers often carry weapons

18   off duty, correct?

19   A     Yes.

20   Q     You would agree when they come into contact with other

21   police officers, it's a courtesy to tell the other officer that

22   they are, in fact, a police officer and have a weapon on their

23   person or in their car, correct?

24   A     Yes.

25   Q     You wrote a report, correct?
```

```
 1   A     Yes.

 2   Q     In fact, you wrote two reports, correct?

 3   A     Yes.

 4   Q     You wrote one report, and then you had to write another

 5   report and supplement it and add something, correct?

 6   A     I wrote an additional report.

 7   Q     And what you added in the second report that wasn't in the

 8   first report is a line that said "Officer Corcoran advised me

 9   that a male, later identified as Marcelo Bedetti, threatened to

10   shoot him with a gun," correct?

11   A     Yes.

12   Q     And you wrote "Bedetti advised Corcoran that he had a gun

13   and he would shoot him if Officer Corcoran attempted to arrest

14   him"; is that correct?

15   A     Yes.

16   Q     You interviewed Ms. Hacopian, correct?

17   A     Yes.

18   Q     She -- you learned that there was no injury, correct?

19   A     Yes.

20   Q     And she had not been touched by Mr. Hacopian, correct?

21   A     I don't recall had not been touched.  She had no injury,

22   from what I recall.

23   Q     Do you recall that it was verbal only?

24   A     Yes.

25   Q     And knowing that, you knew that there was no 273.5
```

1   committed as soon as you learned those two facts, correct?

2   A     No.

3   Q     You would agree that an element of a 273.5 is a traumatic

4   injury, correct?

5   A     Yes.

6   Q     And you did not have a victim who had a traumatic injury,

7   correct?

8   A     Ms. Hacopian did not have a traumatic injury, that's

9   correct.

10  Q     While you were on scene, did you -- do you recall hearing

11  any officer express a concern that Mr. Bedetti was reaching

12  into the door, reaching through the door of the Jeep to access

13  his gun?

14  A     No, I didn't hear that.

15  Q     And at your deposition you testified to that fact under

16  penalty of perjury, correct?

17  A     I believe so.

18  Q     You arrested Mr. Bedetti on that videotape that we just

19  watched a portion of without sound, correct?

20  A     No, I did not arrest him, no.

21  Q     Did you tell Mr. Bedetti that he was under arrest?

22  A     I did not, no.

23  Q     Did anyone on that videotape tell Mr. Bedetti that he's

24  under arrest?

25  A     I don't know.

1          MR. PACHOWICZ:  Can we pull up 5A, the video 5A.

2     Don't play that yet.

3   Q   Did you tell Mr. Bedetti that he was under arrest for

4   driving under the influence?

5   A    No.

6   Q   Did you tell Mr. Bedetti that he was under arrest for 422?

7   A    No.

8   Q   Did you tell him that he was under arrest for 148?

9   A    No.

10  Q   Do you know who did?

11  A    No.

12         MR. PACHOWICZ:  Your Honor, I would like to go to

13  about minute 5; 5 minutes, 10 seconds.

14         THE COURT:  Is this still V-5A?

15         MR. PACHOWICZ:  It is V-5A, Your Honor.

16     (Discussion off the record.)

17  BY MR. PACHOWICZ:

18  Q   While we are doing that, sir, let me ask you a couple

19  questions.  Did you write in your report that you observed any

20  symptomatology that Mr. Bedetti was under the influence of

21  alcohol?

22  A    No.

23  Q   Did you write anything in your report to indicate that he

24  was under the influence of a controlled substance?

25  A    No.

1    Q    Did you write anything to indicate that he was under

2    arrest for 422?

3    A    I wrote a report regarding the actual threats that he made

4    towards Officer Corcoran.

5    Q    You said "threats."  Did he make more than one threat?

6    A    The threat that was made that he would shoot him is what

7    was communicated to me.

8    Q    So if we're -- do you recognize this video, sir?

9    A    I do.

10   Q    And we are about five minutes in, and we're going to hit

11   "play," and I will stop it in a second.

12        (Video played in open court.)

13            MR. PACHOWICZ:  Stop it there.

14   Q    Who is the gentleman that's pointing to Mr. Bedetti

15   sitting on the ground.

16   A    That was me.

17   Q    And did you hear yourself say on that audio recording,

18   "You're under arrest for 422"?

19   A    I did.

20            MR. PACHOWICZ:  Can we go back just a little bit.

21   Q    And if you could listen to the rest of that sir, so we

22   hear everything you say.

23        (Video played in open court.)

24            MR. PACHOWICZ:  Stop it, please.

25   Q    On that tape, sir, you tell Mr. Bedetti he's under arrest

1    for driving under the influence; is that true?

2    A    I believe so, yes.

3    Q    And you wrote no report to indicate that fact happened,

4    correct?

5    A    That's correct.

6    Q    And you indicated that he was under arrest for

7    interference, correct?

8    A    That's correct.

9    Q    And you wrote no report to indicate that that fact

10   happened, that you placed Mr. Bedetti under arrest at that

11   point in time, correct?

12   A    I did not place him under arrest.

13   Q    So you telling him that he's under arrest while he's

14   handcuffed is not you placing him under arrest?

15   A    How that initial conversation started out was he asked me

16   what the charges were, so I explained the charges to him.  I

17   did not handcuff him.  I did not place him under arrest, that's

18   correct.

19   Q    Well, who placed him under arrest?

20   A    Officer Corcoran.

21   Q    Well, why did you say he's under arrest for driving under

22   the influence?

23   A    When he asked me the question, that's what I responded

24   with.

25   Q    Why didn't you say he was under arrest for child

1    molestation?

2    A    The facts, as I know them, with regards to Mr. Bedetti

3    that night, those were the charges that I believed he would be

4    placed under arrest for.

5    Q    So what fact did you know that -- strike that.

6         What was the source of your fact for the

7    driving-under-the-influence comment that you made there?

8    A    When I had learned that he was possibly taking Adderall.

9    Q    So possibly taking Adderall was -- you learned that from

10   where?

11   A    When I had heard it from Officer Lehman.

12   Q    So did Officer Lehman tell you that, or did you just hear

13   it while he is talking in general?

14   A    I heard it while he was speaking in general.

15   Q    Did you have any evidence that he had actually taken

16   Adderall?

17   A    No, I did not.

18   Q    Did you have any evidence that the Adderall had affected

19   him in any way?

20   A    No, I did not.

21   Q    What's your knowledge about Adderall?

22   A    From what I know, Adderall is taken for ADHD.

23   Q    Okay.  And do you have some type of medical training?

24            THE COURT:  For the record, why don't we say what

25   the acronym ADHD stands for.

```
 1              THE WITNESS:  Attention deficit disorder.
 2   BY MR. PACHOWICZ:
 3   Q    So am I correct in saying that you told Mr. Bedetti that
 4   he took -- he was under the influence [sic] for driving under
 5   the influence because Officer Lehman found a bottle in his car?
 6   A    I believe that had something to do with it, that's
 7   correct.
 8   Q    What other fact, any symptomatology, unsteady on his feet,
 9   swayed when he stood there, couldn't do field sobriety tests?
10   When you saw him walking around with his cast on, he appeared
11   impaired, did you see anything like that?
12              MR. H. RUSSELL:  Compound.
13              THE COURT:  Sustained.
14   BY MR. PACHOWICZ:
15   Q    Did he have any symptomatology that you could point to,
16   sir, that you saw that was consistent with a person who is
17   impaired by ADHD -- or by Adderall?
18   A    I believed his impairment was possible with his behavior
19   prior to being handcuffed, getting out and contacting us and
20   his behavior.
21   Q    Because he contacted you?
22   A    Not solely because he contacted me.
23   Q    Did he talk to you at all --
24   A    Briefly.
25   Q    -- before he was arrested?
```

```
 1    A     Me specifically?

 2    Q     Yes, sir.

 3    A     I don't believe me specifically.  I believe he was

 4    speaking to anybody that would listen to him in the parking

 5    lot.

 6    Q     Did you hear anything that he said?

 7    A     Yes.

 8    Q     What did you hear him say?

 9    A     When he was initially parking, I heard him state that just

10    write him a fucking parking ticket, if Officer Corcoran was a

11    parking officer or something to that effect.

12    Q     And where were you when you heard that, sir?

13    A     I was in the parking lot also.

14    Q     And where was Officer Foster at that time?

15    A     I don't recall where Officer Foster was.

16    Q     Was he sitting in his car?

17    A     I don't recall.

18    Q     Was Officer Saldana sitting in his car?

19    A     I don't recall where he was seated either -- where he was

20    seated.

21    Q     I apologize.  Did you follow the trail of blood in the

22    parking lot?

23    A     I don't recall a trail of blood.

24    Q     Did you see any blood on his hands at all?

25    A     Whose hands?
```

1    Q     Mr. Hacopian.

2    A     I don't recall.

3    Q     You wrote that "Mr. Bedetti refused and continued to

4    verbally abuse us."  What did he say that verbally abused you?

5    A     I can't recall exactly what his terminology was or what he

6    was saying.

7    Q     Well, isn't that why you write a report right after the

8    incident, so when you get to a court date later, you can

9    remember what verbal abuse you took from Mr. Bedetti?

10   A     Yes.

11   Q     You knew when you wrote your report that it was going to

12   the Long Beach City Prosecutor's Office, correct?

13   A     Yes.

14   Q     And, in fact, you knew that your initial report didn't

15   contain any information sufficient to sustain a threat,

16   correct?  You didn't have any of that in that initial report,

17   did you?

18   A     Usually the reports are filed differently.

19   Q     So you wrote one report which has a reported time of 22:57

20   on November 16th, 2016, correct?

21   A     Can you say the date again?  I'm sorry.

22   Q     November 16th is the reported date --

23   A     Okay.

24   Q     -- in the top, and then next to that, the reported time is

25   22:57.

```
 1   A    That sounds accurate.

 2   Q    And that report doesn't contain anything about Mr. Bedetti

 3   saying he's going to shoot somebody, correct?

 4   A    I don't have the report in front of me, and I --

 5   Q    Exhibit G.  There is a binder which would be volume 5.

 6        (Exhibit G for identification.)

 7             THE WITNESS:  Okay.  Where are we at?  I'm sorry.

 8   BY MR. PACHOWICZ:

 9   Q    Exhibit G.

10   A    Okay.

11   Q    2-1.

12   A    Okay.  I have seen the report.

13   Q    Now, at the very bottom of that report, to clarify one

14   thing, you wrote -- the last paragraph of the first page starts

15   out, "Hacopian stated she was never physically hit and she was

16   only arguing with her husband," correct?

17   A    Yes.

18   Q    And then you write another report that is dated November

19   17th, at 4:36 p.m., or 0436, so I guess 4:30 a.m., correct?

20   A    What exhibit is that?

21   Q    Exhibit G-1-1.

22   A    That's correct.

23   Q    And this report is the one that says, "Marcelo Bedetti

24   threatened to shoot him with a gun."  That's the one that says

25   it, correct?
```

1    A    Yes.

2    Q    In total, this is a paragraph that says, "While working,

3    my partner Corcoran and I were in the area of 130.  We were

4    contacted about a possible dispute."  That's one paragraph.

5    The second paragraph is "During our investigation, we were in

6    the parking lot interviewing two subjects involved in a dispute

7    when Officer Corcoran advised me that a male, later identified

8    as Marcelo Bedetti, threatened to shoot him with a gun.

9    Bedetti initially contacted us during our investigation and he

10   was asked to leave numerous times.  Bedetti continued to

11   interfere and delay in our investigation.  Bedetti refused and

12   continued to verbally abuse us, preventing us from completing

13   our investigation."

14       So the first question is:  What, if anything, did you

15   personally hear Mr. Bedetti say?

16   A    Like I explained earlier, the parking ticket comment, I

17   heard him personally say that.

18   Q    You didn't document that you heard that in this report,

19   did you?

20   A    I did not place that in this report, that's correct.

21   Q    Is there a reason for that, sir?

22   A    When I filed the report, I use the report to refresh my

23   recollection if, in fact, I'm going to testify in court, so --

24   Q    So you didn't put it in the report that the guy that you

25   arrested said to one of your officers, "What are you?  A

1    fucking parking enforcement officer?" something like that?

2    A    I did not specifically put that, that's correct.

3    Q    Did you have any notes of any conversations or comments

4    that you heard Mr. Bedetti say?

5    A    I took notes initially at the scene, yes.

6    Q    And where are they, sir?

7    A    After I filed the report, I shredded the notes.

8    Q    So after you filed this report, you shredded them?

9    A    Regarding this subject matter, that's correct.

10   Q    And this report continues, "Bedetti advised Corcoran that

11   he had a gun and he would shoot him if Officer Corcoran

12   attempted to arrest him.  Officer Corcoran believed this threat

13   due to Bedetti's aggressive behavior and his failing to leave

14   the area.  Bedetti was found to have a loaded handgun in his

15   right front shorts pocket."

16        That is your entire report on this incident; is that true?

17   A    Yes.

18   Q    When you said that Officer Corcoran believed this threat

19   due to Bedetti's aggressive behavior, is that something that

20   Officer Corcoran told you?

21   A    Yes.

22   Q    And was that in your notes that you destroyed?

23   A    I don't recall.

24        MR. PACHOWICZ:  I don't have any other questions.

25        THE COURT:  All right.  Cross-examination?

1            **CROSS-EXAMINATION**

2     BY MR. H. RUSSELL:

3     Q     Officer Bacon, good afternoon now.

4     A     Good afternoon.

5     Q     Can you explain to the jury how the concept of an

6     arresting officer works.  How do you determine who the

7     arresting officer is?

8     A     Usually the arresting officer, from my training and

9     experience and what I have dealt with for a number of years,

10    usually the person that handcuffs the subject is considered the

11    arresting officer.

12    Q     So when Mr. Bedetti was handcuffed, did you participate in

13    that at all?

14    A     I did not.

15    Q     Were you in the parking lot area when the handcuffs were

16    placed?

17    A     Yes.

18    Q     Did you observe any of the efforts on the part of Officer

19    Corcoran or Officer Saldana to take care of Mr. Bedetti's

20    hands?

21    A     Briefly, yes.

22    Q     And when you observed that, where were you in relation to

23    the Jeep?

24    A     I would have been west of the Jeep, more towards Pine

25    Avenue.

1  Q     And what were you doing west of the Jeep, more towards

2  Pine Avenue when you were observing Officer Corcoran and

3  Officer Saldana near the Jeep with Mr. Bedetti?

4  A     I believe I was still involved with Ms. Hacopian and her

5  husband, which his real name is, I believe, Federico Mercado.

6  Q     Now, what were you doing with Ms. Hacopian and

7  Mr. Mercado?  Why were you still with them?

8  A     Ms. Hacopian wanted to get in the car and leave, and her

9  husband, Mr. Mercado, wanted to get some items out of the car,

10 so I was still with them.

11 Q     So in terms of your initial investigation of that possible

12 incident between the two of them, Mr. Mercado and Ms. Hacopian,

13 did you think you were done with that activity?

14 A     No.

15 Q     At what point did you conclude that you were done with

16 your activity regarding them?

17 A     When Ms. Hacopian drove out of the parking lot and

18 Mr. Mercado left the area.

19 Q     So how far away were you, estimate in feet, when you

20 observed Officer Corcoran and Officer Saldana touching

21 Mr. Bedetti?

22 A     I believe approximately 10 to 15 feet west of their

23 location.

24 Q     Now, before you saw Mr. Bedetti touched by

25 Officer Corcoran, did you hear any comment about a gun?

```
 1   A    I don't specifically recall any specific comment about a

 2   gun.

 3   Q    Did you observe the leg sweep that Officer Corcoran

 4   described?

 5   A    Not that I recall.  I can't remember.

 6   Q    Did you see anybody punch Mr. Bedetti in the face?

 7   A    No.

 8   Q    Did you see anybody punch Mr. Bedetti in the head?

 9   A    No.

10   Q    When you were talking to Mr. Bedetti after he had been

11   handcuffed, did he say to you that he had been punched in the

12   face?

13   A    No.

14   Q    Did he say to you that he had been punched in the head?

15   A    No.

16   Q    Did you overhear him say to any officer, "I got punched in

17   the face"?

18   A    No.

19   Q    Did you hear him say to any officer, "I got punched in the

20   head"?

21   A    No.

22   Q    So the conversation that took place between you and

23   Mr. Bedetti was him asking you what to start the conversation?

24   A    From what I recall, I believe he asked me, "What are the

25   charges?"
```

1    Q    So how did you decide what to tell him what the charges

2    were?

3    A    From what I had observed thus far.

4    Q    And had you talked to any of the officers about what they

5    had observed, as opposed to what you had observed?

6    A    Not specifically, no.

7    Q    So you were asked by Mr. Pachowicz about a DUI charge.

8    A    Yes.

9    Q    Why did you think a DUI charge might be appropriate?

10   A    Because people are under the influence, and when they

11   drive under the influence, it would be a misdemeanor charge.

12   Q    And have you observed people who have been driving under

13   the influence of drugs, as opposed to alcohol?

14   A    Yes.

15   Q    And are the symptoms different at all --

16   A    Yes.

17   Q    -- that you observed?

18   A    Yes.

19   Q    How are the symptoms different?

20   A    It would depend on the --

21             MR. PACHOWICZ:  Objection; vague.

22             THE COURT:  Sustained.

23   BY MR. H. RUSSELL:

24   Q    Well, you were asked about some symptoms, so I will just

25   ask you about some specific symptoms.  For example, have you

```
 1   ever observed someone that you believed was driving under the
 2   influence of alcohol have trouble walking steadily?
 3   A    Yes.
 4   Q    Have you observed people under the influence of alcohol
 5   appear to have red eyes?
 6   A    Yes.
 7   Q    Slurred speech?
 8   A    Yes.
 9   Q    Difficulty with their motor skills?
10   A    Yes.
11   Q    Have you observed any different symptoms from someone who
12   turns out to be under the influence of drugs, as opposed to
13   alcohol?
14   A    Yes.
15   Q    Give me an example of a different symptom.
16   A    If someone was driving under the influence of, let's say,
17   marijuana, they would have an odor of marijuana emitting from
18   their breath and person.  Their tongue would be usually a green
19   color, and their motor skills would not be as great -- as good
20   as if they were not intoxicated on marijuana.
21   Q    How about somebody who's under the influence of an
22   amphetamine or stimulant, what type of symptoms would you see?
23             MR. PACHOWICZ:  Objection; lack of foundation.
24             THE COURT:  Sustained.
25   BY MR. H. RUSSELL:
```

1   Q     Have you ever encountered anybody that you believed to be

2   under the influence of an amphetamine while they're driving?

3   A     Yes.

4   Q     And were you able to observe the symptoms of that

5   individual or individuals?

6   A     Yes.

7             MR. PACHOWICZ:  Objection; lack of foundation.

8             THE COURT:  You will have to lay some foundation.

9   BY MR. H. RUSSELL:

10  Q     Have you received any training over the course of your

11  career about what type of effects stimulants, such as

12  amphetamines, have on a person?

13  A     Yes.

14  Q     And have you observed people out in the field while you're

15  working who appear to be under the influence of amphetamines?

16  A     Yes.

17  Q     So what types of symptoms have you seen?

18  A     They would have a raised, elevated pulse or heart rate,

19  possible aggressive behavior.  They wouldn't act rationally,

20  usually, when asked certain questions when dealing with the

21  police.

22  Q     Now, have you watched the videos in this case from the

23  security cameras?

24  A     I have seen them, yes.

25  Q     All right.  And those don't have any audio, but what I

1    would like to do is show you a portion of Exhibit V-1.

2        And I would like to play a portion of that for the jury,

3    Your Honor.

4              THE COURT:  Has that been admitted already?

5              MR. PACHOWICZ:  The edited version.

6              MR. H. RUSSELL:  No, not the edited one, the actual

7    one.

8              MR. PACHOWICZ:  The one that goes to all the

9    irrelevant spots.

10             MR. H. RUSSELL:  Correct.

11   Q    And I will just lay it out there for you and everyone

12   else.  There are parts of this video where the camera angle

13   shifts, so there will be times where you don't see any of the

14   interaction.  But that's okay because I'm going to ask you

15   about just a couple minutes worth of video.  Okay?

16   A    Okay.

17             THE COURT:  Are you seeking admission of this video?

18             MR. H. RUSSELL:  Yes, Your Honor.  And the portion

19   I'm going to start with is at 10:49 on the video.  And the

20   video itself is 20 minutes and 1 second long, but I'm not going

21   to be playing the entire video.

22             THE COURT:  All right.

23   BY MR. H. RUSSELL:

24   Q    Before we press "play," do you recognize the area that's

25   depicted in the video?

1    A    Yes.

2    Q    And what does that area show?

3    A    It shows Pine Avenue on the west, and it shows the parking

4    lot that we were in that night, and that's going to be just

5    south of 130 Pine Avenue or north of 110 Pine Avenue, the

6    parking lot.

7           MR. PACHOWICZ:  Just for the record, when counsel

8    referred to 10:49, is that the time that's stamped on the

9    video, or is that the time -- the running time?

10          MR. H. RUSSELL:  No, it's the running time.

11          MR. PACHOWICZ:  Okay.

12          MR. H. RUSSELL:  So the screen shot shows 12:30:48

13   a.m. on the bottom of the video.

14   Q    Just to orient us, to the right of the photograph is which

15   direction?

16   A    That's going to be northbound.

17          MR. H. RUSSELL:  So if you could push "play,"

18   please.

19       (Video played in open court.)

20          MR. H. RUSSELL:  And stop right there, please.

21   Q    Okay.  Now, do you see in this video still, which is

22   12:31:32 a.m., a police car?

23   A    Yes.

24   Q    Do you know whose police car that is?

25   A    I believe it is Officer Saldana and Foster.

1           MR. H. RUSSELL:  Okay.  Can you play it, please.

2      (Video played in open court.)

3           MR. H. RUSSELL:  And stop.

4  Q    Did you see in the video, if you look in the alley that's

5  south of the police car or toward the top of the frame, there

6  were two figures that appeared to be walking from the building

7  that's on the left of the still back toward the parking lot?

8  A    Yes.

9  Q    And do you know who those people are?

10  A    I believe it's me and Ms. Hacopian.

11          MR. H. RUSSELL:  Okay.  Can you play it, please.

12      (Video played in open court.)

13          MR. H. RUSSELL:  Stop, please.

14  Q    Okay.  Now, did you get a chance to ever -- well, did you

15  ever see Mr. Bedetti's Jeep that night?

16  A    Yes, I did.

17  Q    Okay.  And do you see the Jeep in this photograph

18  anywhere -- or in this still?

19  A    Yes, it appears to be traveling eastbound with the lights

20  on.

21  Q    Okay.  And can you just, so there's no mistake, can you

22  mark with an "X" the Jeep, please.

23      And can you push "play," please.

24      (Video played in open court.)

25          MR. H. RUSSELL:  Stop for a moment.

```
1   Q    Do you see a person that's standing in spot 17?

2   A    Yes.

3   Q    Do you know who that is?

4   A    I do not, no.

5   Q    Can you tell if it's a police officer?

6   A    It doesn't appear to be a police officer.

7   Q    And what makes you say that?

8   A    It doesn't appear that he has a police uniform on.

9   Q    And when you -- did you actually see Mr. Bedetti's Jeep

10  pull into the parking lot?

11  A    I did.

12  Q    And when you saw Mr. Bedetti's Jeep coming into the

13  parking lot, could you see Mr. Mercado still in the area?

14  A    Yes.

15  Q    Okay.  Do you see any open parking spaces in this screen

16  shot?

17  A    I do.

18  Q    And can you mark for us the open parking spaces that you

19  see in this screen shot?

20  A    With an X or --

21  Q    Sure.  Make an X in the open parking spots that you see.

22       So you put one right above the one in 31.  You have made

23  an X to the left of "a.m." on the screen?

24  A    Correct.

25  Q    And do you see any open parking spots near the Jeep?
```

120

A      (Indicating.)

Q      So there's one in spot 16.  And then are those spots open to the left as you are looking at it on spot 16?

A      No.  There's no spots open up against the wall that I see besides the one that I marked -- oh, I'm sorry.  I was incorrect.  There is one -- I believe it's another spot.

Q      Can you just mark it with an X.

Okay.  And then can you play, please.

(Video played in open court.)

        MR. H. RUSSELL:  And can you stop it right there.

Q      Did you see a person in the photograph move closer to spot 16 from spot 17?

A      Yes.

Q      And again, do you know if that's a police officer?

A      It doesn't appear to be a police officer to me.

Q      And when you said you were aware that Mr. Mercado was still in the area, do you know where in the area Mr. Mercado was?

A      He would have been in the area probably 16, 17 parking spot, in that area.

        MR. H. RUSSELL:  Okay.  Play it, please.

(Video played in open court.)

        MR. H. RUSSELL:  And stop it, please.

Q      Do you see there's a -- looks like a pickup truck that's driven between the police car and the car that's in the bottom

121

1   right of the photograph?

2   A     Yes.

3   Q     And then it looks like there is a person who's sitting

4   down in the alleyway right close to the beginning of the

5   parking lot?

6   A     Yes.

7   Q     Do you know who that is?

8   A     I believe it's Ms. Hacopian.

9   Q     And then there's two people that look like they're talking

10  to the driver's side of the police car.  Do you see them?

11  A     Yes.

12  Q     Can you tell who they are?

13  A     It's very difficult, but I believe it's myself and

14  Officer Corcoran.

15  Q     Okay.  And then there's a person, and it looks like

16  dark-colored clothing that's on the other side of the pickup

17  truck.  Do you know who that is?

18  A     I believe that's Mr. Mercado.

19         MR. H. RUSSELL:  Okay.  Play it, please.

20         (Video played in open court.)

21         MR. H. RUSSELL:  And stop it, please.

22  Q     So from where you were or you believed you were talking

23  with Officer Corcoran just a couple seconds before on the

24  video, could you hear anything that was being said from the

25  Jeep?

122

```
 1   A     Currently, right this moment you mean?

 2   Q     No.

 3         Can you back it up maybe five seconds, please.

 4         That's fine.  Play it from there.

 5         (Video played in open court.)

 6              MR. H. RUSSELL:  Okay.  And stop it right there,

 7   please.

 8   Q     So the two people that are talking to the -- or at least

 9   standing to the driver's side of the police car, you believe

10   one of them was you, correct?

11   A     Yes.

12   Q     And then the Jeep is now attempting to park in spot 16,

13   correct?

14   A     Yes.

15   Q     Could you hear anything that the driver of the Jeep said

16   from where you're standing in this screen shot we see here?

17   A     Yes.

18   Q     And do you remember anything specific the driver of the

19   Jeep said?

20   A     Something to the effect of "If you're the fucking parking

21   patrol, write me a ticket," or something to that effect.

22   Q     Did that bother you when you heard that?

23   A     No.

24   Q     Did it appear to bother Officer Corcoran?

25   A     No.
```

1   Q    Did you hear Officer Corcoran respond to the driver of the

2   Jeep in any way?

3   A    A little later he spoke to him about the parking

4   situation.

5   Q    Do you recall what was said?

6   A    Not exactly, no.

7   Q    Did you ever hear Officer Corcoran call the driver of the

8   Jeep a dumb ass?

9   A    No.

10  Q    And while you were standing there, did you hear the driver

11  of the Jeep identify himself as a police officer?

12  A    No.

13  Q    Did you ever hear him identify himself as a police

14  officer?

15  A    No.

16  Q    Did you ever see him hand any identification to any other

17  officer?

18  A    Not that I recall.

19  Q    Before you observed the handcuffs on Mr. Bedetti, did you

20  have any awareness he was a police officer?

21  A    Not that I recall, no.

22  Q    Did Mr. Bedetti ever say anything to you to say that you

23  were not properly trained?

24  A    No.

25  Q    Did he ever say anything to you that you were

```
 1   unprofessional?

 2   A      No.

 3   Q      Did any of your actions toward Mr. Bedetti have anything

 4   to do with any of the words he spoke to you?

 5   A      No.

 6   Q      So to the best of your recollection, how did you learn

 7   from Officer Corcoran what Mr. Bedetti had said to him?

 8                MR. PACHOWICZ:  Objection; vague.

 9                THE COURT:  Overruled.

10                THE WITNESS:  He spoke to me and told me.

11   BY MR. H. RUSSELL:

12   Q      And where were you when you had that conversation?

13   A      I believe we had a brief conversation in the parking lot.

14   Q      Okay.  When you say "brief," can you estimate for us how

15   long the conversation was?

16   A      Seconds.

17   Q      And do you recall what specifically Officer Corcoran said

18   to you?

19   A      That he had threatened him.

20   Q      Do you recall if he mentioned a gun?

21   A      I can't recall that.

22   Q      And based on what information you had from

23   Officer Corcoran, why did you tell Mr. Bedetti that you

24   believed 422 would be one of the charges?

25   A      Because it applies when you're threatening someone.  It's
```

1    immediate threat.  It's also unconditional, so I believe that

2    would apply.

3    Q    Did any officer who handcuffed Mr. Bedetti tell you he's

4    under arrest for 422?

5    A    Not that I recall, no.

6    Q    So when you were talking to Mr. Bedetti, were you actually

7    telling him, "I'm placing you under arrest for these charges"?

8    A    I did not, no.

9    Q    What was your purpose in talking to him about charges at

10   all?

11   A    Because he had asked me what charges.

12          MR. H. RUSSELL:  That's all I have, Your Honor.

13          THE COURT:  All right.  Any redirect?

14          MR. PACHOWICZ:  Brief.

15                **REDIRECT EXAMINATION**

16   BY MR. PACHOWICZ:

17   Q    You walked into the picture frame on the last video,

18   correct?  On the video that Mr. Baeza shot, you actually walk

19   up to Mr. Bedetti and talk to him, correct?

20   A    I did speak to him, yes.

21   Q    And in this video right here, the gentleman that's

22   standing across the parking lot -- and we're looking still at

23   Exhibit V-1 -- the gentleman across the parking lot who you

24   referred to as Mr. Mercado, you didn't know his name that

25   night, did you?

1   A     No.

2   Q     Because you wrote in your report "a Hispanic male" because

3   that was the only description you had of him, correct?

4   A     I would have to refer to the report.  I didn't know it was

5   Mr. Mercado that night, that's correct.

6   Q     Please look at Exhibit G-2-1.

7   A     Yes, I did refer to him as a male Hispanic in my report,

8   yes.

9   Q     Because you didn't have any other identifying information

10  about him, correct?

11  A     At that time that's correct.

12  Q     And that time is when you wrote this report, which is

13  after the incident happened, you and the other officers talked

14  in the parking lot for about an hour or two hours, and then you

15  went to the police station and wrote your report, correct?

16  A     I don't recall speaking in the parking lot for two hours,

17  no.

18  Q     How long did you speak in the parking lot to the other

19  officers?

20  A     Probably would be closer to the hour mark, I would

21  imagine.

22  Q     All right.  And you actually documented that the lady who

23  walked over to you and caused you to go into the parking lot

24  and look for these people told you that she observed a

25  Hispanic -- male Hispanic hitting a car window, correct?

```
1    A    That's correct.

2    Q    She didn't say "broke it," did she?

3    A    No.

4    Q    Now, in that video that we were just looking at where you

5    and Officer Corcoran were standing next to each other on what

6    would be the driver's side of the Jeep, you recall that one,

7    Exhibit V-1?

8    A    Yes.

9    Q    There was -- where the Jeep was parking, there was space

10   17, which is a spot, correct?

11   A    Yes.

12   Q    Where you said you think it is; you're not sure.

13   A    That's exactly where I said I think it is, correct.

14   Q    And that spot is what?  Those spots were pretty small,

15   correct, like ten feet?

16   A    I don't know the exact measurements, but they seem

17   smaller, yes.

18   Q    Smaller than normal, right?

19   A    They are smaller parking spots, yes.

20   Q    So that's ten feet, and then there's almost another ten

21   feet where you and Officer Corcoran were standing, correct?

22   A    I believe I was standing in parking lot -- or parking

23   space 17 from the --

24   Q    And your testimony is that Officer Corcoran said nothing

25   to the individual driving the Jeep at all.  The driver of the
```

```
 1   Jeep just piped up and said, "What are you?  The fucking

 2   parking enforcement?  And you're going to give me a ticket,"

 3   correct?

 4   A     No, he spoke to him.  Officer Corcoran spoke to him.

 5   Q     Before the comment that came out of the Jeep about fucking

 6   parking enforcement?

 7   A     Yes, I believe it was before, that's correct.

 8   Q     And what did he say before?

 9   A     From what I recall, he was speaking to him about the

10   parking situation, where he was parking.

11   Q     And what did he say before?

12   A     Something to the effect that the spot was too tight or

13   something like that.  I don't know the exact words, but

14   something regarding the parking spot.

15   Q     So Officer Corcoran actually stopped talking to you to

16   engage the driver of the Jeep, correct?

17   A     I believe so.  That's accurate.

18   Q     And what he engaged the driver of the Jeep on is the

19   distance between the car on the other side of the Jeep and the

20   Jeep, correct?

21   A     He was speaking about the parking spot and the Jeep.

22   Exactly what he said, like I said, I don't recall.

23   Q     And you would agree with me when the Jeep pulled into that

24   spot, you had no idea what the distance was between the Jeep

25   and the car to the right of it, correct?
```

| | |
|---|---|
| 1 | A    I don't recall if I knew the distance when he pulled in. |
| 2 | Q    You couldn't see it because the Jeep is in the way, right? |
| 3 | A    The Jeep was in the parking spot. |
| 4 | Q    And so you couldn't see the car to the right of that, |
| 5 | correct? |
| 6 | A    Not when the Jeep was completely parked, that's correct. |
| 7 | Q    And you were in the same location as Officer Corcoran was, |
| 8 | correct? |
| 9 | A    I was in the area, that's correct. |
| 10 | MR. PACHOWICZ:  Nothing else. |
| 11 | THE COURT:  All right.  Recross? |
| 12 | MR. H. RUSSELL:  No, thank you, Your Honor. |
| 13 | THE COURT:  All right.  Thank you, Officer Bacon. |
| 14 | You may step down. |
| 15 | We will now take our lunch break, and we will return at |
| 16 | 1:45. |
| 17 | THE COURTROOM DEPUTY:  All rise. |
| 18 | THE COURT:  We are in recess. |
| 19 | (Proceedings concluded at 12:29 p.m.) |
| 20 | ---oOo--- |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**UNITED STATES DISTRICT COURT**

1              **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6             I, CAROL JEAN ZURBORG, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  May 30, 2017

17

18

19                        /s/ CAROL JEAN ZURBORG
                    _____
20                  CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                    Federal Official Court Reporter
21

22

23

24

25

**UNITED STATES DISTRICT COURT**